

Your Missouri Courts                                    .net

Search for Cases by: Select Search Method...

**Judicial Links** | **eFiling** | **Help** | **Contact Us** | **Print**        GrantedPublicAccess  Logoff BRSHANK0183

20JE-CC00277 - BEN SCOFIELD V WSTR HOLDINGS, INC. D/B/A BIG ET AL (E-CASE)

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |
|---|---|---|---|---|---|---|---|---|

This information is provided as a service and is not considered an official court record.

**Click here to eFile on Case**                  Sort Date Entries: ◉ Descending    **Display Options:**
**Click here to Respond to Selected Documents**              ○ Ascending         All Entries

---

**10/30/2020** ☐ **Summons Withdrawn**
Document ID - 20-SMCC-655; Served To - BUCHHEIT OF HERCULANEUM, INC; Server - ; Served Date - 30-OCT-20; Served Time - 00:00:00; Service Type - Other; Reason Description - Recalled/Withdrawn

☐ **Order of Dismissal**
PROPOSED ORDER TO DISMISS BUCHHEIT OF HERCULANEUM ONLY GRANTED. CLAIMS ARE STILL PENDING AGAINST OTHER DEFENDANTS. SO ORDERED; VICTOR MELENBRINK, CIRCUIT JUDGE DIV. FIVE

**09/22/2020** ☐ **Case Mgmt Conf Scheduled**
Scheduled For: 07/09/2021;  9:00 AM ;  VICTOR JOSEPH MELENBRINK;  Jefferson

☐ **Jury Trial Scheduled**
Scheduled For: 10/04/2021;  8:30 AM ;  VICTOR JOSEPH MELENBRINK;  Jefferson

**09/18/2020** ☐ **Hearing Held**
Scheduled For: 09/18/2020;  9:00 AM ;  VICTOR JOSEPH MELENBRINK;  Jefferson

**09/17/2020** ☐ **Proposed Order Filed**
Proposed order granting Buchheits motion to dismiss; Electronic Filing Certificate of Service. SENT TO JUDGE FOR SIGNATURE
**Filed By:** BRIAN RICHARD SHANK
**On Behalf Of:** WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC., BUCHHEIT OF HERCULANEUM, INC

☐ **Proposed Order Filed**
Proposed Joint scheduling order; Electronic Filing Certificate of Service. SO ORDERED; VICTOR MELENBRINK, CIRCUIT JUDGE DIV. FIVE
**Filed By:** BRIAN RICHARD SHANK

**08/13/2020** ☐ **Case Review Scheduled**
This case will be heard remotely via the Zoom teleconference platform. Parties appearing for this docket must either install the Zoom application on a phone or tablet, or must use the Zoom software on a laptop or desktop computer. Registration for a Zoom account is required for attorneys, and strongly encouraged for everyone else. Presence by video is also strongly encouraged, but not required. Upon signing in to the meeting you will be assigned to the waiting room until your case is taken up. It is recommended that attendees use the link below to test their ability to connect to the meeting beforehand. If an attorney or party is unable to comply with the above requirements, contact the court BEFORE the court date. Topic: JeffCo Div 5 (Melenbrink) Docket Time: This is a recurring meeting Meet anytime Join Zoom Meeting https://us02web.zoom.us/j/86514317935 Meeting ID: 865 1431 7935 One tap mobile +13126266799,,86514317935# US (Chicago) +16465588656,,86514317935# US (New York) Dial by your location +1 312 626 6799 US (Chicago) +1 646 558 8656 US (New York) +1 301 715 8592 US (Germantown) +1 669 900 9128 US (San Jose) +1 253 215 8782 US (Tacoma) +1 346 248 7799 US (Houston) Meeting ID: 865 1431 7935 Find your local number: https://us02web.zoom.us/u/kbyh9FJhOx ------------------- IF SCHEDULING ORDER FILED, NO APPEARANCE REQURIED
**Associated Entries: 09/18/2020 - Hearing Held**

Exhibit A

**Scheduled For:** 09/18/2020;  9:00 AM ;  VICTOR JOSEPH MELENBRINK;  Jefferson

**Hearing Held**
VIA ZOOM. MT GRANTED OVER DEFENDANT'S OBJECTION. ATTORNEY KARFIS TO DRAFT PROPOSED ORDER AND EMAIL TO JUDGE.
**Scheduled For:** 08/13/2020;  10:30 AM ;  VICTOR JOSEPH MELENBRINK;  Jefferson

07/31/2020   **Order**
FOR PRO HAC VICE SO ORDERED; VICTOR MELENBRINK, CIRCUIT JUDGE DIV. FIVE

**Order**
GRANTING DEFENDANT'S CONSENT MOTION TO ADMIT SO ORDERED; VICTOR MELENBRINK, CIRCUIT JUDGE DIV. FIVE

07/30/2020   **Proposed Order Filed**
PROPOSED ORDER GRANTING MILTON KARFIS PRO HAC VICE. SENT TO JUDGE FOR SIGNATURE
**Filed By:** BRIAN RICHARD SHANK

**Proposed Order Filed**
PROPOSED ORDER ADMITTING STEPHANIE M ANDERSON PRO HAC VICE. SENT TO JUDGE FOR SIGNATURE
**Filed By:** BRIAN RICHARD SHANK

**Motion Filed**
Motion pro hac Karfis; Exhibit A; Exhibit B; Electronic Filing Certificate of Service.
**Filed By:** BRIAN RICHARD SHANK
**On Behalf Of:** WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC., BUCHHEIT OF HERCULANEUM, INC

**Motion Filed**
Motion pro hac Anderson; Exhibit A; Exhibit B; Electronic Filing Certificate of Service.
**Filed By:** BRIAN RICHARD SHANK

07/29/2020   **Cert Serv Answers Interrog Fil**
COS-Plaintiffs Answers Resp to Def Expert Rogs RFP; Electronic Filing Certificate of Service.
**Filed By:** DANIEL THOMAS RYAN
**On Behalf Of:** BENJAMIN ISAAC SCOFIELD

07/10/2020   **Response Filed**
Response to motion for trial setting; Electronic Filing Certificate of Service. SENT TO JUDGE FOR SIGNATURE
**Filed By:** BRIAN RICHARD SHANK
**On Behalf Of:** WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC., BUCHHEIT OF HERCULANEUM, INC

**Response Filed**
MOTION TO BE TAKEN UP ON THE 08/13/2020 DOCKET @ 10:30 AM SO ORDERED; VICTOR MELENBRINK, CIRCUIT JUDGE DIV. FIVE

07/09/2020   **Notice to Take Deposition**
CROSS NOTICE OF VIDEO TAPED TRIAL DEPOSITION OF WILLIAM CARDEN on August 12, 2020 @ 10:00 am; Electronic Filing Certificate of Service.
**Filed By:** DANIEL THOMAS RYAN
**On Behalf Of:** BENJAMIN ISAAC SCOFIELD

07/07/2020   **Notice to Take Deposition**
Notice of deposition; Electronic Filing Certificate of Service.
**Filed By:** BRIAN RICHARD SHANK
**On Behalf Of:** WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC., BUCHHEIT OF HERCULANEUM, INC

**Cert Serv of Interrog Filed**
Certificate of service; Electronic Filing Certificate of Service.

Exhibit A

Filed By: BRIAN RICHARD SHANK
On Behalf Of: WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC., BUCHHEIT OF HERCULANEUM, INC

**07/01/2020** ☐ **Notice of Hearing Filed**
Notice of Hearing re Trial Setting; Electronic Filing Certificate of Service.
    **Filed By:** DANIEL THOMAS RYAN
    **On Behalf Of:** BENJAMIN ISAAC SCOFIELD

☐ **Motion for Trial Setting**
Motion for Trial Setting; Electronic Filing Certificate of Service.
    **Filed By:** DANIEL THOMAS RYAN
    **On Behalf Of:** BENJAMIN ISAAC SCOFIELD

**06/30/2020** ☐ **Judge/Clerk - Note**
This case will be heard remotely via the Zoom teleconference platform. Parties appearing for this docket must either install the Zoom application on a phone or tablet, or must use the Zoom software on a laptop or desktop computer. Registration for a Zoom account is required for attorneys, and strongly encouraged for everyone else. Presence by video is also strongly encouraged, but not required. Upon signing in to the meeting you will be assigned to the waiting room until your case is taken up. It is recommended that attendees use the link below to test their ability to connect to the meeting beforehand. If an attorney or party is unable to comply with the above requirements, contact the court BEFORE the court date. Topic: JeffCo Div 5 (Melenbrink) Docket Time: This is a recurring meeting Meet anytime Join Zoom Meeting https://us02web.zoom.us/j/86514317935 Meeting ID: 865 1431 7935 One tap mobile +13126266799,,86514317935# US (Chicago) +16465588656,,86514317935# US (New York) Dial by your location +1 312 626 6799 US (Chicago) +1 646 558 8656 US (New York) +1 301 715 8592 US (Germantown) +1 669 900 9128 US (San Jose) +1 253 215 8782 US (Tacoma) +1 346 248 7799 US (Houston) Meeting ID: 865 1431 7935 Find your local number: https://us02web.zoom.us/u/kbyh9FJhOx
-------------------

☐ **Motion Hearing Scheduled**
    Associated Entries: 08/13/2020 - Hearing Held   ⊞
    Scheduled For: 08/13/2020;  10:30 AM ;  VICTOR JOSEPH MELENBRINK;  Jefferson

**06/29/2020** ☐ **Notice of Hearing Filed**
Notice of Hearing; Electronic Filing Certificate of Service.
    **Filed By:** BRIAN RICHARD SHANK
    **On Behalf Of:** BUCHHEIT OF HERCULANEUM, INC

**06/10/2020** ☐ **Memo of Law in Suppt of Filed**
Memorandum in Support of Motion to Dismiss; Electronic Filing Certificate of Service.
    **Filed By:** BRIAN RICHARD SHANK
    **On Behalf Of:** BUCHHEIT OF HERCULANEUM, INC

☐ **Motion to Dismiss**
Motion to dismiss; Exhibit A; Exhibit B; Exhibit C; Exhibit D; Exhibit E; Electronic Filing Certificate of Service. SENT TO DIV
    **Filed By:** BRIAN RICHARD SHANK

**05/29/2020** ☐ **Amended Answer Filed**
First amended answer; Electronic Filing Certificate of Service.
    **Filed By:** BRIAN RICHARD SHANK
    **On Behalf Of:** WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC., BUCHHEIT OF HERCULANEUM, INC

**05/19/2020** ☐ **Answer Filed**
    **Filed By:** BRIAN RICHARD SHANK
    **On Behalf Of:** WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC., BUCHHEIT OF HERCULANEUM, INC

☐ **Entry of Appearance Filed**

Exhibit A

Entry of Appearance on behalf of WSTR Holdings, Inc dba Big Dog Treestands, Inc Buchheit of Herculaneum, Inc; Electronic Filing Certificate of Service.
    **Filed By:** BRIAN RICHARD SHANK

☐ **Summons Issued-Circuit**
Document ID: 20-SMCC-655, for BUCHHEIT OF HERCULANEUM, INC.

☐ **Summons Issued-Circuit**
Document ID: 20-SMCC-654, for WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC..

☐ **Summ Req-Circuit Pers Serv**
Memo to Clerk Requesting Summons Be Issued.
    **Filed By:** DANIEL THOMAS RYAN
    **On Behalf Of:** BENJAMIN ISAAC SCOFIELD

**04/16/2020** ☐ **Judge/Clerk - Note**
OVERPAYMENT OF $2 WILL BE REFUNDED

☐ **Filing Info Sheet eFiling**
    **Filed By:** DANIEL THOMAS RYAN

☐ **Note to Clerk eFiling**
    **Filed By:** DANIEL THOMAS RYAN

☐ **Pet Filed in Circuit Ct**
PETITION.
    **On Behalf Of:** BENJAMIN ISAAC SCOFIELD

☐ **Judge Assigned**

Exhibit A

**20JE-CC00277**

Electronically Filed - Jefferson - April 16, 2020 - 12:26 PM

IN THE CIRCUIT COURT OF JEFFERSON COUNTY
STATE OF MISSOURI

| | |
|---|---|
| BEN SCOFIELD )<br>    A Missouri resident )<br>    )<br>    Plaintiff )<br>    )<br>vs. )<br>    )<br>    )<br>WSTR HOLDINGS, INC. D/B/A BIG DOG)<br>TREESTANDS, INC. )<br>    A Illinois Corporation )<br>    )<br>**HOLD SERVICE**: )<br>Ketra A. Mytech )<br>1230 W. Candletree Drive., Suite A )<br>Peoria, IL 61614 )<br>    )<br>    And )<br>    )<br>BUCHHEIT OF HERCULANEUM, INC., )<br>    A Missouri Corporation )<br>    )<br>**HOLD SERVICE**: )<br>Reid Willen )<br>33 PCR 53 )<br>Perryville, MO 63775 )<br>    )<br>    Defendants. ) | Cause Number:<br><br>Division:<br><br><br>JURY TRIAL DEMANDED |

**PETITION**
**COUNT I – STRICT LIABILITY**

Comes now plaintiff, Ben Scofield and for Count I of his cause of action against

defendants WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. and Buchheit of Herculaneum,

Inc. and states as follows:

1.    Plaintiff Ben Scofield is now and was at all times herein mentioned a resident and

citizen of the State of Missouri. Plaintiff's injury as more fully described below was sustained in

Exhibit A

Electronically Filed - Jefferson - April 16, 2020 - 12:26 PM

Jefferson County, State of Missouri therefore jurisdiction and venue are proper in the Circuit Court of Jefferson County.

2.     Defendant WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. is and was at all times herein mentioned a  duly organized and existing corporation  under the laws of the state of Illinois and was doing business designing, manufacturing, and selling treestands for deer hunting including the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 (hereafter referred to as the treestand) involved in this incident.

3.     Defendant Buchheit of Herculaneum, Inc. is and was at all times herein mentioned a corporation duly organized and existing under the laws of the State of Missouri and was doing business selling treestands for deer hunting including the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 involved in this incident.

4.     On or about August 27, 2015 plaintiff was installing a Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 on a tree on property in Ware, Missouri off Brownfield Road in preparation for deer hunting. As plaintiff was at the top of the treestand when finishing the installation, he grabbed the top section of the treestand to steady his way down at which time the treestand snapped and caused him to fall.

5.     At the time the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 was designed, manufactured, and sold by defendants WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. the climbing stick treestand was then in a defective condition and unreasonably dangerous when put to a reasonably anticipated use in that the climbing stick treestand was insufficiently designed and/or manufactured so that it would hold plaintiff, would not break when used by plaintiff and prevent plaintiff from falling and sustaining severe injuries.

Exhibit A

Electronically Filed - Jefferson - April 16, 2020 - 12:26 PM

6.      The Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 referred to above was used by plaintiff in a manner reasonably anticipated by defendants.

7.      That as a direct and proximate result of the defective and unreasonably dangerous condition of the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 designed, manufactured, and sold by defendants plaintiff has been caused to sustain the following damages to wit: plaintiff sustained injuries to his back, right heel resulting in a fracture, burst fractures at T11 through L3 , and thoracic and lumbar compression fractures which required surgical implantation of rods and screws in his back; plaintiff has incurred medical expenses to date in an amount in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) and continues to incur medical expenses for continuing medical care; plaintiff has lost wages in an amount to be determined and his ability to work, labor and enjoy life has been significantly impaired and diminished.

WHEREFORE plaintiff prays judgment against defendants, and each of them, in an amount which is fair and reasonable in excess of $25,000.00 plus any further relief the Court deems just and proper.

## COUNT II – STRICT LIABILITY FAILURE TO WARN

Comes now plaintiff, Ben Scofield and for Count II of his cause of action against defendants WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and states as follows:

8.      Plaintiff reincorporates and re-alleges paragraphs 1-7 of his petition as fully set forth herein.

9.      The above mentioned Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 was defective and unreasonably dangerous at the time it was designed, manufactured and sold by

Exhibit A

Electronically Filed - Jefferson - April 16, 2020 - 12:26 PM

defendants in that the climbing stick was insufficiently designed and/or manufactured so that it would not break when used by plaintiff,  would hold plaintiff when climbing and would therefore prevent plaintiff from falling and sustaining severe injuries.

10.     That defendants and each of them did not give adequate warning of the dangerous condition of the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 as aforesaid.

11.     That plaintiff was using the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 in a manner reasonably anticipated by defendants and each of them and as a direct and proximate result of the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 being sold without an adequate warning, plaintiff sustained damages as set forth in paragraph 7 above.

WHEREFORE plaintiff prays judgment against defendants, and each of them, in an amount which is fair and reasonable in excess of $25,000.00 plus any further relief the Court deems just and proper.

## COUNT III – NEGLIGENCE

Comes now plaintiff, Ben Scofield and for Count III of his cause of action against defendants WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and states as follows:

12.     Plaintiff reincorporates and re-alleges paragraphs 1-11 of his petition as fully set forth herein.

13.     The above mentioned Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 was defective and unreasonably dangerous at the time it was designed, manufactured and sold by defendants in that the climbing stick was insufficiently designed and/or manufactured so that it would not break when used by plaintiff,  would hold plaintiff when climbing and would therefore prevent plaintiff from falling and sustaining severe injuries.

Exhibit A

Electronically Filed - Jefferson - April 16, 2020 - 12:26 PM

14.     That defendants knew or should have known of the dangerous condition of the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 and had no reason to believe that plaintiff would realize the dangerous condition.

15.     That Defendants failed to use ordinary care to either design the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 to be reasonably safe or defendants failed to use ordinary care to warn plaintiff and others of the risk and hazardous condition of the Big Dog 20- foot Hot Foot Climbing Stick BDSL-20 as aforesaid and as a direct and proximate result of defendants' negligence plaintiff has sustained damages as set forth in paragraph 7 above.

Exhibit A

Electronically Filed - Jefferson - April 16, 2020 - 12:26 PM

WHEREFORE plaintiff prays judgment against defendants, and each of them, in an amount which is fair and reasonable in excess of $25,000.00 plus any further relief the Court deems just and proper.

LAW OFFICE OF DANIEL T. RYAN, LLC


By:    \_\_/S/Daniel T. Ryan_____
        Daniel T. Ryan, #38744
        Attorney for Plaintiff
        3008 Sutton Blvd., Suite 100
        Maplewood, MO  63143
        314.222.7717
        314.932.2688 (facsimile)
        dan@danryanlawoffice.com

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 12:52 PM

IN THE CIRCUIT COURT OF JEFFERSON COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD | ) | |
|     A Missouri resident | ) | |
| | ) | |
|     Plaintiff | ) | |
| | ) | |
| vs. | ) | Cause Number:20JE-CC00277 |
| | ) | |
| | ) | Division: |
| WSTR HOLDINGS, INC. D/B/A BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
|     A Illinois Corporation | ) | |
| | ) | JURY TRIAL DEMANDED |
| **SERVE**: | ) | |
| Ketra A. Mytech | ) | |
| 1230 W. Candletree Drive., Suite A | ) | |
| Peoria, IL 61614 | ) | |
| | ) | |
|     And | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC., | ) | |
|     A Missouri Corporation | ) | |
| | ) | |
| **SERVE**: | ) | |
| Reid Willen | ) | |
| 33 PCR 53 | ) | |
| Perryville, MO 63775 | ) | |
| | ) | |
|     Defendants. | ) | |

## <u>MEMO TO CLERK</u>

Comes now Plaintiff and respectfully moves that a Summons be ordered to issue to the

following defendants:

WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC.
**SERVE REGISTERED AGENT**:
Ketra A. Mytech, 1230 W. Candletree Drive., Suite A, Peoria, IL 61614

BUCHHEIT OF HERCULANEUM, INC.
**SERVE REGISTERED AGENT**:
Reid Willen, 33 PCR 53, Perryville, MO 63775

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 12:52 PM

**LAW OFFICE OF DANIEL T. RYAN, LLC**

By:      \_\_/S/Daniel T. Ryan_____
       Daniel T. Ryan, #38744
       Attorney for Plaintiff
       3008 Sutton Blvd., Suite 100
       Maplewood, MO  63143
       314.222.7717
       314.932.2688 (facsimile)
       dan@danryanlawoffice.com

Exhibit A



# IN THE 23RD JUDICIAL CIRCUIT, JEFFERSON COUNTY, MISSOURI

| Judge or Division:<br>VICTOR JOSEPH MELENBRINK | Case Number:  20JE-CC00277 |
|---|---|
| Plaintiff/Petitioner:<br>BENJAMIN ISAAC SCOFIELD<br><div align="right">vs.</div> | Plaintiff's/Petitioner's Attorney/Address<br>DANIEL THOMAS RYAN<br>1717 PARK AVE<br>SAINT LOUIS, MO  63104 |
| Defendant/Respondent:<br> WSTR HOLDINGS, INC. D/B/A BIG DOG<br>TREESTANDS, INC. | Court Address:<br>P O BOX 100<br>300 MAIN ST<br>HILLSBORO, MO  63050 |
| Nature of Suit:<br>CC Pers Injury-Prod Liab | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC.
<div align="center">Alias:</div>

ATTENTION: KETRA A. MYTECH
1230 W. CANDLETREE DRIVE, #A
PEORIA, IL  61614



*COURT SEAL OF*

*JEFFERSON COUNTY*

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

MAY 19, 2020
 Michael E. Reuter, Circuit Clerk
By: /s/ ERobinson Deputy Clerk

### Sheriff's or Server's Return

**Note to serving officer**: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with
_____, a person of the defendant's/respondent's family over the age of
15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
<div align="center">Printed Name of Sheriff or Server                          Signature of Sheriff or Server</div>
<div align="center">**Must be sworn before a notary public if not served by an authorized officer:**</div>

<div align="center">Subscribed and sworn to before me on _____ (date).</div>

*(Seal)*

<div align="center">My commission expires: _____          _____</div>
<div align="center">Date                                                    Notary Public</div>

| **Sheriff's Fees, if applicable** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.



# IN THE 23RD JUDICIAL CIRCUIT, JEFFERSON COUNTY, MISSOURI

| Judge or Division:<br>VICTOR JOSEPH MELENBRINK | Case Number:  20JE-CC00277 |
|---|---|
| Plaintiff/Petitioner:<br>BENJAMIN ISAAC SCOFIELD<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>DANIEL THOMAS RYAN<br>1717 PARK AVE<br>SAINT LOUIS, MO  63104 |
| Defendant/Respondent:<br> WSTR HOLDINGS, INC. D/B/A BIG DOG<br>TREESTANDS, INC. | Court Address:<br>P O BOX 100<br>300 MAIN ST<br>HILLSBORO, MO  63050 |
| Nature of Suit:<br>CC Pers Injury-Prod Liab | (Date File Stamp) |

## Summons in Civil Case

| The State of Missouri to:  BUCHHEIT OF HERCULANEUM, INC<br>Alias: |
|---|

**ATTENTION: REID WILLEN**
**33 PCR 53**
**PERRYVILLE, MO  63775**
*COURT SEAL OF*



*JEFFERSON COUNTY*

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

MAY 19, 2020
 Michael E. Reuter, Circuit Clerk
By: /s/ ERobinson Deputy Clerk

### Sheriff's or Server's Return

**Note to serving officer**: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____       _____
Printed Name of Sheriff or Server                               Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____       _____
                                            Date                                             Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $      10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

 A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. D/B/A BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY OF APPEARANCE

COME NOW Evans & Dixon, L.L.C., and Brian R. Shank, and hereby enter their appearance as counsel for defendants WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC.

Respectfully submitted,

EVANS AND DIXON, L.L.C.

By: /s/ Brian R. Shank
    Brian R. Shank  (#59955)
    Metropolitan Square
    211 North Broadway, Ste. 2500
    St. Louis, MO 63102
    Phone: (314) 621-7755
    Fax:    (314) 621-3136
    bshank@evans-dixon.com

*ATTORNEYS FOR DEFENDANTS*
*BIG DOG TREESTANDS, INC. AND BUCHHEIT*
*OF HERCULANEUM, INC.*

Exhibit A

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system on this 19th day of May, 2020.

                                                    __/s/ Brian R. Shank_____

4434507

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

Exhibit A

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS WSTR HOLDINGS, INC. AND BUCHHEIT OF HERCULANEUM,
INC.'S FIRST AMENDED ANSWER TO PETITION FOR DAMAGES**

NOW COME Defendants WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS,
INC. (hereinafter, "Defendant Big Dog Treestands, Inc.") and BUCHHEIT OF
HERCULANEUM, INC., (hereinafter, "Defendant Buchheit of Herculaneum, Inc.") by and
through their attorneys, and state as follows for their first amended answer to Plaintiff's Petition
as a matter of course pursuant to Rule 55.33(a):

COUNT I – STRICT LIABILITY

1.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. lack
sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph
1; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff
is left to his proofs.

2.      Defendant WSTR Holdings, Inc. d/b/a Big Dog TreeStands, Inc. admits it is an
Illinois corporation with its principle place of business in Illinois which sells various hunting
products, including a Climbing Stick, Model BDSL-20. The remainder of the paragraph is neither

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

admitted nor denied; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff is left to his proofs.

3.      Defendant Buchheit of Herculaneum, Inc. admits it is a Missouri corporation with its principal place of business in Missouri which sells various hunting products, including a Climbing Stick, Model BDSL-20. The remainder of the paragraph is neither admitted nor denied; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff is left to his proofs.

4.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. lack sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 4; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff is left to his proofs.

5.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc., and deny deny the allegations in paragraph 5.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

6.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. lack sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 6; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff is left to his proofs.

7.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 7.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

ClarkHill\36755\314761\223914207.v1-5/28/20

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

WHEREFORE Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. request this court enter a judgment of no cause and dismiss this action with prejudice together with costs and attorney fees wrongfully incurred.

<u>COUNT II – STRICT LIABILITY FAILURE TO WARN</u>

8.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. incorporate by reference their response to paragraphs 1-7 of this Petition as if fully set forth under Count 2 herein.

9.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 9.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc., Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

10.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 10.

11.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 11.

WHEREFORE Defendants request this court enter a judgment of no cause and dismiss this action with prejudice together with costs and attorney fees wrongfully incurred.

<u>COUNT III - NEGLIGENCE</u>

12.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. incorporate by reference their response to paragraphs 1-11 of this Petition as if fully set forth under Count 3 herein.

13.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 13.  Defendants further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

ClarkHill\36755\314761\223914207.v1-5/28/20

Exhibit A

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

14.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 14.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

15.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 15.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

WHEREFORE Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. request this court enter a judgment of no cause and dismiss this action with prejudice together with costs and attorney fees wrongfully incurred.

ClarkHill\36755\314761\223914207.v1-5/28/20

Exhibit A

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

## SPECIAL AND/OR AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and first defense to Plaintiff's Petition for Damages state that the petition fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and second defense to Plaintiff's Petition for Damages state that the Plaintiff had a duty to mitigate damages and failed to do so.

### THIRD DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and third defense to Plaintiff's Petition state that the Plaintiff failed to exercise reasonable care and caution for Plaintiff's own safety in that Plaintiff failed to act as a reasonably prudent person would under the circumstances, failed to take precautions for Plaintiff's own safety, and such conduct was the sole and/or contributing cause of Plaintiff's own injuries and damages alleged.

### FOURTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and fourth defense to Plaintiff's Petition state that the Plaintiff was negligent, contributorily negligent, and/or comparatively negligent in the incident in that Plaintiff failed to act as a reasonably prudent person would under the circumstances, failed to take precautions for Plaintiff's own safety and/or in general failed to exercise the reasonable degree of care for the

Exhibit A

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

circumstances then and there existing proximately resulting in the alleged injuries as will be more fully developed prior to the conclusion of discovery and prior to the trial of this matter.

## FIFTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and fifth defense to Plaintiff's Petition state that there was intervening and superseding negligence of others including the Plaintiff and others unknown to Defendants at this time such that the injuries or damages suffered by the Plaintiff were caused in whole or in part by the acts or omissions of the Plaintiff, and/or by other non-parties so that the alleged injuries and damages suffered by the Plaintiff were not proximately caused by the acts or omissions of Defendants.

## SIXTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and sixth defense to Plaintiff's Petition state that Plaintiff's claims are barred in whole or in part because the comparative fault of Plaintiff is greater than the aggregate fault of persons, whether or not parties to this action.

## SEVENTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and seventh defense to Plaintiff's Petition state that Plaintiff seeks to recover for injuries that were caused by an inherent characteristic of the product which is a generic part of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

ClarkHill\36755\314761\223914207.v1-5/28/20

Exhibit A

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

**EIGHTH DEFENSE**

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and eighth defense to Plaintiff's Petition state that Plaintiff's claims are barred, in whole or in part, because Plaintiff assumed an appreciated, known or obvious risk to his own safety.

**NINTH DEFENSE**

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and ninth defense to Plaintiff's Petition state that the risk of harm of which Plaintiff complains was open and obvious and/or a matter of common knowledge, or it should have otherwise been aware of the risk and/or that Plaintiff assumed any risk associated with the use of the subject product.

**TENTH DEFENSE**

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and tenth defense to Plaintiff's Petition state that the product about which Plaintiff complains was materially altered and/or modified after it left the control of Defendants.

**ELEVENTH DEFENSE**

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and eleventh defense to Plaintiff's Petition state that the product conformed with generally recognized state of the art applicable to the safety of the product at the time the product was designed, manufactured, packaged and labeled.

ClarkHill\36755\314761\223914207.v1-5/28/20

Exhibit A

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

### TWELFTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and twelfth defense to Plaintiff's Petition state that Defendant breached no express or implied warranties pertaining to this product.

### THIRTEENTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and thirteenth defense to Plaintiff's Petition state that the Plaintiff's claim is barred because the product complied with applicable governmental or voluntary requirements.

### FOURTEENTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and fourteenth defense to Plaintiff's Petition state that the actions of a potential nonparty were the cause, in whole or in part, of any of the Plaintiff's alleged injuries.

### FIFTEENTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and fifteenth defense to Plaintiff's Petition state that Defendant reserves the right to amend, delete, add or alter the special and/or affirmative defenses during the course of discovery and trial of this matter.

### SIXTEENTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and sixteenth defense to Plaintiff's Petition state that to the extent that discovery supports the same, Defendants assert the defenses of product abuse, produce misuse, and/or production modification.

Exhibit A

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

## SEVENTEENTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and seventeenth defense to Plaintiff's Petition state that any warnings given by Defendants were adequate and/or any failure to warn was not the proximate cause of any alleged injury.

## EIGHTEENTH DEFENSE

Further Defendants aver that Plaintiff's damages should be assessed based upon the rebuttable presumption of the value of the damages based upon the actual amounts paid to satisfy the costs of the services or materials provided, pursuant to Mo. Rev. Stat. sec. 490.715.5.  The dollar amount necessary to satisfy the financial obligation to any of Plaintiff's health care providers represents the value of the medical treatment rendered, and no other amount should be presented to the jury, absent a motion, hearing, and court order to determine the measure of such damages.

## NINETEENTH DEFENSE

 Further Defendants aver that any verdict rendered and/or judgment entered in this matter on behalf of Plaintiff should be reduced by all applicable settlements with any and all co-defendants, other tort-feasors, and/or insurance carriers or any other person, firm or corporation alleged to be liable for Plaintiff's claimed damages; and Defendants reserve the right of credit or set-off for any amounts paid to, or for settlement or settlements or payment of damages to the plaintiff by any other parties or entities, settling tort-feasors or other non-collateral sources arising out of the subject incident or injuries or damages alleged by Plaintiff, pursuant to R.S.Mo. 537.060.

ClarkHill\36755\314761\223914207.v1-5/28/20

Exhibit A

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

### TWENTIETH DEFENSE

Further Defendants aver that Plaintiff's damages, which are denied by Defendants, were caused in whole or in part by events which preceded or were subsequent to the incident which is the subject of Plaintiff's Petition.

### TWENTY-FIRST DEFENSE

Further Defendants aver that any recovery by Plaintiff shall be diminished by Plaintiff's own fault by failing to use the product as reasonably anticipated by the manufacturer or Defendants, as set out in Mo.Rev.Stat §537.765.

### TWENTY-SECOND DEFENSE

Further Defendants aver that any recovery shall be diminished by Plaintiff's use of the product for a purpose not intended by the manufacturer or Defendants, as set out in Mo.Rev.Stat §537.765.

### TWENTY-THIRD DEFENSE

Further Defendants aver that any recovery shall be diminished by Plaintiff's use of the product with knowledge of a danger involved in such use with reasonable appreciation of the consequences and the voluntary and unreasonable exposure to that danger, as set out in Mo.Rev.Stat §537.765.

### TWENTY-FOURTH DEFENSE

Further Defendants aver that any recovery by Plaintiffs shall be diminished by Plaintiff's unreasonable failure to appreciate the danger involved in the use of the product or the consequences thereof and the unreasonable exposure to that danger, as set out in Mo.Rev.Stat §537.765.

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

### TWENTY-FIFTH DEFENSE

Further Defendants aver that any recovery by Plaintiff shall be diminished by Plaintiff's failure to undertake the precautions a reasonably careful user of the product would take to protect himself against dangers which he would reasonably appreciate under the same or similar circumstances, as set out in Mo.Rev.Stat §537.765.

### TWENTY-SIXTH DEFENSE

Further Defendants aver that any recovery by Plaintiff shall be diminished by Plaintiff's failure to mitigate his damages, as set out in Mo.Rev.Stat §537.765.

### TWENTY-SEVENTH DEFENSE

Further each Defendant avers that if it is found to be less than 51% at fault, that it is only responsible for the percentage of fault assessed to it, pursuant to Missouri Revised Statute.

### TWENTY-EIGHTH DEFENSE

For its further defense, Defendant Buchheit of Herculaneum, Inc. states that it should be dismissed as set out in Mo.Rev.Stat §537.762 because its liability is based solely on its alleged status as a seller of the subject product identified as a Big Dog Climbing Stick model BDLS-20 in the stream of commerce and another Defendant, including the upstream seller, designer and/or manufacturer of the subject product, is properly before the Court and total recovery may be had for Plaintiff's claim from such other Defendant.

### RELIANCE ON JURY DEMAND

Defendants Buchheit of Herculaneum, Inc. and Big Dog Treestands, Inc. aver hereby relies upon Plaintiff's Jury Demand.

Respectfully submitted this 29th day of May, 2020.

11

Electronically Filed - Jefferson - May 29, 2020 - 02:20 PM

Respectfully submitted,

EVANS AND DIXON, L.L.C.

By:  /s/ Brian R. Shank
Brian R. Shank  (#59955)
Metropolitan Square
211 North Broadway, Ste. 2500
St. Louis, MO 63102
Phone: (314) 621-7755
Fax:    (314) 621-3136
bshank@evans-dixon.com

*ATTORNEYS FOR DEFENDANTS*
*BIG DOG TREESTANDS, INC. AND BUCHHEIT*
*OF HERCULANEUM, INC.*

## CERTIFICATE OF SERVICE

This is to certify that the above and foregoing document has been served on all counsel of record on this 29th day of May, 2020, through the Court's ECF system.

/s/Brian R. Shank

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

BEN SCOFIELD,                          )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )        Cause No: 20JE-CC00277
                                       )
WSTR HOLDINGS, INC. D/B/A BIG DOG)
TREESTANDS, INC.                       )
                                       )
and                                    )
                                       )
BUCHHEIT OF HERCULANEUM, INC.    )
                                       )
        Defendants.                    )

**DEFENDANTS WSTR HOLDINGS, INC. AND BUCHHEIT
OF HERCULANEUM, INC.'S ANSWER TO PETITION FOR DAMAGES**

NOW COME Defendants WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC. (hereinafter, "Defendant Big Dog Treestands, Inc.") and BUCHHEIT OF HERCULANEUM, INC., (hereinafter, "Defendant Buchheit of Herculaneum, Inc.") by and through their attorneys, and in response to Plaintiff's Petition state as follows:

<u>COUNT I – STRICT LIABILITY</u>

1.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. lack sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 1; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff is left to his proofs.

2.      Defendant WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. admits it is an Illinois corporation with its principal place of business in Illinois which sells various hunting products, including a Climbing Stick, Model BDSL-20. The remainder of the paragraph is neither

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

admitted nor denied; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff is left to his proofs.

3.      Defendant Buchheit of Herculaneum, Inc. admits it is a Missouri corporation with its principal place of business in Missouri which sells various hunting products, including a Climbing Stick, Model BDSL-20. The remainder of the paragraph is neither admitted nor denied; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff is left to his proofs.

4.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. lack sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 4; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff is left to his proofs.

5.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc., and deny deny the allegations in paragraph 5.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

6.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. lack sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 6; to the extent a response is nonetheless required, the allegations are denied and thus the Plaintiff is left to his proofs.

7.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 7.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

WHEREFORE Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. request this court enter a judgment of no cause and dismiss this action with prejudice together with costs and attorney fees wrongfully incurred.

<u>COUNT II – STRICT LIABILITY FAILURE TO WARN</u>

8.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. incorporate by reference their response to paragraphs 1-7 of this Petition as if fully set forth under Count 2 herein.

9.      Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 9.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc., Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

10.     Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 10.

11.     Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 11.

WHEREFORE Defendants request this court enter a judgment of no cause and dismiss this action with prejudice together with costs and attorney fees wrongfully incurred.

<u>COUNT III - NEGLIGENCE</u>

12.     Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. incorporate by reference their response to paragraphs 1-11 of this Petition as if fully set forth under Count 3 herein.

13.     Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 13.  Defendants further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

14.     Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 14.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

15.     Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. deny the allegations in paragraph 15.  Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. further state that the Big Dog Climbing Stick model BDLS-20 was reasonably safe.

WHEREFORE Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. request this court enter a judgment of no cause and dismiss this action with prejudice together with costs and attorney fees wrongfully incurred.

ClarkHill\36755\314761\223839723.v1-5/8/20

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

## SPECIAL AND/OR AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and first defense to Plaintiff's Petition for Damages state that the petition fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and second defense to Plaintiff's Petition for Damages state that the Plaintiff had a duty to mitigate damages and failed to do so.

### THIRD DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and third defense to Plaintiff's Petition state that the Plaintiff failed to exercise reasonable care and caution for Plaintiff's own safety in that Plaintiff failed to act as a reasonably prudent person would under the circumstances, failed to take precautions for Plaintiff's own safety, and such conduct was the sole and/or contributing cause of Plaintiff's own injuries and damages alleged.

### FOURTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and fourth defense to Plaintiff's Petition state that the Plaintiff was negligent, contributorily negligent, and/or comparatively negligent in the incident in that Plaintiff failed to act as a reasonably prudent person would under the circumstances, failed to take precautions for Plaintiff's own safety and/or in general failed to exercise the reasonable degree of care for the

ClarkHill\36755\314761\223839723.v1-5/8/20

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

circumstances then and there existing proximately resulting in the alleged injuries as will be more fully developed prior to the conclusion of discovery and prior to the trial of this matter.

### FIFTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and fifth defense to Plaintiff's Petition state that there was intervening and superseding negligence of others including the Plaintiff and others unknown to Defendants at this time such that the injuries or damages suffered by the Plaintiff were caused in whole or in part by the acts or omissions of the Plaintiff, and/or by other non-parties so that the alleged injuries and damages suffered by the Plaintiff were not proximately caused by the acts or omissions of Defendants.

### SIXTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and sixth defense to Plaintiff's Petition state that Plaintiff's claims are barred in whole or in part because the comparative fault of Plaintiff is greater than the aggregate fault of persons, whether or not parties to this action.

### SEVENTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and seventh defense to Plaintiff's Petition state that Plaintiff seeks to recover for injuries that were caused by an inherent characteristic of the product which is a generic part of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

### EIGHTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and eighth defense to Plaintiff's Petition state that Plaintiff's claims are barred, in whole or in part, because Plaintiff assumed an appreciated, known or obvious risk to his own safety.

### NINTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and ninth defense to Plaintiff's Petition state that the risk of harm of which Plaintiff complains was open and obvious and/or a matter of common knowledge, or it should have otherwise been aware of the risk and/or that Plaintiff assumed any risk associated with the use of the subject product.

### TENTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and tenth defense to Plaintiff's Petition state that the product about which Plaintiff complains was materially altered and/or modified after it left the control of Defendants.

### ELEVENTH DEFENSE

Come now Defendants Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and for their answer and eleventh defense to Plaintiff's Petition state that the product conformed with generally recognized state of the art applicable to the safety of the product at the time the product was designed, manufactured, packaged and labeled.

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

**TWELFTH DEFENSE**

Come now Defendants Buchheit of Herculaneum, Inc. and Big Dog Treestands, Inc. and for their answer and twelfth defense to Plaintiff's Petition state that Defendant breached no express or implied warranties pertaining to this product.

**THIRTEENTH DEFENSE**

Come now Defendants Buchheit of Herculaneum, Inc. and Big Dog Treestands, Inc. and for their answer and thirteenth defense to Plaintiff's Petition state that the Plaintiff's claim is barred because the product complied with applicable governmental or voluntary requirements.

**FOURTEENTH DEFENSE**

Come now Defendants Buchheit of Herculaneum, Inc. and Big Dog Treestands, Inc. and for their answer and fourteenth defense to Plaintiff's Petition state that the actions of a potential nonparty were the cause, in whole or in part, of any of the Plaintiff's alleged injuries.

**FIFTEENTH DEFENSE**

Come now Defendants Buchheit of Herculaneum, Inc. and Big Dog Treestands, Inc. and for their answer and fifteenth defense to Plaintiff's Petition state that Defendant reserves the right to amend, delete, add or alter the special and/or affirmative defenses during the course of discovery and trial of this matter.

**SIXTEENTH DEFENSE**

Come now Defendants Buchheit of Herculaneum, Inc. and Big Dog Treestands, Inc. and for their answer and sixteenth defense to Plaintiff's Petition state that to the extent that discovery supports the same, Defendants assert the defenses of product abuse, produce misuse, and/or production modification.

**SEVENTEENTH DEFENSE**

ClarkHill\36755\314761\223839723.v1-5/8/20

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

Come now Defendants Buchheit of Herculaneum, Inc. and Big Dog Treestands, Inc. and for their answer and seventeenth defense to Plaintiff's Petition state that any warnings given by Defendants were adequate and/or any failure to warn was not the proximate cause of any alleged injury.

## EIGHTEENTH DEFENSE

Further Defendants aver that Plaintiff's damages should be assessed based upon the rebuttable presumption of the value of the damages based upon the actual amounts paid to satisfy the costs of the services or materials provided, pursuant to Mo. Rev. Stat. sec. 490.715.5.  The dollar amount necessary to satisfy the financial obligation to any of Plaintiff's health care providers represents the value of the medical treatment rendered, and no other amount should be presented to the jury, absent a motion, hearing, and court order to determine the measure of such damages.

## NINETEENTH DEFENSE

Further Defendants aver that any verdict rendered and/or judgment entered in this matter on behalf of Plaintiff should be reduced by all applicable settlements with any and all co-defendants, other tort-feasors, and/or insurance carriers or any other person, firm or corporation alleged to be liable for Plaintiff's claimed damages; and Defendants reserve the right of credit or set-off for any amounts paid to, or for settlement or settlements or payment of damages to the plaintiff by any other parties or entities, settling tort-feasors or other non-collateral sources arising out of the subject incident or injuries or damages alleged by Plaintiff, pursuant to R.S.Mo. 537.060.

## TWENTIETH DEFENSE

Further Defendants aver that Plaintiff's damages, which are denied by Defendants, were caused in whole or in part by events which preceded or were subsequent to the incident which is the subject of Plaintiff's Petition.

ClarkHill\36755\314761\223839723.v1-5/8/20

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

### TWENTY-FIRST DEFENSE

Further Defendants aver that any recovery by Plaintiff shall be diminished by Plaintiff's own fault by failing to use the product as reasonably anticipated by the manufacturer or Defendants, as set out in Mo.Rev.Stat §537.765.

### TWENTY-SECOND DEFENSE

Further Defendants aver that any recovery shall be diminished by Plaintiff's use of the product for a purpose not intended by the manufacturer or Defendants, as set out in Mo.Rev.Stat §537.765.

### TWENTY-THIRD DEFENSE

Further Defendants aver that any recovery shall be diminished by Plaintiff's use of the product with knowledge of a danger involved in such use with reasonable appreciation of the consequences and the voluntary and unreasonable exposure to that danger, as set out in Mo.Rev.Stat §537.765.

### TWENTY-FOURTH DEFENSE

Further Defendants aver that any recovery by Plaintiffs shall be diminished by Plaintiff's unreasonable failure to appreciate the danger involved in the use of the product or the consequences thereof and the unreasonable exposure to that danger, as set out in Mo.Rev.Stat §537.765.

### TWENTY-FIFTH DEFENSE

Further Defendants aver that any recovery by Plaintiff shall be diminished by Plaintiff's failure to undertake the precautions a reasonably careful user of the product would take to protect himself against dangers which he would reasonably appreciate under the same or similar circumstances, as set out in Mo.Rev.Stat §537.765.

Exhibit A

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

### TWENTY-SIXTH DEFENSE

Further Defendants aver that any recovery by Plaintiff shall be diminished by Plaintiff's failure to mitigate his damages, as set out in Mo.Rev.Stat §537.765.

### TWENTY-SEVENTH DEFENSE

Further each Defendant avers that if it is found to be less than 51% at fault, that it is only responsible for the percentage of fault assessed to it, pursuant to Missouri Revised Statute.

### TWENTY-EIGHTH DEFENSE

Further Big Dog Outdoors, Inc. and Big Dog Tree Stands, Inc., Bucheit of Herculaneum, Inc., and Bucheit Herculaneum, Inc. are improperly identified corporate entities.

### TWENTY-NINTH DEFENSE

Further Big Dog Outdoors, Inc. and Big Dog Tree Stands, Inc., Bucheit of Herculaneum, Inc., and Bucheit Herculaneum, Inc. were neither the manufacturers nor distributors of the Big Dog Climbing Stick model BDLS-20 described in Plaintiff's Petition for Damages and had no involvement with placing the climbing stick into the stream of commerce and are improper parties.

### RELIANCE ON JURY DEMAND

Defendants Buchheit of Herculaneum, Inc. and Big Dog Treestands, Inc. aver hereby relies upon Plaintiff's Jury Demand.

Respectfully submitted this 19th day of May, 2020.


Respectfully submitted,

EVANS AND DIXON, L.L.C.

By: /s/ Brian R. Shank
      Brian R. Shank  (#59955)
      Metropolitan Square
      211 North Broadway, Ste. 2500
      St. Louis, MO 63102
      Phone: (314) 621-7755

11

Electronically Filed - Jefferson - May 19, 2020 - 02:20 PM

Fax:    (314) 621-3136
bshank@evans-dixon.com

*ATTORNEYS FOR DEFENDANTS*
*BIG DOG TREESTANDS, INC. AND BUCHHEIT*
*OF HERCULANEUM, INC.*

**CERTIFICATE OF SERVICE**

      This is to certify that the above and foregoing document has been served on all counsel of record on this 19th day of May, 2020, through the Court's ECF system.

/s/Brian R. Shank_____

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. D/B/A BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT BUCHHEIT HERCULANEUM, INC.'S MOTION TO DISMISS
PURSUANT TO MISSOURI REVISED STATUTE 537.762**

NOW COMES Defendant BUCHHEIT OF HERCULANEUM, INC., (hereinafter "Buchheit"), by and through its attorneys, and pursuant to Mo. Rev. Stat. § 537.762, hereby respectfully requests that this Court enter an Order granting Buchheit's Motion to Dismiss. Specifically, Buchheit requests dismissal of all of Plaintiff's claims against it under the "innocent seller" statute, R.S.Mo. § 537.762.  In support of its motion, Buchheit avers as follows:

1.      Section 537.762, R.S.Mo. provides that when a defendant's liability is based solely upon its status as a seller in the stream of commerce it may be dismissed from a products liability case.

2.      Plaintiff has filed a petition against Defendant Buchheit, claiming damages resulting from the use of the allegedly defective climbing stick sold by Defendant Buchheit. (*See Petition attached hereto as **Exhibit A**).* Plaintiff alleged that he purchased the subject climbing stick at Buchheit's store in Herculaneum, Missouri. (*See Plaintiff's Deposition Transcript, attached hereto as **Exhibit B**, at p. 23).*

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

3.      Plaintiff's Petition is in three counts:  1) Strict Liability; 2) Strict Liability Failure to Warn; and 3) Negligence (for defective product). (*See Exhibit A*).

4.      Plaintiff alleges under strict products liability that at the time the stick ladder was manufactured, designed, sold and/or distributed by Defendant Buchheit during the course of its business, it was then in a defective condition unreasonably dangerous when put to its reasonably anticipated use. Plaintiff further alleges that as a direct result of this defect with the climbing stick he was injured. (*Id.*).

5.      Defendant Buchheit filed its answer to Plaintiff's petition and has denied any liability to plaintiff's therein.

6.      Defendant Buchheit is not the manufacturer of the product at issue and was merely a seller in the stream of commerce. (*See Affidavit of P. Jannin*, *attached hereto as Exhibit C, at* ¶ 4-6*; see also, Affidavit of T. Royer, attached hereto as Exhibit D, at* ¶ 6).

7.      R.S.Mo. 573.762 provides that a defendant whose liability is based solely on its status as a seller in the stream of commerce may be dismissed from a product liability claim so long as another defendant is properly before the court and from whom total recovery may be had for plaintiff's claim.

8.      Defendant Buchheit's liability, if any, is based solely on its status as a retailer or product seller in the stream of commerce of the allegedly defective product. (*See Exhibit C).*

9.      WSTR Holdings, Inc. d/b/a Big Dog Treestands ("WSTR") is properly before this court and was "upstream" as to Buchheit as the manufacturer/distributor of the subject climbing stick. (*See Exhibit A*).

10.     Total recovery may be had for plaintiff's claims from WSTR as they have $1,000,000 in insurance with The Hartford Insurance Group and $4,000,000 in insurance with

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

Starr Surplus Lines Insurance Company. (*See WSTR's Declaration Pages of Liability Insurance, attached hereto as **Exhibit E**).*

11.    As a non-manufacturing seller, Buchheit had no control or influence over the design, manufacture, construction, warnings, instructions or quality of the subject climbing stick. (*See **Exhibit C**, at* ¶ 6-14).

12.    Petrina Jannin has submitted an affidavit, a copy of which is attached hereto as "**Exhibit C**", pursuant to R.S.Mo. 537.762 which was made under oath and states that Patrina Jannin, as Safety Manager of Buchheit, is aware of no facts or circumstances upon which a verdict might be reached against it other than its status as a seller in the stream of commerce. (*See **Exhibit C**, at* ¶ 18).

13.    Moreover, Plaintiff has presented no evidence to establish that Buchheit did anything other than sell the subject stick ladder at issue in this case.

14.    Based on R.S.Mo. 537.762, the facts set forth herein, and the facts set forth in the attached exhibits and memorandum in support, this court should dismiss the claims against Defendant Buchheit from this matter with prejudice.

WHEREFORE, Defendant BUCHHEIT OF HERCULANEUM, INC. prays that it be dismissed pursuant to R.S.Mo. 537.762 and for such other relief as the court may deem appropriate.

Respectfully submitted this 10th day of June, 2020.

Respectfully submitted,

EVANS AND DIXON, L.L.C.

By:  /s/ Brian R. Shank
          Brian R. Shank  (#59955)
          Metropolitan Square
          211 North Broadway, Ste. 2500
          St. Louis, MO 63102
          Phone: (314) 621-7755

ClarkHill\36755\314761\223923276.v1-6/9/20

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

Fax:     (314) 621-3136
bshank@evans-dixon.com


**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 10th day of June, 2020.

                /s/Brian R. Shank_____

4467649

ClarkHill\36755\314761\223923276.v1-6/9/20

Exhibit A

**20JE-CC00277**

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

IN THE CIRCUIT COURT OF JEFFERSON COUNTY
STATE OF MISSOURI

| | |
|---|---|
| BEN SCOFIELD ) | |
|     A Missouri resident ) | |
| ) | |
|     Plaintiff ) | |
| ) | |
| vs. ) | Cause Number: |
| ) | |
| ) | Division: |
| WSTR HOLDINGS, INC. D/B/A BIG DOG) | |
| TREESTANDS, INC. ) | |
|     A Illinois Corporation ) | |
| ) | JURY TRIAL DEMANDED |
| **HOLD SERVICE**: ) | |
| Ketra A. Mytech ) | |
| 1230 W. Candletree Drive., Suite A ) | |
| Peoria, IL 61614 ) | |
| ) | |
|     And ) | |
| ) | |
| BUCHHEIT OF HERCULANEUM, INC., ) | |
|     A Missouri Corporation ) | |
| ) | |
| **HOLD SERVICE**: ) | |
| Reid Willen ) | |
| 33 PCR 53 ) | |
| Perryville, MO 63775 ) | |
| ) | |
|     Defendants. ) | |

**PETITION**
**COUNT I – STRICT LIABILITY**

Comes now plaintiff, Ben Scofield and for Count I of his cause of action against

defendants WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. and Buchheit of Herculaneum,

Inc. and states as follows:

    1.    Plaintiff Ben Scofield is now and was at all times herein mentioned a resident and

citizen of the State of Missouri. Plaintiff's injury as more fully described below was sustained in

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

Jefferson County, State of Missouri therefore jurisdiction and venue are proper in the Circuit Court of Jefferson County.

2.      Defendant WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. is and was at all times herein mentioned a  duly organized and existing corporation  under the laws of the state of Illinois and was doing business designing, manufacturing, and selling treestands for deer hunting including the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 (hereafter referred to as the treestand) involved in this incident.

3.      Defendant Buchheit of Herculaneum, Inc. is and was at all times herein mentioned a corporation duly organized and existing under the laws of the State of Missouri and was doing business selling treestands for deer hunting including the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 involved in this incident.

4.      On or about August 27, 2015 plaintiff was installing a Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 on a tree on property in Ware, Missouri off Brownfield Road in preparation for deer hunting. As plaintiff was at the top of the treestand when finishing the installation, he grabbed the top section of the treestand to steady his way down at which time the treestand snapped and caused him to fall.

5.      At the time the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 was designed, manufactured, and sold by defendants WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. the climbing stick treestand was then in a defective condition and unreasonably dangerous when put to a reasonably anticipated use in that the climbing stick treestand was insufficiently designed and/or manufactured so that it would hold plaintiff, would not break when used by plaintiff and prevent plaintiff from falling and sustaining severe injuries.

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

6.      The Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 referred to above was used by plaintiff in a manner reasonably anticipated by defendants.

7.      That as a direct and proximate result of the defective and unreasonably dangerous condition of the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 designed, manufactured, and sold by defendants plaintiff has been caused to sustain the following damages to wit: plaintiff sustained injuries to his back, right heel resulting in a fracture, burst fractures at T11 through L3 , and thoracic and lumbar compression fractures which required surgical implantation of rods and screws in his back; plaintiff has incurred medical expenses to date in an amount in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) and continues to incur medical expenses for continuing medical care; plaintiff has lost wages in an amount to be determined and his ability to work, labor and enjoy life has been significantly impaired and diminished.

WHEREFORE plaintiff prays judgment against defendants, and each of them, in an amount which is fair and reasonable in excess of $25,000.00 plus any further relief the Court deems just and proper.

## COUNT II – STRICT LIABILITY FAILURE TO WARN

Comes now plaintiff, Ben Scofield and for Count II of his cause of action against defendants WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and states as follows:

8.      Plaintiff reincorporates and re-alleges paragraphs 1-7 of his petition as fully set forth herein.

9.      The above mentioned Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 was defective and unreasonably dangerous at the time it was designed, manufactured and sold by

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

defendants in that the climbing stick was insufficiently designed and/or manufactured so that it would not break when used by plaintiff,  would hold plaintiff when climbing and would therefore prevent plaintiff from falling and sustaining severe injuries.

10.    That defendants and each of them did not give adequate warning of the dangerous condition of the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 as aforesaid.

11.    That plaintiff was using the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 in a manner reasonably anticipated by defendants and each of them and as a direct and proximate result of the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 being sold without an adequate warning, plaintiff sustained damages as set forth in paragraph 7 above.

WHEREFORE plaintiff prays judgment against defendants, and each of them, in an amount which is fair and reasonable in excess of $25,000.00 plus any further relief the Court deems just and proper.

## COUNT III – NEGLIGENCE

Comes now plaintiff, Ben Scofield and for Count III of his cause of action against defendants WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc. and states as follows:

12.    Plaintiff reincorporates and re-alleges paragraphs 1-11 of his petition as fully set forth herein.

13.    The above mentioned Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 was defective and unreasonably dangerous at the time it was designed, manufactured and sold by defendants in that the climbing stick was insufficiently designed and/or manufactured so that it would not break when used by plaintiff,  would hold plaintiff when climbing and would therefore prevent plaintiff from falling and sustaining severe injuries.

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

14.     That defendants knew or should have known of the dangerous condition of the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 and had no reason to believe that plaintiff would realize the dangerous condition.

15.     That Defendants failed to use ordinary care to either design the Big Dog 20-foot Hot Foot Climbing Stick BDSL-20 to be reasonably safe or defendants failed to use ordinary care to warn plaintiff and others of the risk and hazardous condition of the Big Dog 20- foot Hot Foot Climbing Stick BDSL-20 as aforesaid and as a direct and proximate result of defendants' negligence plaintiff has sustained damages as set forth in paragraph 7 above.

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

WHEREFORE plaintiff prays judgment against defendants, and each of them, in an amount which is fair and reasonable in excess of $25,000.00 plus any further relief the Court deems just and proper.

LAW OFFICE OF DANIEL T. RYAN, LLC

By:     /S/Daniel T. Ryan
Daniel T. Ryan, #38744
Attorney for Plaintiff
3008 Sutton Blvd., Suite 100
Maplewood, MO  63143
314.222.7717
314.932.2688 (facsimile)
dan@danryanlawoffice.com

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

Transcript of the Testimony of

# Benjamin Scofield

January 5, 2018

Ben Scofield v. Big Dog Outdoors



Fortz Legal Support, LLC
844.730.4066
scheduling@fortzlegal.com
fortzlegal.com

**Ben Scofield v. Big Dog Outdoors**                                          **Job 5899**
**Benjamin Scofield 1/5/2018**

---

**Page 1**

```
        IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
                    JEFFERSON COUNTY, MISSOURI


    BEN SCOFIELD,                    )
                                     )
              Plaintiff,             )
                                     )
    vs.                              )   Cause No. 17JE-CC00227
                                     )
    BIG DOG OUTDOORS, INC., and )
    BUCHHEIT OF HERCULANEUM,   )
    INC.,                            )
                                     )
              Defendants.            )

        VIDEO-RECORDED DEPOSITION OF WITNESS, BENJAMIN
    SCOFIELD, produced, sworn and examined on the 5th day of
    January, 2018, commencing at approximately 10:07 A.M.
    at the Law Office of Daniel T. Ryan, 3008 Sutton
    Boulevard, Maplewood, Missouri, before BETH O. ZINK, a
    Registered Professional Reporter, Missouri Certified Court
    Reporter, Illinois Certified Shorthand Reporter and Notary
    Public, in a certain cause now pending in the Circuit
    Court of Jefferson County, State of Missouri, wherein BEN
    SCOFIELD is Plaintiff and BIG DOG OUTDOORS, INC., et al.
    are Defendants.


    JOB NUMBER: 5899
```

---

**Page 3**

```
                        INDEX OF EXHIBITS
                           (Continued)
  DEPOSITION
  EXHIBIT              DESCRIPTION              PAGE
  Exhibit 14   Color copy of photo depicting     59
               subject climbing stick
  Exhibit 15   Color copies of photos            69
               taken upon retrieval, (A-J)
  Exhibit 16   Color copy of photo depicting     70
               DVD - Treestand Safety
  Exhibit 17   Color copy of photo depicting     70
               DVD - Hunting Strategies
  Exhibit 18   Color copy of photo depicting     75
               climbing stick
  Exhibit 19   Color copy of photo depicting     76
               warning tag, Model Year 2014
  Exhibit 20   Color copy of photo depicting
               climbing stick, close-up
  Exhibit 21   Color copy of photo by Plaintiff
               depicting device in tree
  Exhibit 22   Color copy of photo by Plaintiff
               depicting scene
  Exhibit 23   Color copy of photo by Plaintiff
               depicting climbing stick on tree
  Exhibit 24   Color copy of photo by Plaintiff
               depicting device on tree
  Exhibit 25   Color copy of photo by Plaintiff
               depicting device on tree

  (Exhibits attached to original and copy of transcript.)
```

---

**Page 2**

```
                     INDEX OF QUESTIONERS


  EXAMINATION                                   PAGE
  By Mr. Karfis                                   6


                     INDEX OF EXHIBITS

  DEPOSITION
  EXHIBIT              DESCRIPTION              PAGE

  Exhibit 1    Big Dog Treestands Tomcat         26
               (ModelBDF-076) Instruction
               Manual
  Exhibit 2    Model BDSL-16/BDSL-20 16'/20'     46
               Hot Foot Climbing Stick
               Instruction Manual
  Exhibit 3    Gorilla Deluxe Vest Harness       51
               Instruction/Safety Manual
  Exhibit 4    Color copy of photo depicting     52
               Gorilla vest harness
  Exhibit 5    Color copy of photo depicting     52
               vest harness, close-up
  Exhibit 6    Gorilla warning label, 5/2012     52
  Exhibit 7    Color copy of photo depicting     56
               Straps for harness
  Exhibit 8    Color copy of photo depicting     56
               2 sets of straps for harness
  Exhibit 9    Color copy of photo depicting     56
               Strap with orange stitching
  Exhibit 10   Color copy of photo depicting     58
               hook with ratchet strap
  Exhibit 11   Color Copy of photo depicting     59
               subject climbing stick, bent
  Exhibit 12   Color copy of photo depicting     59
               Subject climbing stick, bent
  Exhibit 13   Color copy of photo depicting     59
               close-up of climbing stick
```

---

**Page 4**

```
                     A P P E A R A N C E S


  For the Plaintiff:
      LAW OFFICE OF DANIEL T. RYAN, LLC
      3008 Sutton Boulevard, Suite 100
      Maplewood, Missouri  63143
      By: Mr. Daniel T. Ryan
      (314)222-7717
      e-mail: dan@danryanlawoffice.com

  For the Defendants:
      CLARK HILL, PLC
      151 South Old Woodward Avenue, Suite 200
      Birmingham, Michigan  48009
      By: Mr. Milton S. Karfis
      (313)965-8802
      e-mail: mkarfis@clarkhill.com




  Reported By:
  Beth O. Zink, RPR
  MO-CCR#799, IL-CSR084.004477
  Fortz Legal Support, LLC
  7125 Orchard Lake Road
  West Bloomfield, Michigan  48322
  (844)730-4066
  Videographer: Taedra Hickham
```

---

Ben Scofield v. Big Dog Outdoors                                    Job 5899
Benjamin Scofield 1/5/2018

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

---

**5**

1    IT IS HEREBY STIPULATED AND AGREED, by and between
2  counsel for the Plaintiff and counsel for the Defendants,
3  that this deposition may be taken in shorthand by Beth O.
4  Zink, a notary public and shorthand reporter, and
5  afterwards transcribed into typewriting; and the signature
6  of the witness is expressly waived.
7       (Whereupon, the deposition commenced at
8  approximately 10:07 A.M.)
9           * * * * *
10      VIDEOGRAPHER:  We're now on the record.
11  Today's date is January 5th, 2018.  The time is
12  approximately 10:07 A.M.  This is the videotaped
13  deposition of Ben Scofield in the matter of Ben Scofield
14  versus Big Dog Outdoors, Incorporated, et al., Case Number
15  17JE-CC00227 in the Circuit Court for the 23rd Judicial
16  Circuit, Jefferson County, Missouri.
17      This deposition is being held at the Law
18  Office of Daniel T. Ryan, 3008 Sutton Boulevard, Suite
19  100, Maplewood, Missouri 63143.  The reporter's name is
20  Beth Zink.  My name is Taedra Hickham.  I'm the legal
21  videographer and we're with Fortz Legal.  Would the
22  attorneys present please introduce themselves.
23      MR. RYAN:  Dan Ryan for plaintiff.
24      MR. KARFIS:  And Milton Karfis on behalf of
25  the Defendants.

---

**6**

1       VIDEOGRAPHER:  And would the court reporter
2  please swear in the witness.
3       (Whereupon, the witness was sworn.)
4           * * * * *
5           BENJAMIN SCOFIELD,
6  produced, sworn and examined on behalf of the Defendants,
7  deposes and says:
8           DIRECT EXAMINATION,
9  QUESTIONS BY MR. KARFIS:
10      Q.  Sir, can you please state your full name for
11  the record.
12      A.  Benjamin Scofield.
13      Q.  Mr. Scofield, this is the time and date for
14  your deposition in this case.  Have you ever given a
15  deposition before?
16      A.  No.
17      Q.  Okay.  Hopefully your attorney went over some
18  ground rules with you.  Basically, obviously, I'm here
19  asking questions today.  It's being videotaped also, but
20  it's still important that you give verbal answers.  You
21  can't nod your head or shake because --
22      A.  Okay.
23      Q.  -- Beth, the court reporter, who's taking down
24  everything you're saying, can't take down a shake or a
25  nod, okay?  It's very common to do that.  I'll remind you

---

**7**

1  if --
2      A.  All right.
3      Q.  -- if you give an uh-huh or a nod, okay?
4  Also, today I'll be asking a number of questions that go
5  back, you know, a couple years ago to your accident,
6  questions about your medical history.  Some things you may
7  not recall.  This isn't a memory test today.  If you
8  simply don't know an answer, let me know, if you don't
9  recall, for whatever reason, but if you do give me an
10  answer, I'll assume you understood my question.
11      A.  Okay.
12      Q.  Okay?  And I do ask bad question from time to
13  time, so if you don't understand the question or it
14  doesn't make sense to you, ask me to rephrase it.  I'll be
15  glad to do that.
16      A.  All right.
17      Q.  Also, it's a very common practice, when people
18  are conversing, that people interrupt each other when
19  they're asking questions because you know what question
20  I'm going to ask before I complete it.  So I'm asking you
21  as a courtesy for the court reporter here today, mostly
22  her, and to make a clean record, is if I ask you a
23  question, let me finish my question, even if you know what
24  I'm getting at, and then when you start answering the
25  question, I will give you the same courtesy and not

---

**8**

1  interrupt your answer.
2      A.  Okay.
3      Q.  Okay?  I don't anticipate being here all day
4  today, by any means, so I don't think you'll need a break,
5  but if you need a break, water break, bathroom break or
6  whatever, stretch, let me know, I'm glad to do that.
7      A.  All right.
8      Q.  However, if there's a question pending, I
9  would ask you to answer that question before we take a
10  break.
11      A.  All right.
12      Q.  Okay.  What's your date of birth?
13      A.  Redacted .
14      Q.  And I'm not going to state on the record,
15  because of privacy protection principles, but your social
16  security number was referenced in your answers to
17  interrogatories, and I'm just going to show this to you.
18  I'm not going to have you read the number, but just
19  confirm that in your answers to interrogatories the
20  correct social security number was provided.
21      A.  That's correct.
22      Q.  Okay.  So answer to Number 1 to your answers
23  to interrogatories has your correct social security
24  number?
25      A.  Right.

---

FORTZ Legal

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

9

1    Q.  And what's your -- what is your current
2    address?
3    A.  Redacted                                        .
4    Q.  And how long have you resided there?
5    A.  **Since summer of 2016.**
6    Q.  Okay.  And are you married?
7    A.  **Yes.**
8    Q.  Okay.  How long have you been married for?
9    A.  **Since** Redacted
10   Q.  Okay.  Good you got the date right.  Any
11   children?
12   A.  **Yeah, three kids.**
13   Q.  How old are they?
14   A.  Redacted
15   Q.  You've got your hands full.
16   A.  **Yeah.**
17   Q.  What's your educational background?
18   A.  **High school, a tiny bit of college.**
19   Q.  Are you left or right-hand dominant?
20   A.  **Right-handed.**
21   Q.  And do you wear corrective lenses?
22   A.  **No.**
23   Q.  How tall are you?
24   A.  **About 5'10".**
25   Q.  How much do you weigh?

10

1    A.  **About 175.**
2    Q.  Back in August of 2015 when this accident
3    occurred, were you weighing about the same?
4    A.  **Yes.**
5    Q.  Any military history?
6    A.  **No.**
7    MR. KARFIS:  And my understanding, Counsel, is
8    that you're not making any lost wage claim; is that
9    correct?
10   MR. RYAN:  That's correct.
11   MR. KARFIS:  Okay.  And I'm not going to go --
12   MR. RYAN:  He can explain to you why.
13   Q.  Yeah.  From review of your discovery responses
14   and I understand that you work -- you have a company that
15   does computer software development?
16   A.  **Yes.**
17   Q.  Okay.  And obviously you sustained certain
18   injuries, I think your back and your heel, your right
19   heel?
20   A.  **Uh-huh.**
21   Q.  Does that interfere with your ability to earn
22   wages?
23   A.  **Well, with the way that my job works, I didn't**
24   **miss any deadlines or -- so stuff basically just got put**
25   **off.  But the ongoing injuries, yeah, you know, I can't**

11

1    **sit at my desk for eight hours a day, so -- because a**
2    **portion of my job is entrepreneurial, so I have clients,**
3    **but then I have my own stuff that we're launching.  The**
4    **ongoing impact is I don't really have enough time in my**
5    **day to service my clients and then everything in the**
6    **entrepreneurial side is pushed off until whenever I can,**
7    **you know, find the time, just because I can't sit in a**
8    **chair for that long.**
9    MR. KARFIS:  Okay.  So Counsel, are you
10   claiming any lost wages?  I mean --
11   MR. RYAN:  No, it's more --
12   A.  **That's all future stuff.**
13   MR. RYAN:  -- non-economic damage kind of
14   stuff.
15   MR. KARFIS:  Okay.
16   MR. RYAN:  Because he is self-employed.
17   Q.  Well, it saves a lot of questions.
18   A.  **Okay.**
19   Q.  Okay.  But you currently own a company, is it
20   Smart Designs Development, Inc. which is a computer
21   software development company?
22   A.  **Yes.**
23   Q.  Okay.  And that's -- is that kind of the area
24   you've been in since really graduating high school,
25   computer software development or computers?

12

1    A.  **Computers, yes; software development,**
2    **full-time since about 2011.**
3    Q.  And I noticed you said you don't have
4    any post high school specialized education.  Computers are
5    something you've picked up over the years or --
6    A.  **Yeah, self-taught guy.**
7    Q.  Now, I understand in this case you are
8    claiming a back injury when you had I think a spinal
9    fusion or had some rods and --
10   A.  **Yes, I have, yeah, some metal in the back,**
11   **yeah.**
12   Q.  And then you also injured your right heel?
13   A.  **Yeah.**
14   Q.  Were there any other injuries you're claiming
15   from this fall?
16   A.  **No.**
17   Q.  And the right heel, has that resolved?
18   A.  **It had been, and then it flared up a couple**
19   **weeks ago.**
20   Q.  Was that due to an injury or --
21   A.  **Exertion, I think.  It was just going through,**
22   **walking through a park.**
23   Q.  And of course I have your medical records.  I
24   don't think I have all of them, but I have some of them,
25   but I understand the nature of your injury.  So the right

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

**Ben Scofield v. Big Dog Outdoors**                                      **Job 5899**
**Benjamin Scofield 1/5/2018**

13

1  heel, I understand, was conservatively treated; in other
2  words, there was no surgery --
3       A.  No.
4       Q.  -- no cast?
5       A.  Correct.
6       Q.  You were given a walking boot?
7       A.  A walking boot, yeah.
8       Q.  And it let the heel heal on its own literally?
9       A.  Well, they never took additional x-rays or
10  anything like that, but what they had said at the time was
11  that there was a bone chip.  And then as far as the
12  resolution, they just kind of kept me in the boot for X
13  amount of time and then took it off and asked me how it
14  felt.
15       Q.  And when is the last time you saw any doctor
16  for your right heel injury?
17       A.  For the right heel, I want to say I believe it
18  would have been about two or three weeks after I got out
19  of the hospital.
20       Q.  Okay.  So since --
21       A.  I'm not certain of that, though.
22       Q.  I understand.  This isn't a memory test.  I do
23  have some of your medical records --
24       A.  Yeah.
25       Q.  -- and I'll also try and get the --

14

1       A.  There was one follow-up visit, so --
2       Q.  Okay.  Okay.  So after you get out of the
3  hospital, you have one follow-up visit with your right
4  heel and that's the last date of any treatment?
5       A.  Yes, for the heel.
6       Q.  Yeah.  And I assume -- you said you had a
7  flare-up recently, but over the last two and a half years,
8  have you had any other additional problems with your right
9  heel?
10       A.  No.  Exertion like that, no.
11       Q.  And what were you doing then?
12       A.  I was just walking around the park.
13       Q.  And did you see a doctor as a result of that
14  exertion from the park?
15       A.  No, I let it go on for a few days and it
16  stopped.
17       Q.  I know you're not a doctor, but what is your
18  understanding, what was your back injury?
19       A.  If I recall correctly, they said that it was a
20  burst fracture of L1, I think.  So the vertebra shattered
21  into a bunch of pieces.
22       Q.  Okay.  And at some point you had -- you went
23  to the hospital as a result of this fall and you had some
24  surgery for your back injury?
25       A.  Yes.

15

1       Q.  And what was your understanding of the nature
2  of that surgery?
3       A.  They removed the fragments of L1 and then put
4  metal in to keep the spacing, and the metal is attached to
5  two vertebras above and two vertebras below, so there's
6  like five vertebras that are immobilized.
7       Q.  And is that hardware still in your back?
8       A.  Yeah, it's permanent.
9       Q.  Did you have any other medical procedures for
10  your back other than the one -- that one you had the day
11  after?
12       A.  Procedures, no.
13       Q.  Yeah.
14       A.  Like not surgical procedures.  I mean there
15  was removal of a stent, removing of staples and stuff
16  like that.
17       Q.  Correct.  And that surgery occurred a day
18  after your fall on August 28, 2015?
19       A.  Yes.
20       Q.  And what hospital was that?  I've seen
21  reference to Mercy Hospital St. Louis.
22       A.  Yeah, St. John's Mercy or something like that.
23       Q.  Okay.  And I understand you were transported
24  in an ambulance to the hospital.  Were you transferred
25  directly to Mercy Hospital?

16

1       A.  Yeah, I asked to go there, yeah.
2       Q.  Okay.  And then you had your procedure and did
3  you also have your follow-ups there also?
4       A.  Yeah.  Her office, the neurosurgeon's office,
5  is in the building, yeah.
6       Q.  And what was that doctor's name?
7       A.  Quinn, Dr. Quinn.
8       Q.  Did you have any other medical treatment?  I
9  understand you had some follow-up, I'm sure, and some
10  physical therapy and whatnot after the surgery.  Did you
11  see any other doctors besides Dr. Quinn and any other
12  doctors at Mercy Hospital in the ER for this back injury?
13       A.  No, I don't believe so.
14       Q.  When is the last time you saw Dr. Quinn for
15  your back?
16       A.  I don't recall specifically.  We -- I think we
17  had six months of follow-ups once a month maybe, maybe
18  less than that.  I don't recall.  There was a prescribed
19  number of follow-up visits and I had to come into town
20  from Kansas City to do the last one or last two, so that
21  would have gone into the summer of 2016, so I want to say
22  about six months maybe of monthly visits.
23       Q.  So six months after August of 2015 would be
24  March/April 2016?
25       A.  No, that wouldn't have been enough, because I

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

17

1    was already in Kansas City.  Maybe it was nine months of
2    visits.  She didn't actually, that I recall, didn't
3    actually lay out a plan ahead of time.  It was see you
4    next month, see you next month until finally she said
5    don't have to see you anymore.
6        Q.  Okay.  And you recall that being approximately
7    nine months after the fall, summer of 2016?
8        A.  I'm just dating it back to having been in
9    Kansas City, so I moved to Kansas City in the summer, so
10   it was sometime after that.
11       Q.  Okay.  And have you seen any other doctors for
12   your back injury since approximately the summer of 2016?
13       A.  No.
14       Q.  How is your back today?
15       A.  Complicated.
16       Q.  Okay.  What do you mean by that?
17       A.  I can't really pick much up.  If it's in the
18   right position and in the right height, I can use my legs,
19   but I can't really lean over.  You know, too much exertion
20   causes a lot of pain when I lay down later at night and
21   then there's a long period of -- well, the way I've always
22   described it to people when they ask is like when you run
23   too much and then your legs get kind of jelly-like, that's
24   kind of how my back feels for one or two hours after I lay
25   down.  So, you know, pain of various kinds for various

18

1    reasons, anywhere from just plain old soreness from
2    sitting in a chair to over-exerting, and then there's just
3    general lack of strength, I guess, in that area.  I can't
4    use that part of my back, so I guess the muscles there
5    aren't getting exercised, so yeah, complicated for all
6    kinds of reasons.  Just depends on the topic.
7        Q.  Are you currently taking any medications for
8    pain or anything for your back?
9        A.  No.
10       Q.  Anything for your heel?
11       A.  No.  I mean I -- well, no prescription
12   medications.  I will occasionally take pain killers for my
13   back if I've overdone it, but because it's ongoing, I
14   just, because of concerns about being on pain medicine
15   non-stop, I try not to.
16       Q.  Is this a prescription medication or like an
17   aspirin?
18       A.  No, no, no.  Yeah, Aleve actually normally,
19   yeah.
20       Q.  Okay.  Currently are you on any medical
21   restrictions?
22       A.  I don't know how to define medical
23   restrictions.  Like has the doctor told me not to do
24   anything?
25       Q.  Yeah.

19

1        A.  The last advice that I remember getting from
2    her, or recommendations, were that I basically just had to
3    play it by ear and really understand my back and what it
4    was capable of doing and not capable of doing, so not like
5    medical restrictions from a doctor.
6        I've just, over the past whatever one and a
7    half years or whatever it is, I've learned what I can and
8    can't do, because one thing either causes an actual strain
9    or just a lot more pain later on in the day kind of a
10   thing.
11       Q.  So a doctor has not given you specific medical
12   restriction, physical restriction, but told you kind of be
13   your own judge of what you can and cannot do?
14       A.  Yeah.
15       Q.  Any future plans to seek any medical treatment
16   for either your back or your heel from injuries from this
17   fall?
18       A.  From physical therapist, yeah.
19       Q.  Have you had any physical therapy since the
20   summer of 2016?
21       A.  No.  She said she didn't have to -- I didn't
22   need to go.  She said I could if I wanted to, but
23   basically just getting back into routine would get me back
24   to where I could get.
25       Q.  Has your back improved since 2016, the summer

20

1    when you quit seeing Dr. Quinn?
2        A.  Oh, since I quit seen Dr. Quinn, no.  It's
3    been about the same.  Yeah, it plateaued.
4        Q.  But you have no future concrete plans to see
5    any doctors for your back in the future?
6        A.  Based on the condition, no.  I just understand
7    it to be par for the course right now.
8        Q.  And we've covered all the injuries from your
9    fall from the stick ladder?
10       A.  Yeah.
11       Q.  How was your health prior to your fall?
12       A.  Fine, no health issues.
13       Q.  Any prior back injuries?
14       A.  No.
15       Q.  Any prior feet injuries?
16       A.  No.
17       Q.  Any prior significant injuries resulting in
18   hospitalization from automobile accident --
19       A.  No.
20       Q.  -- or fall?
21       A.  No.
22       Q.  Were you taking any medications at the time of
23   your fall?
24       A.  No.
25       Q.  And I'm not going to keep on saying August

**Ben Scofield v. Big Dog Outdoors**                                **Job 5899**
**Benjamin Scofield 1/5/2018**

---

21

1   27th of 2015, but if I say the date of your fall, we agree
2   that's the date?
3        A.  August 27, 2015.
4        Q.  Yeah.
5        A.  Yeah, okay.
6        Q.  And when you fell, you were self-employed with
7   your own company?
8        A.  Yes.
9        Q.  Any prior history of blacking out, fear of
10  heights, vertigo, anything like that?
11       A.  No.
12       Q.  Have you ever blacked out before?
13       A.  No.
14       Q.  Have you ever filed any litigation before?
15       A.  No.
16       Q.  Are you currently still hunting?
17       A.  Yes.  Differently, but yes.
18       Q.  Are you on the ground now or --
19       A.  Yeah.
20       Q.  Okay.  Are you using rifles, bows or --
21       A.  I had to switch to a crossbow, one with what
22  they call an old man crank.  It's got like a little
23  fishing reel thing on the side to help you cock it back,
24  and a rifle occasionally, yeah.
25       Q.  Did you hunt this last season, 2017?

---

22

1        A.  I did.
2        Q.  Did you get anything?
3        A.  Yes, I did.  I got a doe.  Yeah, sorry.  It
4   took a long time, I had to remember, yeah.
5        Q.  If it was a 20-point, I'm sure you would have
6   remembered that.
7        A.  Yeah, exactly.
8        Q.  How long have you been hunting for?
9        A.  I didn't start hunting until I was about 20 or
10  21.
11       Q.  And you're approximately 37 right now?
12       A.  Yes.
13       Q.  So you've been hunting for about 15, 16 years?
14       A.  Uh-huh.
15       Q.  Yes?
16       A.  Yes.  Sorry.
17       Q.  And when you hunt, I'm talking prior to your
18  accident, would you use commercially manufactured tree
19  stands?
20       A.  Yes.
21       Q.  And when I stay commercially manufactured, the
22  kind, the metal ones you go to the store and buy --
23       A.  Right.
24       Q.  -- as opposed to homemade ones you might build
25  out at --

---

23

1        A.  I've both used.  The landowner on the property
2   where I fell has a couple of homemade ones, but those are
3   kind of his.  I've been in them a few times, but for the
4   most part, I used store-bought.
5        Q.  And obviously in 2015 you had the Big Dog
6   climbing stick, the BDL 20 climbing stick, correct?
7        A.  I don't remember the model number off the top
8   of my head, but --
9        Q.  And you apparently, according to discovery,
10  you had purchased that approximately a year before the
11  accident?
12       A.  I believe so, yeah.
13       Q.  And where did you buy that from?
14       A.  Buchheit's in Herculaneum, Missouri.
15       Q.  And I think we asked this, but do you have a
16  proof of purchase, any literature that came with the
17  purchase?
18       A.  I don't.
19       Q.  How about any of the written warnings or
20  instructions that came with the climbing stick, do you
21  have any of that stuff?
22       A.  Only ones that might still be attached to it.
23       Q.  Okay.  So any labels that were attached to any
24  of the straps?
25       A.  Well, Dan has what I have left of the stand,

---

24

1   yeah.
2        Q.  Okay.
3        A.  And I think there's one warning on there, if I
4   recall.  I think I've seen pictures of it floating around.
5        Q.  Okay.  Now, also on the day of your incident
6   you were also utilizing another, a Big Dog hang-on tree
7   stand you were attempting to hang?
8        A.  Yes, there was one with me.  I hadn't done
9   anything with it.
10       Q.  Okay.  It was still on the ground?
11       A.  Yeah.
12       Q.  Okay.  Did you buy that at the same time you
13  bought the climbing stick?
14       A.  I don't remember.
15       Q.  Do you remember where you bought it from?
16       A.  Almost always from Buchheit's, because they
17  would go on sale together.
18       Q.  Okay.
19       A.  Or at the same time, and I could purchase them
20  together, so --
21       Q.  And the hang-on Big Dog tree stand there, you
22  were going to try to install the day of your accident --
23       A.  Uh-huh.
24       Q.  -- do you still have that?
25       A.  The rest of the pieces?

---

Exhibit B

**Ben Scofield v. Big Dog Outdoors**                    **Job 5899**
**Benjamin Scofield 1/5/2018**

7  (Pages 25 to 28)

| 25 | 27 |
|---|---|
| 1   Q. Of the -- I'm talking the tree stand, not -- | 1   you don't know? |
| 2   **A. Oh.** | 2   **A. I don't know, no.** |
| 3   Q. Not the climbing stick. | 3   Q. Also on the date of the fall you also had a |
| 4   **A. No. My wife made me get rid of it all.** | 4   Gorilla full-body safety harness you used? |
| 5   Q. Okay. | 5   **A. Full body, it was -- I think they call them** |
| 6   **A. Like you said, I hunt from the ground now,** | 6   **four point or something like that, yeah.** |
| 7   **so --** | 7   Q. Sure. Gorilla? |
| 8   Q. And so the Big Dog tree stand that was on the | 8   **A. Yeah, Gorilla. Yes.** |
| 9   base of the tree after the accident that you hadn't | 9   Q. And do you recall where you purchased that |
| 10   attempted to install at that point, you said you believe | 10   from? |
| 11   you purchased it around 2014? Do you know approximately | 11   **A. Cabela's.** |
| 12   when you purchased it? | 12   Q. Cabela's, okay. Do you remember when you |
| 13   **A. The tree stand itself?** | 13   purchased that? |
| 14   Q. Yeah. | 14   **A. Early 2012.** |
| 15   **A. No, I don't know.** | 15   Q. Other than those three articles, did you own |
| 16   MR. RYAN: For the uninitiated, when you guys | 16   any other hunting equipment? I'm talking tree stands or |
| 17   start talking about tree stand, you mean the platform, | 17   harnesses, anything like that. |
| 18   right, I guess? | 18   **A. Own at all?** |
| 19   **A. Yes, the platform.** | 19   Q. Yeah. |
| 20   MR. KARFIS: Yeah. The climbing stick is the | 20   Q. Anywhere? |
| 21   metal stick ladder. | 21   Q. Sure. |
| 22   MR. RYAN: So we'll call that climbing stick, | 22   **A. Yeah, yeah.** |
| 23   and that thing -- | 23   Q. How many other -- you understand there's tree |
| 24   MR. KARFIS: That's fine. | 24   stands, there's ladder stands -- |
| 25   MR. RYAN: -- tree stand. | 25   **A. Yeah.** |

| 26 | 28 |
|---|---|
| 1   MR. KARFIS: The hang-on tree stand. | 1   Q. -- there's climbers, there's hang-ons, there's |
| 2   **A. Yeah.** | 2   tripods. |
| 3   MR. RYAN: I get you. | 3   **A. Yeah.** |
| 4   Q. But it was definitely a Big Dog tree stand | 4   Q. Did you own a number of different kinds? |
| 5   hang-on? | 5   **A. Yes.** |
| 6   **A. I don't recall if it was definitely a Big Dog** | 6   Q. Okay. Let's start with hang-ons. This is, |
| 7   **tree stand. I would say 80 to 90 percent of the ones I** | 7   we'll say August of 2015, how many other hang-on tree |
| 8   **had on the farm were.** | 8   stands did you own? |
| 9   Q. Do you recall the model of the tree stand? | 9   **A. About five.** |
| 10   **A. No.** | 10   Q. Do you recall the manufacturer of any of |
| 11   Q. Okay. I'm going to show you and represent to | 11   those? Were those other Big Dog -- |
| 12   you that based on the photographs I've seen of -- there's | 12   **A. Most of them would have been Big Dog, yes.** |
| 13   a couple photographs that depict the tree stand at the | 13   Q. Okay. And those five that you owned, do you |
| 14   site of the fall that were taken, I think, after your | 14   recall approximately when you purchased those? I'm |
| 15   friends came to retrieve the stand, and I'm going to show | 15   talking -- this is 2015. Would they have been purchased |
| 16   you what, based on my client's interpretation of the | 16   in the five years before that? |
| 17   photographs, it was called a Tomcat hang-on Big Dog tree | 17   **A. Maybe one a year for the previous two or three** |
| 18   stand. Do you know if that was the tree stand you had; do | 18   **years, but a couple of years probably two -- you know, two** |
| 19   you have any idea one way or the other? | 19   **in one year.** |
| 20   **A. No, not based on the name.** | 20   Q. Okay. So the five you owned, they were |
| 21   Q. Okay. And this is a photograph in the upper | 21   probably purchased 2012, 13, 14? |
| 22   left corner on Exhibit 1. Do you know, does that look | 22   **A. Thereabouts, yeah.** |
| 23   similar to -- | 23   Q. And you generally purchased Big Dog hang-on |
| 24   **A. It does look similar.** | 24   stands? |
| 25   Q. Okay. Whether that was the same model or not, | 25   **A. Typically. They were, yeah, the ones that** |

Ben Scofield v. Big Dog Outdoors                                    Job 5899
Benjamin Scofield 1/5/2018

8  (Pages 29 to 32)

---

29

1  came into sale right at the right time at Buchheit's, so
2  --
3       Q.  Okay.  Do you recall the make and models of
4  any of the other hang-on stands that you owned from Big
5  Dog?
6       A.  I don't.
7       Q.  Do you recall purchasing any other
8  manufacturer's hang-on stands?
9       A.  The hang-on stand, there may have been -- I do
10  know that I had others besides theirs, but I don't know
11  whose it would have been.
12       Q.  There's a company called Big Game.  Do you
13  know if you ever owned any Big Game stands?
14       A.  I've owned some of their equipment, but I
15  can't say for certain if it was -- if it was a hang-on
16  stand or not.
17       Q.  Company called Primal Vantage?
18       A.  Definitely not.
19       Q.  Ameristep?
20       A.  Ameristep equipment, but don't know if a
21  hang-on.
22       Q.  Okay.  API?
23       A.  No.
24       Q.  Summit?
25       A.  I have a Summit climber, had.  I think it's in

---

30

1  the woods somewhere.
2       Q.  Okay.  So you had the five -- approximately
3  five other hang-on tree stands you owned --
4       A.  Yes.
5       Q.  -- in August of 2015 at the time of the fall?
6       A.  Yes.
7       Q.  How about climbers, what other climbers did
8  you own at that time?
9       A.  Summit.
10       Q.  Do you recall the model?
11       A.  I think it was a Viper.
12       Q.  Approximately when did you purchase that?
13       A.  2012-ish.
14       Q.  Any other climbers?
15       A.  No.
16       Q.  How about ladder stands?
17       A.  One ladder stand.  I don't know the make or
18  model.
19       Q.  When did you buy that, approximately?
20       A.  2013.
21       Q.  Buy it at the same place?
22       A.  That, I don't recall.  I don't recall if I
23  bought that at Buchheit's.
24       Q.  Do you recall where you bought the Summit
25  Viper from?

---

31

1       A.  Cabela's.
2       Q.  Are you the kind of guy that keeps your
3  receipts when you purchase things or are you the kind that
4  throw them away?
5       A.  Only if it's a warranty thing where I'm
6  worried about having to take it back, so no, I'm not the
7  kind of guy to keep everything.
8       Q.  Okay.  For tree stands, for instance, if you
9  bought a tree stand, would you keep the proof of purchase
10  receipt?
11       A.  No.  If it was really expensive, but I don't
12  really buy those.
13       Q.  When you would have bought, for instance, the
14  Big Dog climbing stick that's at issue in this case, would
15  you have purchased it with cash or with a credit card?
16       A.  I don't know.  Could have been either.
17       Q.  Buy it in cash so you can hide it from your
18  wife?
19       A.  No, not for the most part.  She's pretty
20  tolerant of my hunting.
21       Q.  And when you purchased these other tree
22  stands, the hang-ons, the climbers, ladder stands, did
23  they also come with full-body safety harnesses that were
24  copackaged with those?
25       A.  Some did.

---

32

1       Q.  Like when you bought the Big Dog tree stands,
2  did they come with safety harnesses?
3       A.  I don't recall if they did.
4       Q.  The Summit Viper, did that come with a safety
5  harness?
6       A.  Maybe.  I mean I know a lot of them come
7  bundled, but they're so much harder to use than the one
8  that I was using, that I just kind of put it aside.
9  They're exactly the same, it's just the Gorilla brand
10  keeps all the tangle nice and neat in the vest and so it's
11  just easier to use.
12       Q.  So if you had purchased a number of tree
13  stands in the five years prior to your fall, if they were
14  copackaged with safety harnesses, you would not use those,
15  but you would use the one you had purchased, the
16  after-market Gorilla full-body safety harness?
17       A.  Yes.
18       Q.  Do you also recall when you had purchased
19  these tree stands in the past, did they come with a safety
20  DVD?
21       A.  Some came with DVDs.  I recall them being more
22  instructional.  They may have had safety in with them as
23  well.
24       Q.  And these -- we're talking these were videos
25  that were copackaged with the tree stands you had

---

Ben Scofield v. Big Dog Outdoors                                    Job 5899
Benjamin Scofield 1/5/2018

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

9 (Pages 33 to 36)

---

**33**

1   purchased that we discussed earlier?
2       A.  **You mean the Big Dog ones?**
3       Q.  Big Dog --
4       A.  **Or any of them?**
5       Q.  Any of them.
6       A.  **Yeah, some of them did.  I don't recall if all**
7   **of them did.**
8       Q.  Do you recall if the Big Dog came with a
9   safety DVD?
10      A.  **I don't remember.**
11      Q.  If it did come with a safety DVD, would you
12  watch those?
13      A.  **Only if I didn't understand the instructions.**
14      Q.  When you had purchased tree stands in the
15  past, did you also, if it came -- I assume they all came
16  with written warnings and instructions?
17      A.  **I don't remember any not, yeah.**
18      Q.  Okay.
19      A.  **Not having literature.**
20      Q.  Okay.  Are you the kind of guy who, when you
21  purchase a tree stand, are you going to read the warnings
22  and instructions that are provided by the manufacturer?
23      A.  **Typically, yeah.**
24      Q.  You understand that it's important to follow
25  manufacturer's warnings and instructions when utilizing a

---

**35**

1       Q.  And do you agree with me that if you deviate
2   from a manufacturer's warnings and instructions about how
3   to safely utilize their product such as a tree stand
4   product, that that can increase the likelihood of an
5   accident?
6       A.  **Depending on their instruction or the warning.**
7       Q.  Obviously this case involves a climbing stick.
8   How many climbing sticks or similar type products have you
9   owned in the past?
10      A.  **I believe one set for every hang-on tree stand**
11  **we discussed.**
12      Q.  Okay.  Were these all Big Dog climbing sticks
13  or other models or other companies?
14      A.  **I think I owned one by Ameristep.**
15      Q.  Were the rest of them all Big Dog?
16      A.  **I believe so, yes.**
17      Q.  Were they the same model as this one that's
18  like 20 foot?
19      A.  **No.  If I remember correctly, I had two**
20  **different kinds.  One was where the ladder rungs came off,**
21  **what do you call it, parallel, and then one alternated.**
22      Q.  Staggered?
23      A.  **Yeah, yeah.**
24      Q.  At the time of your accident, we're talking
25  August of 2015, how many other Big Dog climbing sticks did

---

**34**

1   product such as a tree stand or tree stand-related
2   product?
3       A.  **Yeah, for the most -- yeah.**
4       Q.  And if there's warnings that are provided, do
5   you try to follow those warnings?
6       A.  **If there's warnings provided in the**
7   **literature, I try to follow them, yeah.**
8       Q.  And if there's step-by-step assembly
9   instructions by the manufacturer of the tree stand
10  product, do you also try to follow those?
11      A.  **Yes.**
12      Q.  Do you pick and choose which ones you want to
13  follow?
14      A.  **No.**
15      Q.  If there's also installation -- about how to
16  install the product, whether it be a climbing stick or a
17  tree stand, do you try to follow the manufacturer's
18  instructions on how to do that?
19      A.  **Yeah.**
20      Q.  And if the manufacturer provides safety
21  equipment with their products, do you also try to follow
22  those instructions and use those as applicable?
23      A.  **No, I mean not all the time.  Like in this**
24  **instance the -- you know, I would use a different safety**
25  **harness than the one that's given.**

---

**36**

1   you own?
2       A.  **I believe the five others, yeah.**
3       Q.  Okay.  And one of them may have been an
4   Ameristep?
5       A.  **Oh, sorry, yeah.  Four others and the one**
6   **Ameristep, yes.**
7       Q.  And those all would have been purchased within
8   a couple years.  Would you basically purchase a tree stand
9   at the same time you purchased a stick --
10      A.  **Yes.**
11      Q.  -- climbing stick?
12      A.  **Usually.**
13      Q.  So if you bought a new hang-on stand, you
14  would buy a climbing stick to go with that one?
15      A.  **Usually, yes.**
16      Q.  Did you keep the climbing stick together with
17  the same hang-on tree stand or would you kind of intermix
18  the climbing sticks with the tree stands?
19      A.  **I didn't pay any attention to it, so --**
20      Q.  And for instance, the four to five prior Big
21  Dog climbing sticks that you purchased, did they come with
22  written warnings and instructions?
23      A.  **Yeah, I believe they probably did.**
24      Q.  And would you read those warnings and
25  instructions each time you purchased a climbing stick?

---

**scheduling@fortzlegal.com**              **Toll Free: 844.730.4066**
**fortzlegal.com**

FORTZ Legal

Exhibit B

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

10  (Pages 37 to 40)

---

37

1       A.  If I thought it was necessary.
2       Q.  Were the Big Dog warnings and instructions
3   similar about how to install and take down these climbing
4   sticks?
5       A.  Yes, I believe they were.
6       Q.  So if Big Dog's written warnings and
7   instructions were four pages for the climbing stick, would
8   you read all four of those pages?
9       A.  If I was on a subsequent set of climbing
10  sticks?
11      Q.  Yes.
12      A.  No.  Typically I would see if the instructions
13  were the same for assembly.
14      Q.  So if you bought the first pair of climbing
15  sticks or first set of climbing sticks, would you read
16  those warnings and instructions, if it was only four
17  pages, would you read all four pages?
18      A.  For additional ones, no, not typically, not
19  all the way through.
20      Q.  But for the first one?
21      A.  I mean I don't recall whether I did or not.
22  Definitely the instructions for assembly.
23      Q.  How about for installation?
24      A.  I don't recall if I read them or not.
25      Q.  How about the generalized warnings?

---

38

1       A.  I -- did I read -- I don't know if I read them
2   all.  You definitely check things like weight limits and
3   stuff like that.
4       Q.  Why did you wear a safety harness when you
5   would hunt?
6       A.  I didn't for the earlier part of my hunting
7   career, and then, you know, it just kind of clicked that a
8   little bit of comfort wasn't worth the risk.
9       Q.  Did you ever have a fall from a tree stand --
10      A.  No.
11      Q.  -- or tree stand product?
12      A.  No.
13      Q.  You've got three children and a wife, so you
14  want to come home safely to them?
15      A.  Yes.  Yeah.
16      Q.  And you realize that if you're utilizing a
17  tree stand or a tree stand-related product such as a
18  climbing stick, that once you leave the ground, there's a
19  risk of falling for any number of different reasons?
20      A.  There's a risk, yeah.
21      Q.  And the purpose of wearing the full-body
22  safety harness is that once you leave the ground, if
23  you're connected to the tree, if you fall, slip or
24  something breaks on you, that you don't fall straight to
25  the ground and become injured?

---

39

1       A.  That's the -- that's the plan.
2       Q.  Okay.  Is this something your wife insisted
3   you use or your kids or --
4       A.  No, she didn't really know whether I used one
5   or not.
6       Q.  Okay.  When you began using one, was the
7   Gorilla, the one you purchased in 2012, was that the first
8   after-market safety harness you had purchased or had you
9   used one before that?
10      A.  Do you mean after-market as in didn't come
11  bundled with a -- I used bundled ones before.
12      Q.  Okay.  So each time you would utilize a tree
13  stand or a tree stand related product such as a climbing
14  stick, would you use a full-body safety harness at all
15  possible times to be connected to the tree?
16      A.  I think I started doing that with the Gorilla
17  harness because that was the first one that came with a
18  lineman's belt.
19      Q.  And what does a lineman's belt allow you to
20  do?
21      A.  The typical setup for a safety harness allows
22  you to attach yourself to the tree once you're up on the
23  tree stand, and then the lineman's belt connects to you
24  and wraps around the tree for while you're climbing, while
25  you're going up and down the tree.

---

40

1       Q.  So the idea of a lineman's belt is that if
2   you're going to be climbing, for instance, a climbing
3   stick up into a tree stand, the lineman's belt allows you
4   to wrap it around the tree, connect it to both sides of
5   your safety harness and allows you to connect it from the
6   time you leave the ground until the time you climb up to
7   the tree stand?
8       A.  Connected to the tree?
9       Q.  Yes.
10      A.  Well, yeah, I mean connected.  You have a
11  strap around you and the tree, yeah.
12      Q.  Okay.  And in case you fall for any reason,
13  the lineman's belt is going to prevent you from falling to
14  the ground, it's going to pull you back towards the tree?
15      A.  Yeah, fall back into the tree.
16      Q.  And you also used -- do you use also lineman's
17  belt during installation and take-down of tree stands
18  including stick ladders or climbing sticks?
19      A.  Oh, yes.
20      Q.  So was your personal policy that any time you
21  were going to use a tree stand, that you would be
22  connected with your safety harness to the tree at all
23  possible times?
24      A.  Yeah.
25      Q.  Did you ever have a fall from a tree stand

---

**Ben Scofield v. Big Dog Outdoors**                    **Job 5899**
**Benjamin Scofield 1/5/2018**

---

41

1   while you were wearing a safety harness and it arrested
2   your fall, prevented you from falling?
3       **A.  No.**
4       Q.  The Gorilla safety harness that you had
5   purchased, did you read those warnings and instructions?
6       **A.  I don't recall.**
7       Q.  Typically if you bought a brand new product
8   such as an after-market, you know, full-body safety
9   harness you had never used before, are you the kind of guy
10  that would just kind of figure it out on your own or would
11  you actually read the instructions, warnings, the
12  step-by-step usage illustrations?
13      **A.  I mean the instructions and illustrations**
14  **probably.**
15      Q.  Would you read the generalized warnings?
16      **A.  I don't know.  It depends probably on the**
17  **product.**
18      Q.  Are you talking warning label on the product
19  or are you talking --
20      **A.  Oh.  Yeah, I thought you were talking about in**
21  **a pamphlet.**
22      Q.  Yeah, talking about the manual, yeah, the
23  written manual.
24      **A.  It depends.  I can't say one way or the other.**
25      Q.  Okay.  So some guys don't read instructions at

---

43

1   said in approximately 2014?
2       **A.  One year before, yeah.**
3       Q.  Okay.  Do you recall approximately when you
4   purchased it?
5       **A.  I don't.  I base those purchases around sales**
6   **at Buchheit's, and I recall that they were usually in the**
7   **summer.**
8       Q.  And I know I asked you this before, but as
9   we're sitting here talking, do you recall when you
10  purchased -- we're talking the climbing stick at issue in
11  this case, do you recall if you purchased also the hang-on
12  Big Dog tree stand?
13      **A.  I don't remember if I did at the same time or**
14  **not.**
15      Q.  But a lot of times you would?
16      **A.  A lot of times I would try to, yeah.**
17      Q.  Was anybody with you when you made that
18  purchase?
19      **A.  No, not likely.**
20      Q.  And I think, according to your discovery, when
21  you purchased this subject climbing stick involved in your
22  accident, that you used it one time in 2014?
23      **A.  Yeah, I believe so.**
24      Q.  And I assume you installed it on a tree, on a
25  tree stand from there, hunted for that season and then

---

42

1   all, some guys --
2       **A.  Yeah.**
3       Q.  -- don't ask for instructions when they get
4   lost, now you've got GPS and stuff.
5       **A.  Right, right.**
6       Q.  You don't have to stop at a gas station, have
7   your wife or girlfriend yell at you.  Some people read
8   from cover to cover, those are engineer types.
9       **A.  Yeah.**
10      Q.  I know you're a computer software guy.  Where
11  do you fall in the spectrum, if you do?
12      **A.  I'm looking for stuff that I don't understand.**
13      Q.  Okay.
14      **A.  Yeah.**
15      Q.  Generally did you find the Big Dog written
16  warnings and instructions clear and easy to follow?
17      **A.  I don't remember.  I don't -- yeah, I don't**
18  **remember.**
19      Q.  Did you ever have any questions or concerns or
20  confusion over any Big Dog instructions, whether it be for
21  a tree stand or a climbing stick?
22      **A.  I don't remember having, you know, being**
23  **confused or anything.**
24      Q.  Now, in this case you purchased, you believe,
25  the climbing stick that was involved in your accident you

---

44

1   took it down at the end of the season?
2       **A.  Yes.**
3       Q.  And any difficulty with this subject tree
4   stand -- or this subject climbing stick, any trouble with
5   that whatsoever in 2014?
6       **A.  No, not that I recall.**
7       Q.  And do you recall approximately when in 2014
8   you installed it; in other words, month?
9       **A.  I don't recall when, but my habit would have**
10  **been to install things July/August time frame.**
11      Q.  And when would you take it down?
12      **A.  Early January was when I would make rounds and**
13  **take them all down.**
14      Q.  For instance, in 2014 how many different
15  stands did you have up, approximately?
16      **A.  Maybe five or six.**
17      Q.  And specifically do you recall which hang-on
18  tree stand you were utilizing with this climbing stick
19  involved in your accident, do you recall which of the
20  hang-ons you had?
21      **A.  In 2014?**
22      Q.  Yeah.
23      **A.  No, I don't recall.**
24      Q.  You told me before that you didn't necessarily
25  pair up a set of climbing sticks with a specific hang-on?

---

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

---

45

```
1        A.  Right.  I would go to the car, pull two out
2   and walk over to set it up.
3        Q.  And where would you store your tree stands
4   off-season?
5        A.  Either the garage or the basement.
6        Q.  Do you recall approximately how many times you
7   climbed up and down the subject climbing stick in 2014; in
8   other words, how many times you hunted out of that --
9        A.  Actually none.  I never hunted out of that
10  specific spot.
11       Q.  Okay.  You set it up?
12       A.  Yeah.
13       Q.  One time, put on the tree stand up there and
14  never hunted out of there?
15       A.  Yeah.
16       Q.  Then came back and --
17       A.  It happens.
18       Q.  Then you came back in January, climbed up
19  there --
20       A.  Yeah.
21       Q.  -- took down the tree stand, unhooked the
22  straps and removed the climbing stick?
23       A.  Uh-huh.
24       Q.  Yes?
25       A.  Yes.  Sorry, yeah.
```

---

46

```
1        Q.  And noticed no operational problems with the
2   climbing stick at all?
3        A.  No, not that I recall.
4        Q.  Did you find the climbing stick easy to
5   install?
6        A.  As easy as any that I had done.
7        Q.  And did you use your Gorilla safety harness
8   when you installed and took down the stick ladder in 2014?
9        A.  Probably.  It's just -- other than safety,
10  it's a lot easier.
11       Q.  So in 2015 obviously hunting season is coming
12  around the corner, it's August, late August, you decide
13  you're going to start hanging up some tree stands?
14       A.  Yeah, later than normal, because we were out
15  of town, so we had come back in town, so I was just
16  getting to it when I could.
17       Q.  Okay.  Before we move on, I'm just going to
18  mark as Exhibit Number 2, this is I believe our Bates
19  stamp pages 1 through 4 that we're going to produce to you
20  in discovery.  This is the four-page instruction manual
21  that came with your 20 foot Big Dog climbing stick that
22  was involved in your accident.  Do you recall this
23  document whatsoever?
24       A.  Are you -- if you're asking do I look at it
25  and remember it, no.
```

---

47

```
1        Q.  Okay.  You do recall, though, that this, the
2   20 foot climbing stick that was involved in your accident
3   did come with written warnings and instructions?
4        A.  Well, like I said, I don't -- I don't ever
5   remember buying one and thinking, hey, it didn't come with
6   a manual.  So yeah, it probably did.
7        Q.  Okay.  And would it be your recollection that
8   you would have sat down with this four-page document,
9   Exhibit Number 2, would you have sat down and read through
10  this?
11       A.  I would have checked for something that looked
12  different in the instructions for assembly.
13       Q.  Okay.  So, for instance, if we go to Page 1 of
14  Exhibit 2, it's got a generalized warning at the top.
15  Would you have read that where it says warning at the very
16  top?
17       A.  For the one I purchased in the year before,
18  probably not.
19       Q.  And we're -- these instructions I'm talking,
20  these specifically go for the climbing stick that was
21  involved in your accident, okay?
22       A.  Right.
23       Q.  So I'm asking the warnings that came with your
24  product involved in this accident.  So the top portion
25  that's got a couple warnings at the top, would you have
```

---

48

```
1   read that?
2        A.  I don't know if I would have or not.
3        Q.  Okay.  The middle portion of Page 2 has kind
4   of a parts list and some parts illustrations.  Would you
5   have reviewed that on the first page?
6        A.  Reviewed as in --
7        Q.  Would you have --
8        A.  -- glanced over?
9        Q.  Yeah.
10       A.  I would have probably glanced at it, yeah.
11       Q.  Would you have confirmed you had all the
12  parts?
13       A.  No.
14       Q.  In this case you believe you had all the parts
15  and straps and bolts and nuts?
16       A.  Yeah, the assembly went as expected, so yeah,
17  that's -- I would have looked at the parts list if the
18  assembly didn't line up.
19       Q.  Okay.  There's also, at the very bottom of
20  Page 1, another warning.  Do you recall whether you would
21  have read that or not?
22       A.  I don't recall.
23       Q.  On Page 2 of Exhibit 2 the top portion has
24  assembly instructions, all models.  Would you have read
25  that, if you recall?
```

---

FORTZ
Legal

Ben Scofield v. Big Dog Outdoors

Job 5899

Benjamin Scofield 1/5/2018

**49**

1        A.  I don't recall.  I might have.
2        Q.  Okay.  The next section on Page 2 is
3    instructions for use, all models.  Do you recall if you
4    would have read that?
5        A.  I don't recall.
6        Q.  Okay.  Then it's got some illustrations about
7    how to strap certain things on Page 2 and then it says
8    climbing stick removal, storage and care.  Do you recall
9    if you read that or not?
10        A.  I don't recall.
11        Q.  Okay.  Then the last two pages of the manual
12    are safety warnings.  Do you recall whether you would have
13    read those or not?
14        A.  I don't recall.
15        Q.  Okay.  And going back to Exhibit Number 1,
16    this is the manual for the tree stand, Tomcat model, I
17    believe the one you had with you at the scene of the fall
18    that you were going to attempt to install on the date of
19    your accident.  There are some generalized warnings in the
20    first couple pages, Pages 1, 2 and 3.  Do you recall
21    whether you read those or not?
22        A.  I don't recall, no.
23        Q.  Okay.  There's also -- on Page 4 of Exhibit 1
24    there is some specialized instructions or warnings for
25    utilizing hang-on tree stands and full-body safety

**50**

1    harnesses.  Do you think you would have read those at all?
2        A.  I don't -- I don't know if I would have or
3    not.
4        Q.  Okay.  On the bottom of Page 4 to Page 5 has
5    basically the assembly instructions and part list.  Is
6    that something you would have looked through and read?
7        A.  Probably.  Those were always a little bit more
8    confusing to assemble, so probably.
9        Q.  Okay.  And then Page 6, I believe, has the
10    installation of the product of Exhibit 1.  Would you have
11    read how to install the hang-on tree stand?
12        A.  For the one that was at the scene where I
13    fell, since it was, you know, the fourth or fifth that I
14    had owned, probably not.
15        Q.  Okay.  And then the last -- last two pages has
16    -- or I guess the next page, 7 -- let's see how many pages
17    -- actually Page 6 and 7 have installation instructions.
18    You told me you're not certain whether you would have read
19    those or not?
20        A.  I'm not certain, no.
21        Q.  Okay.  And then the last page, Page 8 of
22    Exhibit 1, the tree stand instructions also have some
23    removing, do you recall whether you would have read that
24    or not?
25        A.  No.

**51**

1        Q.  Nonetheless, it's still your intention to
2    follow the manufacturer's instructions about how to
3    properly assemble and install and use their product?
4        A.  Yeah, that's -- yeah, typically.
5        Q.  I'll mark as Exhibit 3, this is the Gorilla
6    Deluxe Vest Safety Harness that would apply to the safety
7    harness that you had, and I know it's a large document.
8        A.  Yeah.
9        Q.  And there's various sections in here.  If you
10    go to the very first page, it's got a table of contents on
11    here about usage.  Would you have -- would you have
12    actually gone through this manual and read certain pages
13    in here or would you have skimmed through it or would you
14    have read, you know, cover to cover, the ones that --
15        A.  No.
16        Q.  -- applied specifically to your harness?
17        A.  I don't know how much of it I would have read
18    or not.  It was my first after-market harness, my only
19    after-market harness.  I did notice, when I was looking at
20    this with Dan yesterday, that I'm not entirely certain
21    this would have been the exact model because of the date,
22    the revision date on the bottom.
23            The way I typically did hunting purchases
24    would have been with gift cards from Christmas and then
25    they were typically spent in January, so I know I bought

**52**

1    this in 2012 and the typical habit would have been that it
2    was purchased in January sometime.  But like I said, given
3    that it was my first after-market, I would have -- I would
4    have not like thrown out the manual.
5        Q.  Do you still have the manual around?
6        A.  No, no.
7        Q.  I'm marking as Exhibit 4 and I'll represent to
8    you these are photographs of the harness that was
9    represented to us --
10        A.  Yeah.
11        Q.  -- that was your Gorilla harness.  Is that
12    your Gorilla harness right there?
13        A.  That looks like it.
14        Q.  Exhibit 4.
15        A.  Except for I didn't remember the part where
16    they cut me out of it, but yeah.
17        Q.  Yeah.  Exhibit 4 does show the leg straps,
18    looks like the EMS arrived --
19        A.  Yeah.
20        Q.  -- cut your -- cut the leg straps off your
21    leg.  Exhibit 5 is just another close-up of that.
22        A.  Yeah, I think Dan asked me about the clothes I
23    was wearing, too.  They cut me out of those at the
24    hospital, too, that's why I don't have those.
25        Q.  I'll show you Exhibit 6 which is a

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

Ben Scofield v. Big Dog Outdoors                    Job 5899
Benjamin Scofield 1/5/2018

53

1   manufacturing date code.
2       A.  Okay.
3       Q.  And batch number on -- for your Gorilla safety
4   harness and it says May 2012.
5       A.  Okay.
6       Q.  Now, this was -- that was on your harness.
7       A.  Okay.
8       Q.  Any reason to dispute that it was manufactured
9   May of 2012, that was on the manufacturing label on your
10  Gorilla harness?
11      A.  No, no reason to dispute it, just that's, like
12  I said, typically gift cards for Christmas, spent in
13  January.
14      Q.  So going back to my initial question --
15      A.  Yeah.
16      Q.  -- if the revision for the manual does say, I
17  believe February 20 of 2012, that would predate the
18  manufacture date of May 2012, correct?
19      A.  Yes.
20      Q.  Okay.  So you're not saying that Exhibit
21  Number 3 does not apply to this harness, are you?
22      A.  No, no.  I thought there was a date issue
23  because I thought I bought it earlier.
24      Q.  Okay.  Now, specifically going back to Exhibit
25  3, which I believe is the manual, Exhibit 3 --

54

1       A.  Yeah.
2       Q.  It's got a table of contents here, and Pages
3   2, 3 and 4 have some general -- and 5 have some general
4   safety warnings.  Do you recall if you read that or not?
5       A.  No, I don't recall if I read them or not.
6       Q.  Okay.  Page 6 has basically the package
7   contents, shows you what was included with the product.
8       A.  Okay.
9       Q.  Do you recall looking at that at all?
10      A.  I don't recall looking at it.  I mean I don't
11  recall whether I did one way or the other.
12      Q.  Okay.  And you're aware that this model tree
13  stand comes with obviously the full vest, the four-point
14  vest?
15      A.  Uh-huh.
16      Q.  Yes?
17      A.  Yes.
18      Q.  Okay.  And there's a tether that comes off the
19  back of the vest that you secure to a tree strap that goes
20  around the tree?
21      A.  You mean when you're at the platform?
22      Q.  Yes.
23      A.  That thing, yes.
24      Q.  Okay.  And that is how you use a safety
25  harness.  Once you're at the top, the safety harness is

55

1   connected to a tree strap which is connected to the tree
2   and that connects you to the tree through the tether of
3   the safety harness?
4       A.  When you're at the top, yes.
5       Q.  And also there's also a lineman's belt
6   provided with this product that allows you, as you
7   described earlier, that if you're on the ground, you can
8   wrap one of the straps around the tree, hook to both sides
9   in your hip location and it allows you to climb up, for
10  instance, the climbing stick and be connected to the tree
11  in case you fall, you don't fall to the ground, it will
12  pull you back into the tree?
13      A.  Yes.
14      Q.  Kind of like we see electrical repairmen do?
15      A.  Right, yeah.
16      Q.  And that was -- a strap also provided with
17  this product?
18      A.  It was.  I don't remember it being this strap,
19  however.  The lineman's belt I got was different.
20      Q.  Than what?
21      A.  Than what's shown here.  Is one of these --
22  yeah, than that.
23      Q.  How is it different?
24      A.  It had hooks on the end, J hooks on the end
25  that attached to the loop for lineman's climbing strap.

56

1       Q.  And that's what you believe came with this?
2       A.  Yes.
3       Q.  Did you receive any other straps with this
4   Gorilla harness?
5       A.  The one that goes around the tree.
6       Q.  Okay.  And you said the lineman's climbing
7   strap had two hooks on it?
8       A.  Yes.
9       Q.  I'll show you what I'll mark as Exhibit 7.
10  Is this what you believe came with the Gorilla --
11      A.  Yes.
12      Q.  -- safety harness?  So Exhibit 7 is what you
13  believe was the second strap that came with the Gorilla
14  2012 safety harness?
15      A.  Yes.
16      Q.  Let me show you Exhibit 8.  This is a
17  photograph of another strap that was produced during the
18  inspection.  On the right-hand side of Exhibit 8 is
19  another strap that has some orange stitching near the
20  bottom of one end.
21      A.  Okay.
22      Q.  Where did that strap come from?
23      A.  I do not know.
24      Q.  Was that strap that you -- I've marked that as
25  Exhibit 9 so we can differentiate them.  Exhibit 9, was

Exhibit B

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

57

1   this the strap that came with the Gorilla safety harness?
2      A.  I don't know.  I don't know.  No, I have no
3   idea.
4      Q.  Do you know, on the day of your accident, were
5   you utilizing that strap?
6      A.  For what purpose?
7      Q.  I don't know.
8      A.  No.  I was utilizing that one.
9      Q.  Okay.  So exhibit -- go back to Exhibit 8.
10      A.  Uh-huh.
11      Q.  Exhibit 8, the strap to the left-hand side
12   that has the two hooks on it, that was the strap you were
13   utilizing for the lineman's belt --
14      A.  Uh-huh.
15      Q.  -- on the Gorilla safety harness on the day of
16   your accident?
17      A.  Yes.
18      Q.  And on Exhibit 9, the strap in Exhibit 9 you
19   were not utilizing that strap at all on the day of your
20   accident?
21      A.  No, I don't -- well, not that I recall.  I
22   don't know what it was --
23      Q.  Okay.
24      A.  Yeah, I don't know what that strap is for.
25      Q.  Okay.  There was also a portion of a ratchet

59

1      Q.  Let me get my stickers out when I'm done
2   marking here.  During your inspection -- or our
3   inspection, only one portion of the climbing stick was
4   provided, that was the portion that bent.
5      A.  Yeah.
6      Q.  And I've marked that as Exhibit 11.  That's --
7   that's the one portion that bent.
8      A.  Broke, bent, yeah.
9      Q.  Okay.  Exhibit 12 is just another angle of it.
10   Exhibit 13 is just another angle.  I'm going to show these
11   later.  Exhibit 14, just another photograph.  Okay.  Going
12   back to -- going back to Exhibit 3, on Page 6 you said --
13   so you believe the one --
14      A.  Which is 3?
15      Q.  Exhibit 3 is the Gorilla.  So you believe,
16   once again, that you received two straps with the Gorilla,
17   one was the one that's in Exhibit 8 on the left-hand side
18   with the two hooks, and the other one is the strap that
19   you don't see here before you today?  In other words --
20      A.  Oh.  I don't -- I have no idea whether this is
21   the what's called the tree strap or not.
22      Q.  Exhibit 9?
23      A.  Yeah.  Yes, I don't know if that was the tree
24   strap or not.  It might be.
25      Q.  On the day of the accident did you have the

58

1   strap that was produced during the inspection.
2      A.  Uh-huh.
3      Q.  Was it something that you were utilizing on
4   the day of the accident?
5      A.  I hadn't utilized it.  I don't know what it
6   was for.  I mean I have ratchet straps like that.  I don't
7   know what that one was for.
8      Q.  Okay.  So I'll mark it Exhibit 10.  So on the
9   day of your fall, if this was produced during the
10   inspection, were you planning to utilize Exhibit 10 at
11   all, any portion of that?
12      A.  It may have been used to hang up the hang-on
13   stand.
14      Q.  And do you know what the other portion of that
15   would be?  Would that be something you would use to hang a
16   hang-on stand?
17      A.  Yeah, it would have been, yeah.
18      Q.  That one half of the ratchet strap?
19      A.  No, no, no.  I mean -- well, no, it's missing
20   the second part of it, yeah.  Was this all still out there
21   during the site inspection?
22      MR. RYAN:  No.
23      A.  Okay.  This is -- Konrad retrieved all of
24   this?
25      MR. RYAN:  Yeah, he found all of that.

60

1   tree strap out with you to use to secure yourself to the
2   tree?
3      A.  Probably, because I usually kept it stowed in
4   the vest.
5      Q.  Okay.  And if it wasn't in the vest pocket or
6   it wasn't at the scene, do you know what, if any, that you
7   were planning on utilizing for a tree strap?
8      A.  Say that again.  I don't understand.
9      Q.  Sure.  We've seen no other straps that were
10   produced.
11      A.  Yeah.
12      Q.  There was nothing in your pocket, there was
13   nothing else at the scene that was retrieved, so do you
14   know specifically what strap you were going to use as a
15   tree strap on the day of the incident?
16      A.  Was going to use, like to secure myself once I
17   was up there?
18      Q.  Yes.  Yeah.
19      A.  No.  I usually depended on -- I'm like a
20   creature of habit kind of guy, so it goes in there and I
21   know exactly where it's at.
22      Q.  So Exhibit 9, you don't know where that
23   came from, the strap in Exhibit 9?
24      A.  I don't know if it is for sure that.  I mean
25   I'm taking a stab at it.  I assume this was probably in my

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

Exhibit B

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

16  (Pages 61 to 64)

---

61

1    pocket and would have been the one that they call the tree
2    strap.
3        Q.  Okay.  So Exhibit 9 is the one you believe you
4    were going to utilize as the tree strap?
5        A.  Probably.
6        Q.  And then Pages 7 through -- I'm sorry, 7
7    through 9 have some usage instructions for your model
8    safety harness.  Do you recall if you read that at all?
9        A.  I don't recall.
10       Q.  Okay.  Page 15 has -- Page 15 has a section
11   about selecting a tree.  Do you recall reviewing that at
12   all?
13       A.  I don't recall if I read it or not.
14       Q.  Okay.  Number -- on Page 16 of Exhibit 3 has
15   -- talking about threading your -- the buckle for the
16   lineman's and the tree strap.  Do you recall reviewing
17   that at all?
18       A.  No.
19       Q.  Page 17 and 18 have sections about using the
20   lineman's belt.  Did you read that at all?
21       A.  I don't recall.
22       Q.  Did you ever at one point believe maybe you
23   got the wrong strap with the safety harness?
24       A.  No, because it was my only safety harness, so
25   I didn't -- I had never purchased a safety harness before

---

62

1    or since, I mean, because I haven't been up in a tree
2    since, but --
3        Q.  So in Exhibit 8, the left-hand side of the
4    strap that's depicted there, did that look to be the same
5    strap as depicted in Exhibit 3, or you can tell it's
6    different?
7        A.  Back then or now?
8        Q.  Both.  Either.
9        A.  I don't remember noticing a difference back
10   then.
11       Q.  But now you can clearly see there's a
12   difference?
13       A.  Yeah, yeah.  Yeah, I can see there's a
14   difference now.
15       Q.  And on Page 19 and top of 20 shows you
16   attaching the tree strap to the tree.  Do you recall
17   reviewing that section?
18       A.  I don't recall.
19       Q.  And if you look at exhibit -- I'm sorry --
20   Exhibit 3, Page 20, 21 and 22, it shows the user utilizing
21   the full-body safety harness with the lineman's belt with
22   the climbing aid.  Did you read those sections, do you
23   recall?
24       A.  I don't recall, no.
25       Q.  And I know I've asked you a bunch of questions

---

63

1    that go back a number of years, but for Exhibit 3, though,
2    were there some portions that you did read, do you recall,
3    when you first opened the package?
4        A.  Yeah.  Like I said, I likely would have
5    because it was my first after-market safety harness, one
6    with the vest that contained the straps and all that.
7        Q.  Explain for me how you would use the exhibit
8    -- on Exhibit 8, the photograph, the left-hand strap.
9        A.  Uh-huh.
10       Q.  The one with two hooks on it.
11       A.  Yeah.
12       Q.  Can you describe to me and you would -- you
13   would use that as the lineman's belt?
14       A.  Uh-huh.
15       Q.  Okay.  Can you describe for me how you would
16   do that?
17       A.  So with the two loops on the sides, it would
18   go -- it would hook through the one loop, go around the
19   tree, and then the other hook would attach to the other
20   loop, and then it has a, you know, tightening whatever you
21   call it, take the slack out of it mechanism.
22       Q.  And if you look at the photographs with the
23   safety harness, I don't know if any of these are good
24   photographs enough to show you, can you see the loop, the
25   lineman's belt loop on any of these photographs?

---

64

1        A.  No, not on these I can't.
2        Q.  Okay.  Go back to exhibit -- Exhibit 3, Page 6
3    which is the Gorilla instructions.
4        A.  Page 6.  Yeah.
5        Q.  Okay.  So it's your testimony that -- if you
6    look on Page 6, the upper photograph shows -- it's
7    indicated loop for lineman's climbing strap?
8        A.  Uh-huh.
9        Q.  And it's on both sides, it's got kind of a
10   line to that.  That is what you would -- maybe you can
11   show it to the videographer, show -- so Exhibit 8, you
12   would you take those two hooks?
13       A.  Uh-huh.
14       Q.  And then show the videographer on Page 6 of
15   Exhibit 3 where you place those.
16       A.  Onto those two.
17       Q.  And could you circle those for me and then put
18   your initials by it?
19       A.  (The witness complied.)
20       Q.  And maybe you can depict for the videographer
21   and explain --
22       A.  Yeah.
23       Q.  So Exhibit 8 has -- it's got metal hooks on
24   it?
25       A.  Yeah.

---

**scheduling@fortzlegal.com**                    **Toll Free: 844.730.4066**
**fortzlegal.com**

FORTZ legal

Exhibit B

**Ben Scofield v. Big Dog Outdoors**                              **Job 5899**
**Benjamin Scofield 1/5/2018**

17  (Pages 65 to 68)

---

65

1         Q.  So you take those hooks and you loop them
2    inside the --
3         A.  Yeah, go through this loop, around the tree
4    and then into the other loop.
5         Q.  Okay.  And that's how you would secure
6    yourself, safety harness to the tree, while utilizing a
7    lineman's belt?
8         A.  Yes.
9         Q.  So during the installation you're just -- you
10   were going to wear your full-body safety harness and have
11   yourself connected with the lineman's belt as you're
12   instructed to do and that's the configuration you had it
13   in?
14        A.  Yes.
15        Q.  Is that the configuration you had on the day
16   of the accident?
17        A.  Oh, yeah.  Yeah.  Putting those stands up is
18   tiring, and having been on the last section, I would have
19   used it, because if not, you know, your one arm in the
20   tree and doing the stuff, so --
21        Q.  And the purpose of the lineman's belt is kind
22   of a third arm, so it allows you to lean back or kind of
23   basically --
24        A.  It can, yeah.  I don't.  I mean that's not --
25        Q.  The lineman's belt has got two purposes

---

66

1    really.
2         A.  Yeah.
3         Q.  It kind of prevents you in case of a fall?
4         A.  Yeah.
5         Q.  Prevents you from striking the ground, but
6    also it's also good for stability --
7         A.  Yeah.
8         Q.  -- when you're trying to hang your tree stand
9    or even secure your climbing stick, that gives you more
10   support?  The tree is here --
11        A.  Uh-huh.
12        Q.  -- you're tight against the tree --
13        A.  Yeah.
14        Q.  -- and it allows your hands --
15        A.  Tight against the tree, yeah.
16        Q.  -- to move.  It allows your hands to be free
17   to move around to secure and tie things which you need to
18   tie?
19        A.  Right, right.
20        Q.  And this is something you do each time you
21   install a climbing stick, you utilize your Gorilla
22   full-body safety harness with the same strap in the same
23   manner you just described?
24        A.  From the time I got it, yeah.
25        Q.  I mean connect yourself from the ground,

---

67

1    you're climbing, then you would have it on the whole time
2    while you're doing the installation including the tree
3    stand?
4         A.  Uh-huh.
5         Q.  Yes?
6         A.  Yes.  Sorry.
7         Q.  Okay.  Now, on the date of the accident you
8    bring your equipment out to the tree.  You've got your --
9    the tree stand, and I'm going to mark -- my understanding
10   is after the accident, you had your friends, this Dr.
11   Wid --
12        A.  Dr. Widmer.
13        Q.  Dr. Widmer and a friend of his?
14        A.  My father-in-law.
15        Q.  Oh.
16        A.  Because he is -- Dr. Widmer owns the property
17   and he's --
18        Q.  Okay.
19        A.  -- a friend of the family.
20        Q.  Okay.
21        A.  So they came out together.  Friend of my
22   father-in-law's, so they came out together.
23        Q.  And Mr. Lentz is your --
24        A.  No.  Mr. Lentz I don't know.  He assisted
25   Konrad in taking the stand down two, three months later.

---

68

1         Q.  And Konrad is your --
2         A.  Konrad is Dr. Widmer.  I'm sorry.
3         Q.  Okay.  Dr. Widmer.  And he's your --
4         A.  Friend of the family, friend of my
5    father-in-law's, owns the property that I was on.
6         Q.  Okay.
7         A.  And he came because I was in a pretty
8    nondescript area that only he would really be able to get
9    people to.
10             MR. KARFIS:  Do you want to take a break?
11   I've been going for a while.
12        A.  I'm just a little cold.
13             MR. KARFIS:  Well, we could do this outside if
14   you want.
15        A.  Make me appreciate the little bit of heat
16   we've got going on?
17             MR. KARFIS:  Whatever you want to do.  If you
18   want to keep on going --
19             MR. RYAN:  I want to just run to the restroom.
20             MR. KARFIS:  Okay.
21             VIDEOGRAPHER:  This concludes media number
22   one.  The time is approximately 11:14 A.M.  We're off the
23   record.
24             (Whereupon, a recess was taken from 11:14 to
25   11:22 A.M.)

---

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

**Ben Scofield v. Big Dog Outdoors**                    **Job 5899**
**Benjamin Scofield 1/5/2018**

---

69

1      VIDEOGRAPHER:  This begins media number two in
2  the deposition of Ben Scofield.  The time is approximately
3  11:22 A.M.  We're back on the record.
4      Q.  Mr. Scofield, my understanding, after your
5  accident, I think it was Mr. Lentz and Dr. --
6      A.  Widmer.
7      Q.  -- Widmer, they went to the site and retrieved
8  some of your equipment and they took a number of
9  photographs?
10     A.  I wasn't there, but yeah, that's what I heard.
11     Q.  Okay.  I understand there was 10 photographs
12  that were taken by one of the two gentlemen.
13     A.  Okay.
14     Q.  Okay.  And have you seen those photographs
15  before?
16     A.  Maybe.  I'm not sure.
17     Q.  I've marked as Exhibit 15, and I've
18  subcategorized them A through J.
19     A.  Okay.
20     Q.  So there's 10 photographs here, and in the
21  bottom left-hand corner it has letters for them, so if I'm
22  referring to a certain -- certain one of those items,
23  that's what I'm talking about.
24     A.  Okay.
25     Q.  So it's Exhibit 15, and then, once again, the

---

70

1  lower right corner should have the --
2      A.  Okay.
3      Q.  -- various letters, okay?  Have you looked at
4  these photographs before?
5      A.  A does not look familiar.  I don't think so.
6      Q.  Okay.  The photographs were taken.  Were they,
7  at some point, given to you, sent to your attorney, your
8  wife or somebody or how did you -- how did these
9  photographs --
10     A.  I think they were sent to Dan, the attorney.
11     Q.  Okay.  And after the fall, were you out at the
12  site when they retrieved the evidence?  Were you out
13  there, by any chance?  Were you out there in a car nearby,
14  were you out there at the scene?
15     A.  No.  I mean the car was a fair distance away.
16     Q.  Okay.  But on the date when it was retrieved,
17  were you --
18     A.  Oh, I'm sorry.
19     Q.  Were you out at the site when it was
20  retrieved?
21     A.  Oh, no, not at all.  Not at all.
22     Q.  Okay.
23     A.  No, I wasn't.
24     Q.  Okay.  I don't mean to jump around on you, but
25  I just want to, before I forget, we discussed some safety

---

71

1  videos that would have been copackaged with some of the
2  tree stands you had purchased in the past.  I'm going to
3  show you Exhibit 16 and 17.  I'll represent to you that
4  these are two of the safety videos that would be
5  copackaged with tree stands sold that you would have
6  purchased.  Do either of those -- I know they're just a CD
7  cover.  Do either of those look familiar to you?
8      A.  No, they don't look familiar.
9      Q.  Okay.  Do you recall some -- there being some
10  safety DVDs copackaged with some of your tree stands?
11     A.  I don't -- oh, with some of them?
12     Q.  Yeah.
13     A.  Yeah, yeah.
14     Q.  But whether you watched them or not you don't
15  recall?
16     A.  I watched some.  I don't recall watching
17  these.
18     Q.  Okay.  It could have been those; you just
19  don't remember?
20     A.  Yeah, I have no idea.
21     Q.  Okay.  Okay.  So the date of the fall --
22     A.  Uh-huh.
23     Q.  -- you're going out to the site.  Are you by
24  yourself that day?
25     A.  Yes.

---

72

1      Q.  And it's whose property again?
2      A.  Dr. Widmer's.
3      Q.  Okay.
4      A.  Yeah.
5      Q.  And he's a friend of your father-in-law's?
6      A.  Yeah.
7      Q.  And he had gave you permission to go out there
8  and hunt?
9      A.  Yeah, several years ago.
10     Q.  Okay.  And looking at Exhibit 15-A, this
11  depicts the climbing stick up in the tree, correct?
12     A.  Yes.
13     Q.  And so obviously post-accident, correct?
14     A.  Yes.
15     Q.  And if you look on the middle of the bottom
16  lower right corner of Exhibit 15-A, it has some portion of
17  the climbing stick on the ground.  Do you see that?
18     A.  Yeah.
19     Q.  Were you utilizing all five sticks or --
20  because there's four on the tree.  The top -- the fourth
21  one is bent.  The fifth one is on the ground.  On the day
22  of the accident were you using all five or were you only
23  using four?
24     A.  I don't recall.  I don't recall.  Sometimes
25  there's height issues.  You go up too high and there's a

---

FORTZ Legal

Exhibit B

Ben Scofield v. Big Dog Outdoors                    Job 5899
Benjamin Scofield 1/5/2018

73

1  bunch of branches in the way, that kind of thing.
2      Q.  Well -- and we'll get to your fall scenario
3  here shortly, but when you apparently grabbed on the top
4  of the climbing stick, was there four sections in the tree
5  or were there five sections in the tree?
6      A.  I honestly don't recall.  If -- yeah, if a
7  section came off, I don't remember.
8      Q.  Okay.  So nonetheless, this depicts the
9  subject climbing stick.  It also shows at the very, very
10 bottom of the tree you can see, under leaves, you can see
11 the hang-on --
12     A.  Uh-huh.
13     Q.  -- tree stand, correct?
14     A.  Uh-huh.
15     Q.  Yes?
16     A.  Yes.
17     Q.  Okay.  And if you go more over to -- on
18 Exhibit 15-C, go one more page over, and that depicts the
19 tree stand.  Is that the tree stand that you were going to
20 -- in the process of trying to hang that day?
21     A.  If that's the one they picked up, yes.
22     Q.  Okay.  And you also had with you your Gorilla
23 safety harness?
24     A.  I had it with me when I was climbing?
25     Q.  Yes.  You were going to wear it that day, you

74

1  had it on?
2      A.  Yeah.  Yeah, I don't -- did they retrieve it?
3  I don't know if -- no.  I don't know if that one went with
4  me to the hospital or not.  I don't know.
5      Q.  Well, Exhibit 14 --
6      A.  Okay.
7      Q.  Or Exhibit 4, once again, that is the safety
8  harness you were wearing at the time of your fall?
9      A.  Yes, it looks like it, yeah.
10     Q.  And Exhibit 8, are these the two straps that
11 you were going to utilize; one is the tree strap, one is
12 the lineman's belt?
13     A.  I was using that one as a lineman's belt.  I
14 don't know what this one was there for.  I -- earlier, my
15 best guess was it was in the pocket of my -- because
16 that's, like I said, routine; that I don't ever have to
17 worry about where it's at if it's always in my pocket.
18     Q.  Okay.  So Exhibit 8, the left-hand strap with
19 two hooks at the end --
20     A.  Uh-huh.
21     Q.  -- that's the one you were using as a
22 lineman's belt?
23     A.  Yes.
24     Q.  And the strap to the right-hand side, you're
25 not certain why that was there?

75

1      A.  No.
2      Q.  And that would be the one with the orange
3  stitching near the bottom?
4      A.  Uh-huh.
5      Q.  Yes?
6      A.  Yes.  Sorry.
7      Q.  Did you have any other hunting equipment with
8  you that you had that day?
9      A.  Not that I recall.  I would have had my
10 backpack with me with like a game camera, trail camera in
11 it.  That's about it.
12     Q.  Okay.  And had used this climbing stick
13 the year before.  I assume you had taken it all apart?
14     A.  Yeah, the sections, not the bolts.
15     Q.  And you had the -- did you have the strap
16 still tied to the -- strap still tied to the --
17     A.  From the year before?
18     Q.  Yes.
19     A.  Probably.
20     Q.  I'll mark as Exhibit 18, and this is actually
21 the -- one of the -- the step that actually broke.
22     A.  Uh-huh.
23     Q.  And it shows you where you had tied the straps
24 that secured the stick ladder to the tree.  Is that how
25 you had them secured in all sections?

76

1      A.  I don't know.  I don't recall.
2      Q.  Well, however 18 is depicted, you have the
3  straps configured around looks like a -- kind of a thin
4  metal pole that connects it, the two ends of the tree
5  brace?
6      A.  Are you asking if that's what I see here?
7      Q.  Yeah.
8      A.  Yeah.
9      Q.  And is that how you recall having it tied?
10     A.  I don't recall.  I don't remember.
11     Q.  I'll mark as Exhibit 19, you also recall there
12 being warning labels on the straps that were used to
13 secure the climbing stick to the tree?
14     A.  Do I -- yeah, I suppose.
15     Q.  Okay.  Do you recall reading them?
16     A.  I don't remember if I did.
17     Q.  Okay.  And that warning does tell you to wear
18 the safety harness at all times when utilizing it and
19 never detach, correct?
20     A.  Okay.
21     Q.  And that's something that you intended to
22 practice?
23     A.  Yes, I did intend to practice that.
24     Q.  So you go to the site and you have the five
25 portions of the stick ladder with the straps still

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

---

**77**

1    connected to it.  Are you carrying it, are you going to
2    Bobcat it or how do you get back there?
3         **A.  Carry it, yeah.**
4         Q.  Okay.  You've got a tree stand in one hand and
5    the five portions of the climbing stick in the other hand?
6         **A.  Somehow, yeah.  Yeah, something like that.**
7         Q.  And then you selected the tree that's depicted
8    in Exhibit 15-A?
9         **A.  Looks like it.**
10        Q.  Had you hunted from that tree before?
11        **A.  No.**
12        Q.  And you're just walking around and thought
13   that would be a good tree?
14        **A.  Yeah.**
15        Q.  Okay.  Are you aware of anybody else ever
16   utilizing that tree to hunt from?
17        **A.  No, not aware of that.**
18        Q.  How's the game out there in that area?
19        **A.  Eh, it's all right.**
20        Q.  So --
21        **A.  No record breakers, but it's all right.**
22        Q.  Okay.  So you get to -- you select this tree
23   and then what do you do next?
24        **A.  So I'm, you know, it's -- the area, the area**
25   **right around it and then you've got to find a straight**

---

**78**

1    **tree because these things don't work on real crooked**
2    **trees.  Then I would have -- I did, I trimmed some smaller**
3    **trees around the base of it.  You set it down, you hook --**
4    **fit the pieces together and then raise it up against the**
5    **tree.**
6         Q.  Okay.  So if you're going to use four or five
7    pieces, you put all four or five pieces together --
8         **A.  Uh-huh.**
9         Q.  -- or do it separately?
10        **A.  No, all at the same time.  Put them all**
11   **together and then raise it up.**
12        Q.  Okay.  And once again, do you recall as you
13   sit here today whether you had four or five sections all
14   put together?
15        **A.  I don't recall.  I don't think I've used less**
16   **than five sections ever.**
17        Q.  Okay.
18        **A.  Yeah.  This is the first time I've -- like if**
19   **he sent me these, I never even realized there was a piece**
20   **not attached.**
21        Q.  Okay.  So your recollection would have been if
22   you were going to utilize the 20-foot stick ladder that
23   has five sections, you're going to use all five sections?
24        **A.  Yeah.**
25        Q.  So on the day of the accident, best as you can

---

**79**

1    recollect is that five sections you put together and
2    leaned up against the tree?
3         **A.  Uh-huh.  Uh-huh.**
4         Q.  Yes?
5         **A.  Yes.  Sorry.**
6         Q.  That's okay.  So what did you do next?
7         **A.  Leaned it up against the tree, then you go and**
8    **you attach the first one that's at about -- if that's Mr.**
9    **Lentz, his waist there in picture A.  Then I would have**
10   **strapped on and started climbing up the ladder, done the**
11   **next one and then so on all the way up.**
12        Q.  Okay.  So we're clear here, so after you
13   secure the first strap from ground level for the bottom
14   climbing stick section, then you would take your safety
15   harness, wrap exhibit -- the hook buckle on Exhibit 8,
16   wrap that -- put one section into the hook on your safety
17   harness, wrap it around the tree and hook it to the other
18   section --
19        **A.  Yes.**
20        Q.  -- of the safety harness?
21        **A.  Yes.**
22        Q.  And that way you would be connected to the
23   tree?
24        **A.  Yeah, because I would have been leaving the**
25   **ground, but yeah.**

---

**80**

1         Q.  So then you start -- then you climb up.  Can
2    you give me an idea when you're climbing, I mean where are
3    you standing when you're securing the next -- the next
4    upper strap?  I mean is it at waist level, is it above
5    your head where you're strapping it or --
6         **A.  No.  For leverage, it's probably right around**
7    **my shoulder.**
8         Q.  Okay.
9         **A.  Because of the way the straps work is you pull**
10   **them tight and there's like teeth on the -- I think that's**
11   **this kind.  You pull them tight and there's teeth that**
12   **grab on, so you need, you know, a fair amount of leverage**
13   **to tighten it up.**
14        Q.  Okay.  So your practice was -- and these steps
15   on this ladder, they're not staggered, they're the same
16   level?
17        **A.  Uh-huh.**
18        Q.  Correct?
19        **A.  They're parallel, yeah.**
20        Q.  Okay.  So would you have both feet standing on
21   the same lower step?
22        **A.  I mean I don't -- yeah, I would imagine so,**
23   **yeah.**
24        Q.  And you say when -- so you would be standing,
25   your feet would be at a level below the strap so basically

---

Exhibit B

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

21 (Pages 81 to 84)

---

81

1    it would be you said shoulder level when you're tying it
2    tight?
3        A.  I don't know which one -- I don't know where
4    my feet would be.  I know I would try to have been around
5    shoulder level for the strap, yeah.
6        Q.  Okay.
7        A.  But it doesn't always work out that way.
8        Q.  Okay.
9        A.  Yeah.
10       Q.  Okay.  So -- and I'm looking at Exhibit 15-A
11   here.  It's got -- obviously, so you're climbing up,
12   you're securing the straps as you go?
13       A.  Uh-huh.
14       Q.  Yes?
15       A.  Yes.
16       Q.  Okay.  And Exhibit 15-A, once again, it shows
17   the top -- the fourth section strap looks like it's
18   connected to the tree?
19       A.  Yes.
20       Q.  Okay.  And obviously the top of the fourth
21   section is bent?
22       A.  Yes.
23       Q.  Now, do you recall at what point of the
24   installation process this accident occurred?  In other
25   words, obviously you had -- it looks like you had

---

82

1    installed the fourth strap.
2        A.  Yes.
3        Q.  What happen next?
4        A.  That does make me think that this definitely
5    was on at the time, I just don't remember it falling off,
6    because I was on the last strap when it busted.
7        Q.  Okay.
8        A.  So that had to have been on.  I -- up until I
9    saw this picture, I didn't even remember that it had come
10   off.  I assumed this was the fifth section when I was
11   looking up at it.  So I had done the fourth section and I
12   was starting to do the fifth section, so I was either
13   already at level with it or I was moving up to get at the
14   right level to adjust the tension on the strap or wrap it,
15   I don't recall, and when I grabbed some part of the tree
16   stand, it came with me and -- I mean is that what you want
17   to know?
18       Q.  Yeah.
19       A.  Okay.
20       Q.  Yeah.
21       A.  So it came with me and I went back.  I mean
22   that's -- yeah.
23       Q.  And I'll ask -- let you talk, then I'll ask
24   you some follow-up questions.
25       A.  Yeah.

---

83

1        Q.  So you recall securing the fourth strap from
2    the fourth ladder -- climbing stick section?
3        A.  I remember going to work on the last one.
4        Q.  Okay.
5        A.  So yeah, it -- the fourth one would have had
6    to have been -- and I know I didn't install the last one,
7    so to see the fourth one installed makes me realize that
8    it was all five pieces and I guess one of them came off.
9        Q.  Okay.  So you had the fifth piece secured, the
10   top section of the stick ladder and I --
11       A.  It would have -- yeah, it would have been
12   originally when I put it up, yeah.
13       Q.  And so you're -- and -- so you're climbing up
14   to secure the fifth strap for the fifth section?
15       A.  Yes.
16       Q.  Okay.  And do you recall immediately before
17   the climbing stick started bending backwards, do you
18   recall where you were situated or what you were doing?
19       A.  I was -- no, I don't.  I don't know if I was
20   going upward or if I was repositioning to, you know,
21   tension the thing.
22       Q.  Okay.  So whether you were at the very top
23   holding onto the top securing the fifth strap or whether
24   you're climbing up towards the fifth strap, you don't
25   recall?

---

84

1        A.  Not with -- not with certainty.
2        Q.  Okay.  Well, what do you think you were doing?
3        A.  I think I was at the top repositioning to deal
4    with the final strap.
5        Q.  And that final strap, so would it be
6    approximately shoulder level?
7        A.  Yeah, I believe so.
8        Q.  Okay.
9        A.  Yeah.  I mean -- so my recollection was that I
10   -- I had grabbed the top of the fifth piece.  I don't know
11   if that's in a pic by itself or not, but --
12       Q.  I gave you a bunch of these here, so let me
13   see here.  How about exhibit --
14       A.  Well, that would be the fourth, right?
15       Q.  Yeah.  Exhibit 11.  I'm just trying to get an
16   idea.  So Exhibit 11, and I understand this is the fourth
17   piece, because the fifth piece isn't really depicted.
18   Actually, no, the fifth piece is --
19       A.  Bottom of A?
20       Q.  Yeah.
21       A.  Yeah.
22       Q.  So maybe -- you've got a marker over there.
23   Can you circle --
24       A.  I don't know which end is up.  Oh, yeah, I do,
25   because the ladder rungs go slightly up, I believe.

---

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

---

85

1      Q.  So -- and I don't know if that's going to
2  work.  Anybody got a good Sharpie?  Someone took mine at
3  the last deposition.
4          MR. RYAN:  Do you want me to get you one?
5      Q.  That's easy.  There you go.  So maybe on
6  Exhibit 15-A circle where you believe --
7      A.  I think I was grabbing there.
8      Q.  Okay.  Do you want to put your -- maybe put an
9  X through that center section there.
10     A.  An X?
11     Q.  Yeah.
12     A.  Okay.
13     Q.  And then maybe put your initials next to that.
14     A.  (The witness complied.)
15     Q.  And if you could hold up to the camera and
16  let's clarify is that the fifth ladder section is -- in
17  this photograph is on the ground at this point, but prior
18  to the accident, the fifth section was on top of the
19  fourth section and you were holding onto the top of the
20  fifth section --
21     A.  Yeah.
22     Q.  -- when the ladder --
23     A.  I believe so.
24     Q.  -- climbing -- climbing stick began to bend
25  backwards?

---

86

1      A.  I believe so, yeah.
2      Q.  Okay.  Do you recall which -- was it your left
3  hand, right hand?
4      A.  I don't recall for certain.
5      Q.  Okay.  And I'm just trying to get an idea, so
6  at the very top --
7      A.  Put it down?
8      Q.  Sure.  So if you're standing there, I'm just
9  trying to get an idea of what -- can you tell me what kind
10  of -- how high you were from the top?  So if the very top
11  is here, is the very top like, you know, eye level, is it
12  at your shoulder, are you reaching up to it, are you
13  reaching down to it, do you recall?
14     A.  I -- I don't for certain.  I -- I don't for
15  certain recall.
16     Q.  Okay.  But -- I'm sorry.  Which hand do you
17  think was holding onto it?
18     A.  I don't know.
19     Q.  Was it one hand or both hands?
20     A.  I mean it was, you know, ladder-like, so --
21     Q.  Okay.
22     A.  Could have been either one.  I don't know if
23  it was -- I don't know if it was one or two hands,
24  honestly.
25     Q.  Okay.  And were both feet on the same level

---

87

1  step below, at some point below?
2      A.  I don't remember.  I don't remember if I was,
3  you know, going up or was already there.  If I was already
4  there, probably.  If I was going up, then I may have
5  been --
6      Q.  Okay.  Do you recall, were you actually
7  climbing at the point when --
8      A.  I think I was -- I think I was getting
9  situated to deal with the strap.  I don't think -- I think
10  I was already up there.
11     Q.  Okay.  And when you were -- do you believe
12  that the other hand had the strap trying to secure it?
13     A.  No.  I think I was trying to move myself.
14     Q.  To get in position to secure the --
15     A.  Yeah.
16     Q.  -- fifth strap?
17     A.  Yeah.
18     Q.  Okay.  And would the strap, once again, if
19  you're situated with the strap level, would that have been
20  approximately level with your shoulder?
21     A.  I -- I think.  I mean that's -- I know where I
22  would have gotten the best leverage, so that would been
23  ideal.
24     Q.  Do you know what level your -- what step your
25  foot on was?  In other words --

---

88

1      A.  No.  No.
2      Q.  So one hand is holding the very top of the
3  fifth section.  The other hand is trying to situate to get
4  a hold of the strap to secure it?
5      A.  I don't know if I was reaching for the strap
6  or not.  I don't remember.  Honestly, the overwhelming --
7  the one overwhelming thing that I remember is feeling very
8  confused when I fell, because the safety harness had come
9  undone.  That's like the one solid recollection I have is
10  thinking what's going on.
11     Q.  Why am I on the ground?
12     A.  No.  Falling backwards, I -- that was the
13  overwhelming sense I had was being very confused.
14     Q.  When you were -- right before the fall, did
15  you have tension on your lineman's belt?  In other words,
16  were you leaning back on the lineman's belt for support?
17     A.  I don't remember.  I didn't like doing that,
18  so not likely.
19     Q.  Okay.  And according to the photographs I see,
20  the bending characteristics of the stick ladder, it looks
21  like you kind of bent almost straight back, a little bit
22  to the left?
23     A.  Oh, I have no idea.
24     Q.  When it started bending, did you feel yourself
25  falling backwards or to the left or the right?

---

Exhibit B

Ben Scofield v. Big Dog Outdoors       Job 5899
Benjamin Scofield 1/5/2018

23 (Pages 89 to 92)

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

---

**89**

1 A. I have no -- no idea.
2 Q. Okay. So immediately before the stick ladder
3 began to bend, what was your sensation? In other words,
4 what --
5 A. Confusion.
6 Q. Okay.
7 A. Seriously. I don't know. I find it funny
8 looking back at it, so that's what I tell people, I just
9 remember being really confused at that happening and the
10 safety harness all at the same time and all that.
11 Q. And the lineman's belt will prevent you not
12 only from falling straight to the ground, but also prevent
13 you from falling -- pulling away a sufficient way from the
14 tree, right?
15 A. Uh-huh.
16 Q. Correct?
17 A. Yeah.
18 Q. So basically even if you wanted to bend back
19 the stick, the climbing stick, the lineman's belt limits
20 how far you can move back and forwards or to the left or
21 to the right?
22 A. Yeah, depending on the tension, it adjusts,
23 yeah.
24 Q. How tight did you have the lineman's belt?
25 A. I don't know. I do like to adjust them while

---

**90**

1 going up.
2 Q. Okay. And had you adjusted it while you were
3 climbing that day?
4 A. Probably.
5 Q. Did you have any trouble at all with the
6 lineman's belt at any point during the installation
7 process prior to the accident occurring?
8 A. No.
9 Q. Had you ever had any problems in the past with
10 the lineman's belt installing any of your stick ladders or
11 climbing sticks?
12 A. The most I remember is getting -- it's a
13 little hard to get off and on, but that's all.
14 Q. Okay. Because the hook nature of the --
15 A. Just, yeah, that hook, you know, because I
16 adjust it and by the time I get back to the bottom, it's
17 really, really tight, so yeah.
18 Q. And just for the record, I know I occasionally
19 have been saying stick ladder instead of climbing stick.
20 You understand those terms are pretty interchangeable?
21 A. Yeah.
22 Q. So just in case --
23 A. The part that broke, yeah.
24 Q. Okay. So -- and if we're talking, if I or you
25 say climbing stick or stick ladder, we're talking about

---

**91**

1 the same thing?
2 A. I am, yes.
3 Q. Okay. And I am, too.
4 A. Okay.
5 Q. So I apologize if I'm confusing things, but
6 those terms are used interchangeably.
7 A. Okay.
8 Q. What -- how was the weather that day?
9 A. Hot. Dry, if I remember correctly.
10 Q. What were you wearing besides the safety
11 harness?
12 A. Jeans and t-shirt. There's real bad ticks out
13 there, so. . .
14 Q. And when you began falling, did you feel
15 anything from the safety harness catch at all or was there
16 nothing?
17 A. There was freefall.
18 Q. Okay.
19 A. Absolute freefall.
20 Q. And when you were falling, were you still
21 holding onto the end of this -- the climbing stick, do you
22 know?
23 A. I didn't remember that. I don't remember it
24 hitting me either. I don't -- like I said, seeing this
25 picture, this is the first time I ever realized it came

---

**92**

1 apart. When I looked up at it -- I took a picture
2 somewhere. When I looked up at it and took a picture, I
3 thought it was the fifth section.
4 Q. When did you take a picture of it?
5 A. Lying at the bottom of the tree.
6 Q. Have we seen that? I haven't seen that.
7 A. I don't know.
8 MR. RYAN: Yeah, I should have sent it to you.
9 Can we go off just for a second?
10 MR. KARFIS: Yeah.
11 VIDEOGRAPHER: The time is approximately 11:44
12 A.M. We're off the record.
13 (Whereupon, a discussion was held off the
14 record.)
15 VIDEOGRAPHER: This begins media number three
16 in the deposition of Ben Scofield. The time is
17 approximately 11:46 A.M. We're back on the record.
18 Q. Mr. Scofield, we had a discussion off the
19 record about apparently you took two photographs from the
20 base of the tree --
21 A. Uh-huh.
22 Q. -- that apparently you sent to counsel.
23 A. Yes.
24 Q. And we'll print them up here and we'll ask you
25 some questions about it later, and off the record we had

---

scheduling@fortzlegal.com    Toll Free: 844.730.4066
fortzlegal.com
FORTZ Legal          Exhibit B

**Ben Scofield v. Big Dog Outdoors**                    **Job 5899**
**Benjamin Scofield 1/5/2018**

24  (Pages 93 to 96)

---

93

1    discussions to clarify that when you looked up there after
2    the accident, the fifth section had separated from the
3    fourth section?
4        **A.  I didn't know at the time, but yeah, it was**
5    **not attached to what I see in this.**
6        Q.  Okay.
7        **A.  The page there.**
8        Q.  And it would have been attached to -- the
9    fifth section was on top of the fourth section --
10       **A.  Yeah.**
11       Q.  -- right before the accident?
12       **A.  Yes.**
13       Q.  Okay.  And you told me before that the fifth
14   section didn't strike you on the way down or anything?
15       **A.  No, not that I recall.  I didn't have any, you**
16   **know, physical damage from it or anything.**
17       Q.  Did anything -- I mean do you recall slipping,
18   losing your balance, anything before the accident?
19       **A.  No.  It was like a trust fall.  It was just**
20   **smooth.**
21       Q.  Okay.  Do you recall leaning back when it
22   happened or were you leaning forward, to the side?
23       **A.  No.  I mean I -- I -- I remember flinching, I**
24   **mean, you know, hit -- hit came and that wasn't slowly, it**
25   **just came, and then, you know, but you can't really flinch**

---

94

1    **from nothing behind you.**
2        Q.  So when you -- it sounds like you fell kind of
3    backwards based on the damage to this climbing stick.
4    When you fell, were your feet still on the same rungs
5    until basically you went vertical and they came off or do
6    you recall?
7        **A.  I don't recall.**
8        Q.  Were you able to -- with your other free hand,
9    were you able to grab anything else, the tree or the strap
10   or anything?
11       **A.  No.**
12       Q.  Happened pretty quick?
13       **A.  Yeah.  Yeah, like I said, there was no catch,**
14   **it was a backwards -- like a trust fall, like smooth**
15   **motion.**
16       Q.  And when you came down, the lineman's belt,
17   was that still attached on one side of your safety
18   harness, do you recall?
19       **A.  I don't remember.  I don't remember.**
20       Q.  Do you recall the safety harness or any part
21   of the lineman's belt coming and catching anything on the
22   way down; in other words, any part of the climbing stick?
23       **A.  You know, like I never felt like a tug or**
24   **anything, no.**
25       Q.  And when you were -- when is the last time you

---

95

1    adjusted your lineman's belt prior to the fall?
2        **A.  I don't know.**
3        Q.  Would you typically adjust it a couple times
4    during --
5        **A.  Yeah.  Yeah, as the tree gets thinner, yeah.**
6        Q.  And would you keep yourself pretty tight to
7    the tree during the installation?
8        **A.  As much as I could and still maneuver, yeah.**
9    **I didn't like -- I know, like you said, electricians use**
10   **them and they lean and all that.  I didn't like doing**
11   **that.**
12       Q.  Did you have any operational problems with any
13   of the straps during this install?
14       **A.  No, not that I recall.**
15       Q.  And I think you told me before, did you have
16   any questions or concerns or confusion about any written
17   warnings or instructions that came with this?
18       **A.  I don't remember being confused by it.**
19       Q.  In this case you're not saying that there were
20   any improper or inadequate warnings or instructions that
21   caused or contributed to your accident, right?
22       **A.  Say that again.**
23       Q.  You're not saying that there's any inadequate
24   or improper warnings or instructions that caused or
25   contributed to your accident, are you?

---

96

1        **A.  Do I think anything in the instruction manual**
2    **made it break?**
3        Q.  Made this accident occur, or caused or
4    contributed to it.
5        **A.  No.**
6        Q.  The retailer in this case, do you hold them
7    responsible other than the fact that they sold this
8    product, is there anything specifically they did to you,
9    any representations they made to you besides the fact that
10   they -- that you made the purchase there?
11       **A.  You mean like verbally?**
12       Q.  Sure.
13       **A.  No.**
14       Q.  Did they make any express representations
15   about the climbing stick about what it can and cannot do
16   or give you any direction about how to use it?
17       **A.  No, not verbally.  I mean no more than what**
18   **you assume by somebody carrying a product.**
19       Q.  Sure.  But other than the fact that the
20   retailer simply --
21       **A.  I never talked to any of the associates about**
22   **it or anything.**
23       Q.  Okay.  Other than them selling the product,
24   the retailer --
25       **A.  Uh-huh.**

---

Exhibit B

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

---

97

1      Q.  -- did they do anything wrong that you believe
2  caused or contributed to your accident?
3          MR. RYAN:  Just let me object to the form, it
4  calls for a legal conclusion, but you can answer.
5      **A.  I never conversed with any of them about any**
6  **of it, so verbally I never had a conversation with**
7  **anybody, so. . .**
8      Q.  Okay.  And there was no, you know, marketing
9  brochures?
10     **A.  No, no.**
11     Q.  Nothing like that that caused you to -- induce
12  you to buy this product that was not --
13     **A.  It was on sale.**
14     Q.  Okay.  So other than the fact that --
15     **A.  I literally waited every year for their summer**
16  **sale kind of a thing.**
17     Q.  Other than Buchheit having a sale, you making
18  that purchase --
19     **A.  That was it, yeah.**
20     Q.  -- they did nothing wrong, as far as you're
21  concerned?
22     **A.  No.**
23     Q.  Okay.  That's correct?
24     **A.  Yes.**
25     Q.  Was there any other operational problems that

---

98

1  you had; in other words, securing the portions together
2  or, you know, nuts and bolts, any other issues you had
3  whatsoever with this --
4      **A.  No.**
5      Q.  -- climbing stick?  While doing the
6  installation process, the lower sections, did they seem to
7  be stable and secure when you were working on those lower
8  sections?
9      **A.  Yes.  Yeah.**
10     Q.  And you said -- is it your understanding that
11  your wife -- or your wife made you discard all your
12  elevated tree stand products?
13     **A.  Well, she made me or asked me not to use them**
14  **anymore.  I mean there's still some -- there's still some**
15  **out there.  I didn't go like -- I don't want to go cut**
16  **them down, so -- and we moved.**
17     Q.  Okay.  If you look at Exhibit 15-G, this is
18  another photograph of the tree stand that was retrieved
19  from the site according to what we've been told.  This is
20  -- so this tree stand here, the one you were using on the
21  date of your accident, do you know, is it still in
22  existence, has it discarded?  Do you know where it's
23  at?
24     **A.  I'm sure it's been discarded, because I don't**
25  **-- I mean I don't have it.  It didn't go with me to Kansas**

---

99

1  City.
2      Q.  Okay.  Do you have any other photographs or
3  any proof of purchase or anything that goes with this --
4  the stand that you were attempting to install on the day
5  of the accident?
6      **A.  No.  No.**
7      Q.  So all we have is the two pictures -- or three
8  pictures?
9          MR. RYAN:  I'm going to send you -- he's got a
10  picture when he's sitting in the ambulance and he has
11  pictures before we took it down, but that may be those
12  pictures; you know what I mean, but I'll send them to you.
13          MR. KARFIS:  Okay.  E-mail to me, if you can.
14  If you can print those off, that would be great.  We can
15  take a break and get them.
16     Q.  (By Mr. Karfis) Okay.  So after you fall, how
17  do you come down?
18     **A.  I believe I caught myself on the heel that had**
19  **a portion of bone break off.**
20     Q.  The right heel?
21     **A.  Right heel, yes.**
22     Q.  So you came down, did you fall straight down?
23     **A.  No.  I was -- I was at a back -- you know, not**
24  **completely flat on my back, but I was, you know, maybe**
25  **45-ish.**

---

100

1      Q.  So you came down on your right heel, then you
2  went down on your back?
3      **A.  Back, yeah.**
4      Q.  Okay.  In proximity if you're looking straight
5  up to the stick ladder, did you fall kind of straight
6  down, to the left or the right?
7      **A.  I don't remember.  I kind of freaked out when**
8  **I hit the ground and kind of scooted myself around with my**
9  **arms some.  I know that when I quit scooting, I ended up**
10  **with my torso more or less where Mr. Lentz's feet are.**
11     Q.  So in Exhibit 15-A where Mr. Lentz --
12     **A.  But I did a lot -- I did a lot of scooting,**
13  **though, so it may not be germane to how I landed.  But**
14  **yeah, I was -- I know I was somewhere around there because**
15  **when they -- when I heard them looking for me, I was**
16  **banging on the tree stand with a knife to my right, so I**
17  **was -- would have been somewhere right around there.**
18     Q.  I don't know if you can -- before I mark this,
19  this is an aerial view looking straight down, so --
20     **A.  Okay.**
21     Q.  So my great artwork.
22     **A.  Okay.**
23     Q.  Not very good, but -- so if you're looking
24  straight down from the Goodyear blimp --
25     **A.  Yeah.**

---

FORTZ Legal

Exhibit B

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

**Ben Scofield v. Big Dog Outdoors**                    **Job 5899**
**Benjamin Scofield 1/5/2018**

26  (Pages 101 to 104)

---

101

1     Q.  -- that's the tree and it says tree there and
2  the climbing stick is depicted and the box is there.
3     **A.  Yeah.**
4     Q.  Can you show me with an X maybe where you
5  believe you came down and landed?
6     **A.  Yeah.  Where I believe?**
7     Q.  Where you came down.
8     **A.  I -- I honestly don't know.**
9     Q.  You have no idea?
10    **A.  I have no guess, no.**
11    Q.  Okay.  The photographs seem to indicate that
12  the climbing stick bent backwards and slightly to the
13  left.
14    **Okay, yeah.**
15    Q.  Is that your recollection of --
16    **A.  Oh --**
17    Q.  You don't know?
18    **A.  No, not -- I have no idea how I fell.  Sorry I**
19  **made you draw that.**
20    Q.  I know.  Jeez.  Missed my plane now.  So you
21  strike the ground.  Where you see in Exhibit 15-A the tree
22  stand, was that where it was?
23    **A.  I don't know.  I don't know if they moved it**
24  **or --**
25    Q.  Had you done anything with the tree stand

---

102

1  other than carry it out to the site --
2     **A.  No.**
3     Q.  -- before the fall?
4     **A.  No.**
5     Q.  And what was your process once you had
6  finished the fifth section, securing the fifth top
7  climbing stick section --
8     **A.  Uh-huh.**
9     Q.  -- would you climb back down to get the tree
10  stand or what would you do?
11    **A.  Yeah.  Yeah, I would climb back down, tie a**
12  **rope onto it and then hoist it up.**
13    Q.  Okay.  But you hadn't got to that part yet?
14    **A.  No.**
15    Q.  So after you strike the ground, what's your
16  next step?  What do you do after you --
17    **A.  Like I said, I scooted around a little bit,**
18  **then I kind of tried to collect myself, deal with some of**
19  **the pain and then I got my cell phone and called my wife.**
20    Q.  Okay.  And what happened next?
21    **A.  A lot of back and forth and then, I don't know**
22  **how many hours later, some hours later, it had been dark**
23  **for a little bit, Dr. Widmer and my father-in-law showed**
24  **up.**
25    Q.  Okay.  And what time did the accident occur?

---

103

1     **A.  If I remember correctly at the time when it**
2  **was still in our phones, I called her at about 6:15 and**
3  **the time frame between then and everything else is fuzzy,**
4  **but I believe I got to the hospital about 11:45, but -- so**
5  **the order of events were Dr. Widmer and my father-in-law**
6  **show up, Dr. Widmer had been an ER doc for a long time, so**
7  **he was a great first person to have on site.**
8     Q.  Okay.
9     **A.  And so his obvious first move was, well, we**
10  **can't move you.  He called in the paramedics, which I was**
11  **hesitant to do because they wouldn't have been able to**
12  **find me.  They needed a guide.  I couldn't yell or**
13  **anything like that.  So he calls in the paramedics, they**
14  **come in and the -- whoever was leading the group, the**
15  **first thing he told me was, you know, if we try to carry**
16  **you out of here on this plastic stretcher thingy the way**
17  **we just came in, we're going to drop you, so we have to**
18  **call in a UTV.**
19    **So they called in the UTV with a special rack.**
20  **They attached me to the rack, put me on the UTV and then**
21  **took me in the UTV back to the ambulance.**
22    Q.  Okay.  And while you were sitting there, you
23  took a couple photographs of the --
24    **A.  Yeah.**
25    Q.  -- the climbing stick from the ground?

---

104

1     **A.  Uh-huh.**
2     Q.  Yes?
3     **A.  Yes.**
4     Q.  Okay.  And how long did it take them before
5  they got out to the site?
6     **A.  I don't recall.  Like I said, if it was around**
7  **6:15 I believe when I called my wife, Dr. Widmer and my**
8  **father-in-law didn't even show up until after dark, and**
9  **then the paramedics would have been 20 minutes after that**
10  **probably.**
11    Q.  Okay.  And then obviously EMS treated you,
12  transferred you and then took you to the hospital?
13    **A.  Yes.**
14    Q.  And we went through that.  You obviously had
15  some testing and you had surgery the next day?
16    **A.  Uh-huh.**
17    Q.  Yes?
18    **A.  Yes.  Sorry.**
19    Q.  And then we've been through the treatment you
20  had, for about the next nine months you went back on a
21  monthly basis with Dr. Quinn?
22    **A.  Yes.**
23    Q.  And did you see any other doctors,
24  specialists, orthopedic, neurosurgeons, anybody besides
25  Dr. Quinn, other than somebody that would be in her

---

**Ben Scofield v. Big Dog Outdoors**                          **Job 5899**
**Benjamin Scofield 1/5/2018**

27  (Pages 105 to 108)

---

105

1   practice?
2       A.  They -- well, I mean people came through while
3   I was in the hospital.  I don't know who all they were.
4   And then the -- I had the one follow-up visit for my foot
5   with some other guy that I never saw again.
6       Q.  And that was in the hospital?
7       A.  Yes.  Yeah, it was in the hospital building.
8       Q.  The reason I'm asking, we're going to subpoena
9   your records.  We have the EMS records, we have the Mercy
10  St. Louis records, Dr. Quinn's practice group records.
11      A.  Yeah.
12      Q.  Would there be any other doctors that have any
13  records for you?
14      A.  Just that guy that saw my foot.  I'm sure I
15  have paperwork on it somewhere, but it was a follow-up
16  thing and then that was it.
17      Q.  Was it a podiatrist or --
18      A.  I don't remember.
19      Q.  That was back in 2015?
20      A.  Yeah, I think it probably was, yeah.
21      Q.  We said a couple weeks after the accident?
22      A.  I think it was, yeah.  Yeah.
23      Q.  Have you taken a hunter safety course in the
24  state of Mississippi?
25      A.  Missouri?

---

106

1       Q.  I'm sorry.  Missouri.
2       A.  Yes.
3       Q.  And when did you take that class?
4       A.  I don't know.  I don't know how long I've had
5   the hunter's cert.  Early 2000s probably.
6       Q.  So 12 to 15 years before the accident?
7       A.  Yeah.
8       Q.  Do you recall them talking about tree stand
9   safety or safety harness usage?
10      A.  I'm sure they did.  I mean I'm fairly --
11  fairly familiar with it, excuse me.
12      Q.  Do you know Mr. Lentz at all?
13      A.  I've never met Mr. Lentz, no.
14      Q.  Have you talked to Mr. Lentz at all?
15      A.  Huh-uh.  No, I think he was the -- sorry.  No.
16  I think he was the conservation agent for that area and
17  that's how he became friends with the land owner.
18      Q.  And have you ever talked to Dr. Widmer about
19  anything he observed during retrieving the evidence?
20      A.  No, not really.
21      Q.  Are you friendly with him at all?
22      A.  Oh, yeah.  Yeah.
23      Q.  What did you do with your other, your existing
24  climbing sticks, did you throw those away, too, or --
25      A.  I think most of them are out at the property.

---

107

1   He's been taking them down as he sees them.  I don't know.
2   He doesn't get around the property like I did.  He's quite
3   a bit older than I am.
4       MR. KARFIS:  Dan, this might be a good time to
5   take a break and grab those photographs, but --
6       MR. RYAN:  Okay.
7       MR. KARFIS:  Yeah, let's take a break.
8       MR. RYAN:  All right.  Let's take a minute.
9       VIDEOGRAPHER:  This concludes media number
10  three.  The time is approximately 12:03 P.M.  We're off
11  the record.
12      (Whereupon, a recess was taken from 12:03 to
13  12:15 P.M.)
14      VIDEOGRAPHER:  This begins media number four
15  in the deposition of Ben Scofield.  The time is
16  approximately 12:15 P.M.  We're back on the record.
17      Q.  Mr. Scofield, you were kind enough to forward
18  to your attorney some photographs that you had taken I
19  believe on the day of the incident from the scene.  I'm
20  not certain which are from the scene or which are not,
21  because some of these definitely do not look like from the
22  scene, but I'll let you determine which ones -- because I
23  can see from the foliage here, it's changed, but
24  nonetheless, Photograph -- or Exhibit 21, that's a
25  photograph you took while from the ground?

---

108

1       A.  Yes.
2       Q.  Photograph 22, this looks maybe not from the
3   ground because the foliage looks like it's changed there.
4   Do you know where that picture came from?
5       A.  I don't know.  Did I send you this one?
6       MR. RYAN:  Uh-huh.
7       A.  Okay.
8       Q.  Do you know where that's from?
9       A.  Do I know where it's from?
10      Q.  No, when it's from, where it came from.
11      A.  No, I don't.  I mean I may have taken it and
12  sent it to him, but -- I went back once before it was
13  collected.
14      Q.  Okay.  And just to check things out?
15      A.  I just wanted to show my wife.
16      Q.  Okay.  And this -- so Exhibit 22 might have
17  been taken before the evidence was retrieved?
18      A.  Yes, it was taken before the evidence was
19  retrieved.
20      Q.  And I see the tree stand at the base of the
21  tree in Exhibit 22.  Do you see the fifth section of the
22  climbing stick or --
23      A.  Yeah, I do actually.  See it right there
24  sticking out.
25      Q.  Okay.  Can you circle that for me?

---

**Ben Scofield v. Big Dog Outdoors**                                **Job 5899**
**Benjamin Scofield 1/5/2018**

28  (Pages 109 to 112)

---

109

1       A.  Yeah. (The witness complied.)
2       Q.  Did you move the climbing stick or the tree
3   stand after your fall?
4       A.  I may have moved the tree stand, I'm not
5   certain.  I didn't even know that the climbing stick had
6   come off.
7       Q.  Okay.  Exhibit 23 looks like a close-up of
8   just the portion of the climbing stick on the tree?
9       A.  Yeah.
10      Q.  24, another photograph that's just a close-up
11  of one of the tree braces?
12      A.  Uh-huh.
13      Q.  Yes?
14      A.  Yes.
15      Q.  And that depicts how you had it set up on the
16  day of your accident?
17      A.  Yeah.
18      Q.  Exhibit 25, this is another one that looks
19  like it was not from the date of the accident because
20  it's --
21      A.  Yeah.
22      Q.  -- the foliage --
23      A.  Yes.
24      Q.  And I didn't mark this, but this is a
25  photograph you took looks like from a store of just an

---

110

1   exemplar?
2       A.  Yes, yes.
3       Q.  Okay.  This was a different model than yours,
4   do you know, or just --
5       A.  At the time -- well, when I was talking to him
6   about it, I had only seen two models, the one where the
7   steps weren't even and the ones where they were.
8       Q.  Okay.
9       A.  So that was my -- yeah, my attempt at an
10  example.
11      Q.  Okay.  So is there only one photograph taken
12  on the day of the accident from the scene, and that would
13  be Exhibit 21?
14      A.  There was that nighttime one.  I don't know if
15  it was worth a hoot.
16          MR. RYAN:  Printed that one off, too.  It was
17  dark.
18      A.  It fades before you really even get to the --
19      Q.  You can't see it?
20      A.  -- busted section.
21      Q.  Okay.
22      A.  I can show it to you again on my phone and you
23  can see if you want it.
24      Q.  You sent it to me already, right, so if it's
25  something --

---

111

1           MR. RYAN:  Yeah.
2       Q.  Okay.  Did you ever report this to the DNR or
3   any investigating officials?
4       A.  No.
5       Q.  Have you talked to anybody else besides your
6   attorneys in this case and maybe Mr. -- Dr. Widmer about
7   your incident and your family, friends?
8       A.  I run kind of a big Face Book page dedicated
9   to hunting deer in Missouri, and for lack of anything
10  better to do, I posted about it while I was laying on the
11  ground waiting for people to come get me.  That's actually
12  why I took this picture.  I posted it with a safety
13  warning, oddly enough, about making sure people wear their
14  harnesses.
15      Q.  Have you had any other treatment for either
16  injury you sustained in this accident other than what we
17  have talked about?
18      A.  No.
19      Q.  How long were you in the hospital for?
20      A.  I think the fall occurred on a Thursday, and I
21  believe I got out on Sunday or maybe Saturday.  It's a
22  little blurry.
23      Q.  And have you delineated specific medical loss,
24  medical expense incurred?  I mean I haven't seen that.
25          MR. RYAN:  Yeah, we should have sent it to

---

112

1   you.  The bills?
2           MR. KARFIS:  Yeah.
3           MR. RYAN:  Yeah.  If you don't have them, let
4   me know.
5           MR. KARFIS:  Okay.
6           MR. RYAN:  You should have them.
7       Q.  Okay.  So once again, you have not sought any
8   medical treatment specifically for injuries from this
9   incident since approximately June of 2016?
10      A.  My last visit with my, yeah, neurosurgeon.
11      Q.  Do you recall them taking your safety
12  harness off you at the scene, at the hospital, or do you
13  recall where?
14      A.  I don't recall where.
15      Q.  And do you recall them specifically cutting
16  off your leg straps?
17      A.  I remember them cutting off everything I was
18  wearing.  I just don't remember where.
19          MR. KARFIS:  I think those are all the
20  questions I have.  Thank you very much.
21          MR. RYAN:  Okay.  We'll waive signature.
22  That's it.
23      A.  All right.
24          VIDEOGRAPHER:  Upon concluding the deposition,
25  we will take attorneys' orders now.

---

Exhibit B

**Ben Scofield v. Big Dog Outdoors**                                    **Job 5899**
**Benjamin Scofield 1/5/2018**

29  (Pages 113 to 115)

113

1          MR. KARFIS:  I'll take a copy of the video.
2          MR. RYAN:  Me, too.
3          COURT REPORTER:  What format of transcript
4    would you like?
5          MR. KARFIS:  I'll take a condensed, one-sided,
6    you can attach the exhibits in color.
7          MR. RYAN:  Same, although I like electronic.
8          MR. KARFIS:  E-tran, too.  You've got my
9    e-mail, right?
10         COURT REPORTER:  Yes.
11         VIDEOGRAPHER:  This concludes the
12   video-recorded deposition of Ben Scofield.  The time is
13   approximately 12:23 P.M.  We're off the record.
14
15   (The deposition concluded at 12:23 P.M.)
16
17
18
19
20
21
22
23
24
25

114

1              CERTIFICATE OF REPORTER
2
3          I, BETH O. ZINK, a Registered Professional
4    Reporter, Missouri Certified Court Reporter, Illinois
5    Certified Shorthand Reporter and Notary Public within and
6    for the State of Illinois, do hereby certify that the
7    witness whose testimony appears in the foregoing
8    deposition was duly sworn by me; that the testimony of
9    said witness was taken by me to the best of my ability and
10   thereafter reduced to typewriting under my direction; that
11   I am neither counsel for, related to, nor employed by any
12   of the parties to the action in which this deposition was
13   taken, and further, that I am not a relative or employee
14   of any attorney or counsel employed by the parties
15   thereto, nor financially or otherwise interested in the
16   outcome of the action.
17
18
19         _____
20         Notary Public within and for the
21         State of Illinois, ILCSR#084-004477
22         MOCCR#799
23
24   My commission expires August 3rd, 2018.
25

115

1       IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
                JEFFERSON COUNTY, MISSOURI
2
3    BEN SCOFIELD            )
                            )
4    vs.                    )  Cause No. 17JE-CC00227
                            )
5    BIG DOG OUTDOORS, INC., and )
     BUCHEIT OF HERCULANEUM,   )
6    INC.                   )
7
8          CERTIFICATE OF DEPOSITION
9
     Comes now Beth O. Zink, and pursuant to Rule
10   57.03(g)(2)(a) states as follows:
11   The deposition of Benjamin Scofield was taken on January
     5, 2018.
12   The name and address of the person or firm having custody
     of the original transcript is:
13
     Clark Hill, PLC
14   151 South Old Woodward Avenue
     Birmingham, Michigan  48009
15
16   At the time of delivery of the transcript, the deposition
     charges had not been paid.  Payment status will be updated
17   at the request of the Court pursuant to Section
     492.590(2)RSMo.
18
19
           By:_____
20
21
     Fortz Legal Support, LLC
22   7125 Orchard Lake Road
     West Bloomfield, Michigan  48322
23   (844)730-4066
24
25

**scheduling@fortzlegal.com**                    **Toll Free: 844.730.4066**
**fortzlegal.com**

Exhibit B

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

BEN SCOFIELD,                          )
                                       )
      Plaintiff,                   )
                                       )
vs.                                    )      Cause No: 20JE-CC00277
                                       )
WSTR HOLDINGS, INC. d/b/a BIG DOG      )
TREESTANDS, INC. and BUCHHEIT         )
OF HERCULANEUM, INC.                  )
                                       )
      Defendants.                  )

## AFFIDAVIT OF PETRINA JANNIN

STATE OF MISSOURI           )
                            ) ss
COUNTY OF JEFFERSON         )

      I, Petrina Jannin, have personal knowledge concerning the statements contained in this Affidavit.

      1.     I am the Safety Manager at Buchheit of Herculaneum, Inc. ("Buchheit"). I have been employed at Buchheit from 1992 to present.

      2.     As the Safety Manager of Buchheit of Herculaneum, Inc., I have personal knowledge concerning the purchase of treestand products, including those products distributed by Big Dog Treestands, Inc. Buchheit purchased treestand products, including climbing sticks, from WSTR Holding's, Inc. d/b/a/ Big Dog Treestands ("Big Dog").

      3.     During the time that Big Dog sold climbing sticks to Buchheit, the only contract between the parties was a standard Vendor's Agreement which contained all the terms and conditions concerning the sale of treestands and outdoor products, including climbing sticks. There was never any specialized contract negotiated between Big Dog and Buchheit for the sale of treestands or outdoor products, including climbing sticks.

Exhibit C

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

4.     The subject climbing stick involved in this lawsuit has been identified as a Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20 that was manufactured and distributed by Big Dog and that Big Dog sold such a product to Buchheit.

5.     Big Dog was the manufacturer and/or distributor of the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20 at issue in this lawsuit.

6.     At no time did Buchheit have any involvement with the design, manufacture, production or assembly of any climbing sticks (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

7.     At no time did Buchheit have any involvement with the material selection of any parts or any climbing stick (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

8.     At no time did Buchheit have any involvement with the manufacturing process of any climbing sticks (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

9.     At no time did Buchheit have any involvement with the warnings for any climbing sticks (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

10.     At no time did Buchheit have any involvement with the instructions for any climbing sticks (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

11.     At no time did Buchheit have any involvement with the labeling for any climbing sticks (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

ClarkHill\36755\314761\223910469.v1-5/29/20

Exhibit C

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

12.     At no time did Buchheit have any involvement with the packaging for any climbing sticks (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

13.     At no time did Buchheit have any involvement with the testing of any climbing sticks (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

14.     At no time did Buchheit have any involvement with quality assurance of any climbing sticks (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

15.     The Buchheit name has never been placed on any climbing sticks (or treestands) distributed by Big Dog at any time.

16.     The Buchheit name has never been placed on any warnings and instructions, labeling, or packaging for climbing sticks (or treestands) sold by Big Dog Treestands.

17.     The subject climbing sticks, as with all other climbing sticks (or treestands) sold by Buchheit, was sealed in a cardboard box before it was shipped to Buchheit for sale in its stores, and alleged to have been sold to Plaintiff and was not altered in any way by Buchheit.

18.     Buchheit is aware of no facts or circumstances upon which a verdict could be reached against it other than its status as the seller of the subject climbing sticks.

PETRINA JANNIN

Exhibit C

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

Subscribed and sworn to before me on this
the 29 day of ___May___, 2020

_Apryl L. Yamnitz_

Notary Public, State of Missouri
My Commission Expires: March 10, 2021

```
APRYL L. YAMNITZ
Notary Public - Notary Seal
STATE OF MISSOURI
Perry County
My Commission Expires:  Mar. 10, 2021
Commission # 13760245
```

4

Exhibit C

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 17JE-CC00227 |
| | ) | |
| BIG DOG OUTDOORS, INC., | ) | |
| BUCHEIT OF HERCULANEUM, INC. | ) | |
| BIG DOG TREE STANDS, INC. | ) | |
| BUCHEIT HERCULANEUM, INC. | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WSTR HOLDINGS, INC. D/B/A BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF TERRY ROYER**

| | |
|---|---|
| State of Illinois | ) |
| | ) ss |
| County of Peoria | ) |

I have personal knowledge concerning the statements contained in this Affidavit.

1.     I was the CFO at Big Dog Treestands, Inc. from 2005 to 2016.

2.     As the CFO of Big Dog Treestands, I have personal knowledge concerning the treestand products distributed by Big Dog Treestands, including climbing sticks.  Big Dog Treestands is a distributor of certain outdoor products, including climbing sticks.  Big Dog Treestands distributed/sold climbing sticks to Buchheit of Herculaneum, Inc. ("Buchheit").

3.     As Big Dog Treestands CFO, I am knowledgeable concerning the Big Dog Treestand products, including treestands and climbing sticks sold to Buchheit.

4.     As Big Dog Treestands CFO, I am knowledgeable concerning any involvement Buchheit had with the sale of Big Dog Treestands climbing sticks to Buchheit.

219425864.1

Exhibit D

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

5.      During the time that Big Dog Treestands sold climbing sticks to Buchheit, the only contract between the parties was a standard Vendor's Agreement which contained all the terms and conditions concerning the sale of treestands and outdoor products, including climbing sticks.  There was never any specialized contract negotiated between Big Dog Treestands and Buchheit for the sale of treestands or outdoor product, including climbing sticks.

6.      The subject climbing stick has been identified as a Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20 manufactured by a factory oversees for Big Dog Treestands and distributed in the United States.

7.      Plaintiff has submitted that he purchased this climbing stick from Buchheit's store in Herculaneum, Missouri in 2014 (without any proof of purchase to date) and this model was sold to Buchheit by Big Dog Treestands in 2014.

8.      At no time did Buchheit have any involvement with the design of any climbing sticks sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

9.      At no time did Buchheit have any involvement with the design of any climbing sticks (or treestands).

10.      At no time did Buchheit have any involvement with the material selection of any part of any climbing stick sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

11.      At no time did Buchheit have any involvement with the manufacturing process of any climbing sticks (or treestand) sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

12.     At no time did Buchheit have any involvement with the warnings for any climbing sticks (or treestands) sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

13.     At no time did Buchheit have any involvement with the instructions for any climbing sticks (or treestands) sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

14.     At no time did Buchheit have any involvement with the labeling for any climbing sticks (or treestands) sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

15.     At no time did Buchheit have any involvement with the packaging for any climbing sticks (or treestands) sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

16.     At no time did Buchheit have any involvement with the testing of any climbing sticks (or treestands) to confirm compliance with applicable TMS/ASTM industry standards.

17.     At no time did Buchheit have any involvement with production of any climbing sticks (or treestands) sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

18.     At no time did Buchheit have any involvement with quality assurance of any climbing sticks (or treestands) sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

19.     Buchheit had no contractual arrangement with the overseas manufacturer who produced climbing sticks (or treestands) for Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20.

3

20.     Buchheit had no direct dealings with the overseas manufacturing facility where the subject Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20 climbing stick was produced.

21.     The Buchheit name has never been placed on any climbing sticks (or treestands) distributed by Big Dog Treestands at any time.

22.     The Buchheit name has never been placed on any warnings and instructions, labeling, or packaging for climbing sticks (or treestands) sold by Big Dog Treestands.

23.     Big Dog Treestands has never distributed to Buchheit a climbing stick (or treestand) bearing the Buchheit name and/or a Buchheit brand name.

24.     The subject climbing sticks, as with all other climbing sticks (or treestands) distributed by Buchheit, was sealed in a cardboard box before it was shipped to Buchheit for sale.

25.     Buchheit never inspected the manufacturing facility concerning the design and manufacture of climbing sticks (or treestands).

_____
TERRY ROYER

Subscribed and sworn to before me on this
the 11 day of april , 2018

_____
Notary Public, State of Illinois
My Commission Expires: 5/26/18

OFFICIAL SEAL
DEON KELLY KEPPNER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/26/18

4

Exhibit D

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

This SPECIAL MULTI-FLEX POLICY is provided by the stock insurance company(s) of The Hartford Insurance Group, shown below.

# COMMON POLICY DECLARATIONS

**POLICY NUMBER:** 83 ECS OF5710

**RENEWAL OF:** 83 ECS OF5710



**Named Insured and Mailing Address:**
**(No.,Street,Town,State,Zip Code)**

BIG DOG TREESTANDS, INC.
 P.O. BOX 952
MORTON, IL 61550

**Policy Period:**  **From** 11/01/2014  **To** 11/01/2015

12:01 a.m. Standard Time at your mailing address shown above.

In return for the payment of the premium, and subject to all of the terms of this policy, we agree with you to provide insurance as stated in this policy.  The Coverage Parts that are of this policy are listed below.  The Advance Premium shown may be subject to adjustment.

**Total Advance Premium:** ███████████

**Coverage Part and Insurance Company Summary**                                         **Advance Premium**

███████████████████████████████████████████████████████████████████████████

**Form Numbers of Coverage Parts, Forms and Endorsements that are a part of this policy and that are not listed in the Coverage Parts.**

EH00570605

**Agent/Broker Name:**                         **Agency Code:**

R T SPECIALTY LLC                              553817
180 N STETSON AVENUE
SUITE 4600
CHICAGO, IL 60601

Countersigned by _____
(Where required by law)          Authorized Representative            Date

Scofield v. Big Dog Treestands, Inc., et. al.
Case No. 17JE-CC00227
Bates No.: BD000242

11/05/2014

**Form HM 00 10 01 07**                                                      Exhibit E

# COMMERCIAL GENERAL LIABILITY (EXCESS - BROAD FORM) COVERAGE PART - DECLARATIONS



**DECLARATIONS**

**POLICY NO.** 83 ECS OF5710

> **Previous Policy No.**
> 83 ECS OF5710

This COMMERCIAL GENERAL LIABILITY (EXCESS - BROAD FORM) COVERAGE PART consists of:

  **A.** This Declarations;
  **B.** Commercial Liability Schedule, if applicable;
  **C.** Commercial General Liability (Excess - Broad Form) Coverage Form; and
  **D.** Any Endorsements issued to be part of this Coverage Part and listed below.

**1. Audit Period is the Policy Period unless otherwise herein stated:** ☐ Semi-Annual ☐ Quarterly ☐ Monthly
                                                        ☒ Annual ☐ Not subject to Audit

**2. Advance Premium** ▉▉▉▉▉▉ which is ☐ A Flat Charge Per Each Policy Period

                                                   ☒ Adjustable at the end of each Audit Period, Per Premium Computation Endorsement

**Minimum Retained Audit Premium** ▉▉▉▉▉▉

**Minimum Retained Premium** ▉▉▉▉▉ not subject to adjustment in the event of cancellation by you.

**Applicable State Surcharges:** REFER TO SCHEDULE HC1210

Note: charges, if any, are included in item **2.** above

**3. Limits of Insurance**

  The Limits of Insurance, subject to all the terms of this policy that apply, are:

| | |
|---|---|
| Each Occurrence | $1,000,000 |
| Personal and Advertising Injury Limit | $1,000,000 |
| General Aggregate Limit (Other than Products-Completed Operations) | $2,000,000 |
| Products-Completed Operations Aggregate Limit | $2,000,000. |

**4. Self-Insured Retentions**

  Your self-insured retentions, subject to all the terms of this policy that apply, are:

| | |
|---|---|
| Each Occurrence Retention | $25,000 |
| Personal and Advertising Injury Retention | $25,000 |
| General Aggregate Retention (Other than Products-Completed Operations) | NOT APPLICABLE |
| Products-Completed Operations Aggregate Retention | NOT APPLICABLE |
| All coverages (including Products-Completed Operations) Aggregate Retention | NOT APPLICABLE |

**5. Classification, if any:**

  REFER TO EXTENSION SCHEDULE

**6. Business Description**

  SPORTING GOODS MFG

**7. Form Numbers of Coverage Forms and Endorsements forming a part of this policy:**

  SEE LISTING OF POLICY PROVISIONS AND ENDORSEMENTS FORMING A PART OF THE POLICY AT ISSUE.

11/05/2014

Scofield v. Big Dog Treestands, Inc., et. al.
Case No. 17JE-CC00227
Bates No.: BD000243

**Form EH 00 57 06 05**

(c) 2005, The Hartford

Exhibit E

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

# EXCESS LIABILITY DECLARATIONS

# Starr Surplus Lines Insurance Company

Chicago, IL

Administrative Office: 399 Park Avenue, 8th Floor, New York, NY 10022

**POLICY NUMBER:**  1000010769          **RENEWAL OF:**  NEW

**PRODUCER NAME:**  BRECKENRIDGE INSURANCE SERVICES, LLC

**ADDRESS:**  3870 S LINDBERGH BLVD SUITE 100
ST LOUIS, MO 63127

**ITEM 1.**     **NAMED INSURED:**   BIG DOG TREE STANDS, INC.

**ADDRESS:**   120 Detroit Parkway
Morton, IL 61550

**ITEM 2:**     **POLICY PERIOD:  FROM**        11/01/2014          **TO**          11/01/2015

12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

**ITEM 3.**      **COVERAGE:**   Commercial Excess Liability

**ITEM 4.**     **LIMITS OF INSURANCE:**

The Limits of Insurance, subject to all the terms of this Policy, are:

**A.**      $4,000,000      Each Occurrence
**B.**      $4,000,000      Other Aggregate(s), Where Applicable
**C.**      $4,000,000      Products-Completed Operations Aggregate

**ITEM 5.**     **"UNDERLYING INSURANCE"**

**A. First Underlying Insurance Policy(ies)**
**Insurer**                    **Policy No.**      **Policy Period**
See attached Schedule of Underlying Insurance

**B. Additional Underlying Insurance Policy(ies)**
**Insurer**                    **Policy No.**      **Policy Period**

**ITEM 6.**     **POLICY PREMIUM:**

**SL - 101 - D (10/08)**                                   Page **1** of 3

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

Scofield v. Big Dog Treestands, Inc., et. al.
Case No. 17JE-CC00227
Bates No. BDG00428
Exhibit B

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

**ITEM 7.    NOTICES**

In the event of an accident, occurrence, wrongful act, claim or suit, that is reasonably likely to involve this Policy, send all pertinent facts to:

Send all Excess Casualty Loss Notices to:
York Risk Services Group, Inc
Attn. OSC
P.O. Box 183188
Columbus, OH 43218-3188
4869excessclaims@yorkrsg.com
Fax: 866-695-3651
**After hours emergency service call:**
(866) 391-9675

**ITEM 8.    ENDORSEMENTS ATTACHED:**

| Title | Form Number |
|---|---|
| Excess Liability Declarations | SL 101 D 10 08 |
| Excess Liability Policy Schedule Of Underlying Insurance | SL 102 10 08 |
| Excess Liability Policy Form | SL 100 10 08 |
| Cross Suits Exclusion | SL 139 10 08 |
| Employment Related Practices Exclusion | SL 154 10 08 |
| Lead Exclusion | SL 174 10 08 |
| Professional Liability Exclusion | SL 205 10 08 |
| Illinois Changes - Cancellation And Nonrenewal | SL 301 IL 03 09 |
| Exclusion Of Terrorism | SL 346 10 08 |
| Service of Suit Endorsement (Illinois Only) | SL 704 IL 08 10 |
| CV Starr Excess Liability Program Claim Reporting Form | SL CLAIMS NOTICE |

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

Scofield v. Big Dog Treestands, Inc., et. al.
Case No. 17JE-CC00227
Bates No. BD00042A
Exhibit E

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

The foregoing discloses all hazards insured hereunder known to exist at the inception date of this Policy, unless otherwise stated herein by endorsement on this Policy.

COUNTERSIGNED _____10/31/2014_____   BY _____
                              DATE                        AUTHORIZED REPRESENTATIVE

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

Scofield v. Big Dog Treestands, Inc., et. al.
Case No. 17JE-CC00227
Bates No. BD000425

Exhibit B

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. and BUCHHEIT | ) | |
| OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT BUCHHEIT HERCULANEUM, INC.'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO
<u>MISSOURI REVISED STATUTE 537.762</u>**

NOW COMES Defendant BUCHHEIT OF HERCULANEUM, INC. (hereinafter "Buchheit"), by and through its attorneys, and for its Memorandum of Law in Support of its Motion to Dismiss pursuant to Mo. Rev. Stat. § 537.762, states as follows:

## <u>INTRODUCTION</u>

Defendant Buchheit hereby moves this Court pursuant to Mo. Rev. Stat. § 537.762 for dismissal of each of Plaintiff's claims against Buchheit. The factual record is clear that Buchheit is nothing more than a downstream seller of a product manufactured by WSTR Holdings, Inc. d/b/a Big Dog Treestands ("Big Dog") which allegedly caused Plaintiff's injuries. Buchheit, therefore, cannot be held liable to Plaintiff pursuant to Missouri's Innocent Seller's Statute, Mo. Rev. Stat. § 537.762.  A non-manufacturing seller of an allegedly defective product is not liable for damages under Missouri law when the manufacturer/distributor of the alleged defective product is before the court and from which Plaintiff may seek total recovery.  Here, Plaintiff claims that he purchased the subject climbing stick from Buchheit at their Herculaneum store. Plaintiff cannot show that Buchheit knew of should have known of any alleged defect.  Buchheit

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

made no representations related to the subject product and is a mere retailer.  Buchheit had no control or influence over the design, manufacture, packaging, warnings, instructions, or labeling of the climbing stick.  In addition, there is no evidence that the Buchheit did anything that would have created an alleged defect in the product.  Buchheit merely allegedly sold the product. Plaintiff has failed allege any evidence to establish a claim against Buchheit in this case. Buchheit did nothing other than allegedly sell the subject product. In fact, Plaintiff has no evidence that Buchheit did anything other than sell the subject product. As such, Buchheit, as a non-manufacturing seller and is not liable to Plaintiff for the allegedly "defective" product under Mo. Rev. Stat. § 537.762. The manufacturer of the climbing stick, Big Dog, is a defendant in the case and has $5,000,000 of applicable insurance limits, so total recovery for Plaintiff's claim can be had against Big Dog. Thefore, Buchheit is entitled to dismissal.

## FACTUAL BACKGROUND

The case is a refiling of case #17JE-CC00227. Plaintiff filed this product liability case against Big Dog and Buchheit claiming that the subject Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20, was defective causing him to sustain injuries. (*See Plaintiff's Petition, Exhibit A*).  Plaintiff alleged that the climbing stick "snapped" during the installation when he "grabbed the top section … to steady his way down." (*Id. at ¶ 4*). The claims against Buchheit are based solely on its status as the alleged retail seller in the stream of commerce.  Specifically, Plaintiff alleges to have purchased the subject climbing stick in 2014 from Buchheit's store in Herculaneum, Missouri, but he does not have any proof of purchase for the subject product. (*See Plaintiff's Deposition Transcript, Exhibit B, at p. 23*).

The manufacturer/distributor of the subject climbing stick is a named party in this case. WSTR Holdings, Inc. has defended this case as it manufacturers/distributes Big Dog Treestands.

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

Big Dog has confirmed that the subject climbing stick was manufactured by a factory overseas for Big Dog Treestands and distributed to the United States by Big Dog Treestands. (*See Affidavit of T. Royer, Exhibit D, at ¶ 6*; *see also Affidavit of P. Jannin, Exhibit C, at ¶¶ 4-5*). The subject product was identified as a Big Dog Treestand product on the display model, box and climbing stick unit itself. (*See id.*).

As a non-manufacturing retail seller, Buchheit had no control or influence over the design, manufacturer, construction, warnings, instructions or quality of the subject climbing stick. (*See Exhibit C, at ¶¶ 6-14).* In particular, Buchheit had no involvement with the design, manufacturer, assembly or packaging of the subject climbing stick, and there is no evidence that Buchheit did anything other than sell the subject climbing stick. (*Id.).* Furthermore, at no time did Buchheit have any involvement with the design of the climbing sticks distributed by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20. (*Id. at ¶ 6; see also, Exhibit D, at ¶ 8*). At no time did Buchheit have any involvement with the material selection of any part of any climbing stick sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20. (*See Exhibit C, at ¶ 7; Exhibit D, at ¶ 10*).

Also, at no time did Buchheit have any involvement with the instructions, labeling, packaging, production or quality assurance for any climbing sticks (or treestands) sold by Big Dog Treestands, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20. (*See Exhibit C, at ¶¶ 9-12, 14; Exhibit D, at ¶¶ 12-15, 17*). Buchheit had no involvement in testing of any climbing sticks (or treestands) to confirm compliance with applicable TMS/ASTM industry standards. (*See Exhibit C, at ¶ 13, Exhibit D, at ¶ 16*).

Buchheit's name has never been placed on any climbing stick (or treestands) distributed by Big Dog Treestands, or any warnings and instructions, labeling, or packaging for climbing

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

sticks (or treestands) sold by Big Dog Treestands at any time. (*See Exhibit C, at ¶¶  15-16).*
Buchheit has never sold a climbing stick (or treestand) bearing the Buchheit name and/or a
Buchhit brand name. (*Id.*). The subject climbing sticks, as with all other climbing sticks (or
treestands) distributed by Buchheit, was sealed in a cardboard box before it was shipped to
Buchheit for sale in its stores. (*Id. at ¶ 17).*

The only connection that Buchheit has to the subject climbing stick is that it sold this
model climbing stick in its stores. Plaintiff admitted that Buchheit did nothing other than sell the
subject climbing stick and that Buchheit did nothing wrong.

>Q.      Other than Buchheit having a sale, you making that purchase –
>A.      That was it, yeah.
>Q.      -- they did nothing wrong, as far as you're concerned?
>A.      No.
>Q.      Okay. That's correct?
>A.      Yes.

(*See Exhibit B, at p. 97*). In fact, Plaintiff acknowledged that he made the decision to purchase
the subject climbing sticks on his own without any representations begin made by any Buchheit
employees to him about the climbing sticks:

>**Q.      The retailer in this case, do you hold them responsible other than the
>fact that they sold this product, is there anything specifically they did to you,
>any representations they made to you besides the fact that they – that you
>made the purchase there?**
>A.      You mean like verbally?
>Q.      Sure.
>**A.      No.**
>Q.      Did they make any express representations about the climbing stick about
>what it can and cannot do or give you any direction about how to use it?
>A.      No, not verbally. I mean no more than what you assume by somebody
>carrying a product.
>Q.      Sure. But other than the fact that the retailer simply –
>A.      I never talked to any of the associates about it or anything.
>* * *
>A.      I never conversed with any of them about any of it, so verbally I never had
>a conversation with anybody, so…
>Q.      Okay. And there was no, you know, marketing brochures?

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

A.      No. No.

(*Id. at pp. 96-97*).   Buchheit, therefore, is a pure seller of the product which Plaintiff alleges

caused his accident and injuries. Plaintiff named Big Dog, the manufacturer/distributor of the

subject climbing stick. Big Dog can satisfy any verdict entered in favor of Plaintiff. (*See WSTR's*

*Declaration Pages of Liability Insurance, attached hereto as **Exhibit E***).   There are no facts or

circumstances upon which a verdict might be reached against Buchheit other than its status as a

seller in the stream of commerce of the subject climbing sticks. (*See **Exhibit C**, at ¶ 18*).

## LAW AND ARGUMENTS

### A. THE MISSOURI "INNOCENT" SELLER STATUTE SUBSTANTIVELY PRECLUDES LIABILITY AGAINST BUCHHEIT.

Missouri Product Liability law imposes a duty upon a manufacturer not to introduce an

unreasonably dangerous product into commerce, whether the danger arises from defective

manufacture, defective design, or a failure to warn of danger. Mo. Rev. Stat. § 537.760; *Magnuson*

*by Mabe v. Kelsey-Hayes Co.*, 844 S.W.2d 448, 455 (Mo. Ct. App. 1992).  It is well settled in

Missouri that a non-manufacturing seller of a defective product is not liable for damages in tort if

that party in the chain of distribution can establish that there is no evidence to establish any

possibility that a verdict might be reached against the seller, other than his status as a mere seller

in the stream of commerce.  Mo. Rev. Stat. § 537.762.  As such, the "innocent" seller statute allows

a seller in the stream of commerce to be dismissed from a product liability case if liability is based

solely on the status of being a seller.  *Id.*  Mo. Rev. Stat. § 537.762 provides as follows:

> 1. A defendant whose liability is based solely on his status as a seller in the stream of commerce may be dismissed from a products liability claim as provided in this section.

> 2. This section shall apply to any products liability claim in which another defendant, including the manufacturer, is properly before the court and from whom total recovery may be had for plaintiff's claim.

3. A defendant may move for dismissal under this section within the time for filing an answer or other responsive pleading unless permitted by the court at a later time for good cause shown. The motion shall be accompanied by an affidavit which shall be made under oath and shall state that the defendant is aware of no facts or circumstances upon which a verdict might be reached against him, other than his status as a seller in the stream of commerce.

4. The parties shall have sixty days in which to conduct discovery on the issues raised in the motion and affidavit. The court for good cause shown, may extend the time for discovery, and may enter a protective order pursuant to the rules of civil procedure regarding the scope of discovery on other issues.

5. Any party may move for a hearing on a motion to dismiss under this section. If the requirements of subsections 2 and 3 of this section are met, and no party comes forward at such a hearing with evidence of facts which would render the defendant seeking dismissal under this section liable on some basis other than his status as a seller in the stream of commerce, the court shall dismiss without prejudice the claim as to that defendant.

6. An order of dismissal under this section shall be interlocutory until final disposition of plaintiff's claim by settlement or judgment and may be set aside for good cause shown at any time prior to such disposition.

As such, in order to shield itself from liability under the Seller's Statute, a product retailer must establish two facts: (1) the defendant's liability is based solely on its status as seller in the stream of commerce; and (2) other defendants, including the product manufacturers, are properly before the court that could satisfy a successful verdict. Mo. Rev. Stat. § 537.762. The statute applies to bar both negligence and strict liability claims against product retailers/sellers. Mo. Rev. Stat. § 537.762(2).

The Missouri Supreme Court in *Gramex Corp. v. Green Supply*, 89 S.W.3d 432, 446 (Mo. banc 2002) characterized this statute as both substantive and procedural, noting "[i]t is clear that our legislature sought to protect 'innocent' wholesalers and retailers from the perils of products liability claims, both procedurally and substantively by section 537.762." The Missouri Supreme Court explained:

Although at first glance this statute appears to be merely a procedural device to

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

> save wholesalers and retailers from the significant costs of product liability litigation, inherent in the statute is a substantive public policy choice of significant importance. To the extent that a plaintiff can otherwise obtain 'total recovery,' all liability of a downstream seller, who would otherwise be jointly and severally liable to plaintiff for damages and subject to contribution from the other defendants, is shifted to upstream defendants, including the manufacturer.

*Gramex,* 89 S.W.3d at 445 (emphasis in the original).  Following this decision more recent federal courts have followed *Gramex* and found that the statute has substantive application where there is no reasonable basis for recovery against a retailer defendant who is a seller in the stream of commerce. *See Wichmann v. The Proctor & Gamble Manuf. Co.*, 2006 U.S. Dist. LEXIS 89407, (E.D. Mo. Dec. 11, 2006)

When the case involves both strict liability and negligence claims, the plaintiff must establish factual basis in law or fact that would entitle him to a verdict against a mere seller. In *Wichmann,* the plaintiff alleged both strict liability and negligence claims against the retailer because it sold the allegedly defective tampons.  The plaintiff argued that the retailer was not sued solely in its capacity as a seller of the alleged defective tampons, but rather was also liable to plaintiffs in negligence because it failed to test or observe the manner of use of the tampons, and failed to advise and warn plaintiffs of the risk of overnight use of the tampon which contained rayon as a component part. *Wichmann,* 2006 U.S. Dist. LEXIS 89407, *6-7.  The district court held that dismissal was still warranted because there was not a basis in law or fact to establish liability:

> This argument fails because there is no reasonable basis in law or fact which would impose a duty on the part of Dierbergs, as the seller of the subject tampons, to inspect or test the tampons or to warn Plaintiffs of the risks involved in the use of the tampons.
>
> … Warnings regarding the use of tampons have been mandated by federal regulation. 21 C.F.R. § 801.430(d)(3). Thus, the allegations regarding Dierbergs' duty vis a vis tampon testing and usage would require Dierbergs to go beyond the federally required warnings, (which are contained on the product packaging itself)

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

and engage in highly scientific testing and experimentation. The absurdity of requiring a grocer to test the products it sells and report to its customers the risks of all of those products establishes the lack of a reasonable basis in fact or law of a duty owed by Dierbergs to Plaintiffs. Without the requisite duty, there can be no negligence claim against Dierbergs.

*Wichmann,* 2006 U.S. Dist. LEXIS 89407, *7.

When a moving retailer seeks dismissal and avers that it is merely a seller in the stream of commerce, the other party should come forward with evidence that the defendant seeking dismissal is liable on some basis other than his status as a seller. Mo. Rev. Stat. § 537.762.  In this case, Plaintiff has failed to establish any evidence to support a claim against Buchheit other than a claim that Buchheit was the mere seller of the subject product.  There is no evidence that Buchheit had any knowledge of any alleged defect with the subject climbing sticks and Plaintiff has yet to even identify the alleged defect or alleged negligence against Buchheit.  Buchheit would have received the subject climbing sticks in a sealed package from the other Defendant. It was sold as received in its retail stores and through the internet.  Plaintiff acknowledges that the subject climbing stick was purchased new and has not alleged any facts to support that the product appeared to have any defect at the time of purchase. In fact, Plaintiff testified under oath that he had no evidence that Buchheit did anything other than sell the product at issue.

**B.  PLAINTIFF'S CLAIM AGAINST BUCHHEIT IS BASED SOLELY ON BUCHHEIT'S STATUS AS A SELLER IN THE STREAM OF COMMERCE.**

The first requirement to satisfy the Innocent Seller Statute is that Defendant must show that its liability is based on its status as a seller in the stream of commerce. Mo. Rev. Stat. § 537.762; *Gramex*, 89 S.W.3d at 445. In this case, there is a complete factual record which demonstrates that Buchheit is nothing more than a seller of the product Plaintiff claims caused his injuries. There is no evidence in the record that Buchheit had any input into the design or manufacture of the product at issue, or any of the warnings labels or instructions which

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

accompanied those products. In fact, the record demonstrates that Buchheit had no involvement other than selling the product in its stores.

In this case, Buchheit has clearly set forth evidence to support dismissal as an "innocent" seller under Missouri law related to Plaintiff's claims against it in their entirety. Buchheit has provided the requisite affidavit to support its dismissal. (*See **Exhibit C***). The manufacturer of the subject product is Big Dog. Buchheit had no control or influence over the design, manufacture, construction, warnings, instructions or quality of the subject climbing stick. In particular, Buchheit had no involvement with the design, manufacturer, assembly or packaging of the subject climbing stick, and there is no evidence that Buchheit did anything other than sell the subject climbing stick. Buchheit had no involvement with the material selection of any part of any climbing stick sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20. Buchheit had no involvement with the instructions, labeling, packaging, production or quality assurance for any climbing sticks (or treestands) sold by Big Dog, including the Big Dog 20' Hot Foot Climbing Stick, Model BDLS-20. In addition, Buchheit had no involvement in testing of any climbing sticks (or treestands) to confirm compliance with applicable TMS/ASTM industry standards.

Buchheit's name has never been placed on any climbing stick (or treestands) distributed by Big Dog, or any warnings and instructions, labeling, or packaging for climbing sticks (or treestands) sold by Big Dog at any time. Buchheit has never sold a climbing stick (or treestand) bearing the Buchheit name and/or a Buchheit brand name. The subject climbing sticks, as with all other climbing sticks (or treestands) distributed by Buchheit, was sealed in a cardboard box before it was shipped to Buchheit for sale in its stores. The only connection that Buchheit has to the subject climbing stick is that it sold this model climbing stick in its stores. Plaintiff admitted

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

that Buchheit did nothing other than sell the subject climbing stick and that Buchheit did nothing wrong.

Buchheit's lability in this case is therefore based entirely upon its status as a seller of this product which it placed in the stream of commerce, and the record demonstrates that Buchheit has satisfied the Innocent Seller's Statute's first requirement. There are no facts or circumstances upon which a verdict might be reached against Buchheit other than its status as a seller in the stream of commerce of the subject climbing sticks. Buchheit, therefore, is a pure seller of the product which Plaintiff alleges caused his accident and injuries and should be dismissed.

### C. The Product Manufacturer is Before the Court and Can Satisfy a Successful Verdict.

The second requirement to satisfy the Innocent Seller's Statute is that other defendants, including the product manufacturers, are properly before the court that could satisfy a successful verdict. Mo. Rev. Stat. § 537.762; *Gramex*, 89 S.W.3d at 445. Here, there is no question that this element is satisfied. First, the manufacturer/distributor of the subject climbing stick which Plaintiff allegedly used is an active Defendant before the Court in this case. (*See Exhibit A*).  The manufacturing Defendant, Big Dog has provided evidence that it can fully satisfy any verdict through declarations of insurance coverage. (*See Exhibit E*). There is no evidence in the record that Big Dog is incapable of satisfying any verdict in favor of Plaintiff.  As such, dismissal of Buchheit is appropriate.

## CONCLUSION

Under Missouri law, Buchheit is merely the product seller of the alleged defective product, with Co-Defendant as the manufacturer/distributor.  As a non-manufacturing seller or "innocent" seller, there is no evidence that Buchheit knew or should have known of any defect. The purpose of the retail seller statute is to give innocent sellers who did nothing wrong other than pass on a

10

Exhibit A

Electronically Filed - Jefferson - June 10, 2020 - 02:10 PM

product in the chain of commerce an opportunity to be dismissed from the case. Buchheit has now shown that the elements of the statute have been met.  Plaintiff cannot meet his burden of proof. For the foregoing reasons, Defendant Buchheit of Herculaneum, Inc. respectfully requests this Court grant its Motion and dismiss Plaintiff's Petition in its entirety with prejudice.

Respectfully submitted,

EVANS AND DIXON, L.L.C.

By:  /s/ Brian R. Shank
    Brian R. Shank  (#59955)
    Metropolitan Square
    211 North Broadway, Ste. 2500
    St. Louis, MO 63102
    Phone: (314) 621-7755
    Fax:    (314) 621-3136
    bshank@evans-dixon.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 10th day of June, 2020.

/s/Brian R. Shank

4467691

Exhibit A

Electronically Filed - Jefferson - June 29, 2020 - 02:25 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No.: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. D/B/A BIG DOG | ) | Division No.: 5 |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF HEARING

Comes now defendant Buchheit of Herculaneum, Inc., by and through its undersigned counsel, and gives notice that it will call its Motion to Dismiss for hearing via Zoom video platform, in Division 5 of the Circuit Court of the County of Jefferson, Missouri, on Thursday, August 13, 2020 at 10:30 a.m., or as soon thereafter as may be heard.

Respectfully submitted,

**EVANS & DIXON, L.L.C.**

By:  /s/ Brian R. Shank
Brian R. Shank (#59955)
211 North Broadway, Suite 2500
St. Louis, MO  63102
Phone:   (314) 621-7755
Fax:       (314) 621-3136
bshank@evans-dixon.com
Attorneys for defendants

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 29th day of June, 2020.

  /s/ Brian R. Shank

4485874

Exhibit A

Electronically Filed - Jefferson - July 01, 2020 - 10:56 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No.: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. D/B/A BIG DOG | ) | Division No.: 5 |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR TRIAL SETTING

Comes now plaintiff Ben Scofield, by and through his undersigned counsel and respectfully moves this Court make and enter its order setting the above styled cause of action for trial as a number one setting.

Respectfully submitted,

**LAW OFFICE OF DANIEL T. RYAN, LLC**

By:     __/S/Daniel T. Ryan_____
Daniel T. Ryan, #38744
Attorney for Plaintiff
3008 Sutton Blvd., Suite 100
Maplewood, MO 63143
314.222.7717
314.932.2688 (facsimile)
dan@danryanlawoffice.com

Attorney for plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 1st day of July, 2020.

   /s/ Daniel T. Ryan_____

Exhibit A

Electronically Filed - Jefferson - July 01, 2020 - 10:58 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No.: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. D/B/A BIG DOG | ) | Division No.: 5 |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF HEARING

Comes now plaintiff Ben Scofield, by and through his undersigned counsel, and gives

notice that it will call its Motion for Trial Setting and Scheduling Order for hearing via Zoom video

platform, in Division 5 of the Circuit Court of the County of Jefferson, Missouri, on Thursday,

August 13, 2020 at 10:30 a.m., or as soon thereafter as may be heard.

Respectfully submitted,

**LAW OFFICE OF DANIEL T. RYAN, LLC**

By:     __/S/Daniel T. Ryan_____
Daniel T. Ryan, #38744
Attorney for Plaintiff
3008 Sutton Blvd., Suite 100
Maplewood, MO  63143
314.222.7717
314.932.2688 (facsimile)
dan@danryanlawoffice.com

Attorney for plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was filed electronically with the Clerk of the
Court to be served on all parties of record by operation of the Court's electronic filing system on
this 1st day of July, 2020.

__/s/ Daniel T. Ryan_____

Exhibit A

Electronically Filed - Jefferson - July 07, 2020 - 02:19 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. and BUCHHEIT | ) | |
| OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

Come now defendants, and state that on the 7th day of July, 2020, a copy in Word format

of their expert interrogatories and requests for production were sent by electronic mail to:

dan@danryanlawoffice.com.

Respectfully submitted,

**EVANS & DIXON, L.L.C.**

By: /s/ Brian R. Shank
    Brian R. Shank (#59955)
    211 North Broadway, Suite 2500
    St. Louis, MO  63102
    Phone:    (314) 621-7755
    Fax:        (314) 621-3136
    bshank@evans-dixon.com
    Attorneys for defendants

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this document was filed electronically with the Clerk of the
Court to be served on all parties of record by operation of the Court's electronic filing system on
this 7th day of July, 2020.

    /s/ Brian R. Shank

4498074

Exhibit A

Electronically Filed - Jefferson - July 07, 2020 - 03:26 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. and BUCHHEIT | ) | |
| OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RE-NOTICE OF TAKING DEPOSITION**
***DUCES TECUM* OF WILLIAM CARDEN**

TO:   LAW OFFICE OF DANIEL T. RYAN, LLC
DANIEL T. RYAN, #38744
3008 Sutton Blvd., Suite 100
Maplewood, MO 63143
T: (314) 222-7717
dan@danryanlawoffice.com

PLEASE TAKE NOTICE that pursuant to the Local Court Rules, the undersigned attorneys for Defendants, will take the deposition of WILLIAM CARDEN, on ***Wednesday, August 12, 2020 at 10:00 a.m. (EST),*** and continuing thereafter until completed via video conference.

The expert is requested to bring with him to his deposition any and all documents, photographs and videos in his expert file pertaining to the subject matter and to any opinions he intends to offer at trial, all testing materials/data/video pertaining to the subject matter and to any opinions he intends to offer at trial, and all other materials the expert has/will rely upon to formulate an opinion, including all reports, articles/treaties, billing records, the expert's CV, and a list of cases the expert has testified in for the period of the last four years.

Failure to comply with this demand may subject you and the above-named party to this action to such sanctions as the Rules of Court may allow and the Court shall direct.

Exhibit A

Electronically Filed - Jefferson - July 07, 2020 - 03:26 PM

Respectfully submitted,

**EVANS & DIXON, L.L.C.**

By: /s/ Brian R. Shank
    Brian R. Shank (#59955)
    211 North Broadway, Suite 2500
    St. Louis, MO  63102
    Phone:    (314) 621-7755
    Fax:        (314) 621-3136
    bshank@evans-dixon.com
    Attorneys for defendants

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 7th day of July, 2020.

    /s/ Brian R. Shank

4498359

ClarkHill\36755\314761\260120354.v1-7/7/20

Exhibit A

Electronically Filed - Jefferson - July 09, 2020 - 08:30 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**CROSS NOTICE OF VIDEO TAPED TRIAL DEPOSITION
OF WILLIAM CARDEN**

PLEASE TAKE NOTICE that pursuant to the Local Court Rules, the undersigned attorney for Plaintiff, will take the Cross Video Taped Trial Deposition of WILLIAM CARDEN, on *Wednesday, August 12, 2020 at 10:00 a.m. (EST),* and continuing thereafter until completed via video conference.

**CERTIFICATE OF SERVICE**

This is to certify that the above and foregoing document has been served on all counsel of record on this 9th day of July, 2020 via email.

*/s/Daniel T. Ryan*

CC: Magna Legal Service

Exhibit A

Electronically Filed - Jefferson - July 10, 2020 - 02:39 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## **RESPONSE TO MOTION FOR TRIAL SETTING**

COME NOW the undersigned, counsel for Defendants WSTR HOLDINGS, INC. D/B/A

BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., hereby concur

in the relief requested in Plaintiff's Motion for Trial Setting, with the request that the number one

setting for trial not be any sooner than 120 days.

Respectfully submitted,

Motion to be taken up
on 8/13/20 at 1030.

EVANS AND DIXON, L.L.C.

So Ordered:

By: /s/ Brian R. Shank
    Brian R. Shank  (#59955)
    Metropolitan Square
    211 North Broadway, Ste. 2500
    St. Louis, MO 63102
    Phone: (314) 621-7755
    Fax:    (314) 621-3136
    bshank@evans-dixon.com

Jul 10, 2020, 5:04 pm
Victor J. Melenbrink
Circuit Judge, Div. 5

54451\315310\260162128.v1
54451\315310\260162128.v1

Exhibit A

Electronically Filed - Jefferson - July 10, 2020 - 02:39 PM

and

CLARK HILL PLC

MILTON S. KARFIS
Michigan Bar No.  P55673
STEPHANIE I. ANDERSON
Michigan Bar No. P67493
151 South Old Woodward, Ste. 200
Birmingham, MI  48009
Phone:  (313) 965-8802
Fax:  (313) 309-6922
mkarfis@clarkhill.com
sanderson@clarkhill.com

*ATTORNEYS FOR DEFENDANTS
BIG DOG TREESTANDS, INC. AND BUCHHEIT
OF HERCULANEUM, INC.*

## CERTIFICATE OF SERVICE

This is to certify that the above and foregoing document has been served on all counsel of record on this 10th day of July 2020, through the Court's ECF system.

/s/Brian R. Shank_____

54451\315310\260162128.v1
54451\315310\260162128.v1

Exhibit A

Electronically Filed - Jefferson - July 29, 2020 - 02:13 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. and BUCHHEIT | ) | |
| OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of Plaintiff's Answers and Response to Defendant's Expert Interrogatories & Request for Production of Documents were emailed in Word format to bshand@evans-dixon.com, attorney for defendant, this 29th day of July, 2020.

**LAW OFFICE OF DANIEL T. RYAN, LLC**

By:     __/S/Daniel T. Ryan_____

Daniel T. Ryan, #38744

Attorney for Plaintiff

3008 Sutton Blvd., Suite 100

Maplewood, MO  63143

314.222.7717

314.932.2688 (facsimile)

dan@danryanlawoffice.com

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION TO ADMIT ATTORNEY STEPHANIE M. ANDERSON PRO HAC VICE**

COME NOW the undersigned, counsel for Defendants WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., hereby moves the Court for admission of attorney Stephanie M. Anderson, as visiting attorney appearing on behalf of defendants pursuant to Rule 9.03.  In support of said Motion, the undersigned hereby states as follows:

1. Stephanie M. Anderson, is a member in good standing of the Michigan Bar Association and is also admitted to practice before the United States District Court for the Eastern District of Michigan.  Ms. Anderson, nor members of her firm, are under suspension or disbarment by any Court.

2. Ms. Anderson is not under disbarment by the highest Court of any state and is a member of good standing of the Michigan Bar Association.  Ms. Anderson designates the undersigned, Brian R. Shank, a member of the Missouri bar having an office in St. Louis, Missouri, as associate counsel.

ClarkHill\36755\314761\260046146.v1-6/28/20

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

3. A receipt from the Clerk of the Supreme Court acknowledging receipt of $410.00 as required by Rule 6.01(m), Affidavit of Stephanie M. Anderson, and Certificate of Good Standing by Ms. Anderson are attached hereto as Exhibit A.

4. Ms. Anderson agrees by her appearance to comply with the rules of professional conduct as set forth in Rule 4 and understand they are subject to discipline by the courts of this State regarding the above-referenced matter.

5. A proposed order granting the instant motion is attached hereto as Exhibit B.

WHEREFORE, Defendants WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., pray for an Order (a) granting its motion for admission of Stephanie M. Anderson *pro hac vice*; (b) allowing Defendants to appear of record as co-counsel and participate *pro hac vice* before this Court, and (c) granting such other relief as the Court deems proper.

Respectfully submitted,

EVANS AND DIXON, L.L.C.

By: /s/ Brian R. Shank
      Brian R. Shank  (#59955)
      Metropolitan Square
      211 North Broadway, Ste. 2500
      St. Louis, MO 63102
      Phone: (314) 621-7755
      Fax:    (314) 621-3136
      bshank@evans-dixon.com

ClarkHill\36755\314761\260046146.v1-6/28/20

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

and

CLARK HILL PLC

MILTON S. KARFIS
Michigan Bar No.  P55673
STEPHANIE I. ANDERSON
Michigan Bar No. P67493
151 South Old Woodward, Ste. 200
Birmingham, MI  48009
Phone:  (313) 965-8802
Fax:  (313) 309-6922
mkarfis@clarkhill.com
sanderson@clarkhill.com

*ATTORNEYS FOR DEFENDANTS*
*BIG DOG TREESTANDS, INC. AND BUCHHEIT*
*OF HERCULANEUM, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 30th day of July, 2020.

  /s/ Brian R. Shank

4532303

ClarkHill\36755\314761\260046146.v1-6/28/20

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## **AFFIDAVIT OF ATTORNEY STEPHANIE M. ANDERSON**

STATE OF MICHIGAN   )
                     )ss.
COUNTY OF OAKLAND)

Before me, the undersigned authority, personally appeared attorney STEPHANIE M. ANDERSON, who, first duly sworn, upon her oath and as an officer of Michigan state and federal court, affirms and deposes as follows:

1.  My name is STEPHANIE M. ANDERSON.  I am a practicing attorney in the State of Michigan, an officer of the Michigan state and certain Federal Courts, and fully competent to give this Affidavit.

2.  That I am a resident of the State of Michigan, and a Senior Attorney of the law firm of CLARK HILL, P.L.C., with a business address of 151 South Old Woodward Avenue, Ste. 200, Birmingham, Michigan 48009.

3.  The undersigned is admitted to practice in the State of Michigan, admitted in 2004; the United States District Court for the Eastern District of Michigan, admitted in 2004; the

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

United States District Court for the Central District of Illinois, admitted in 2011; the United States District Court for the Western District of Tennessee, admitted in 2014; United States District Court for the Eastern District of Wisconsin, admitted in 2014; United States District Court Northern District of Florida, admitted in 2014; and United States District Court Northern District of Ohio, admitted in 2014; United States District Court for the Southern District of Indiana, admitted in 2016; United States District Court for the Southern District of Iowa, admitted in 2016; United States District Court for the Eastern District of Missouri, admitted in 2016; United States District Court for the Northern District of New York, admitted in 2016; United States District Court for the Eastern District of Oklahoma, admitted in 2016; United States District Court for the Western District of New York, admitted in 2017; and United States District Court for the Western District of Michigan, admitted in 2017.

4.   That affiant is not currently suspended, disbarred or subject to disciplinary proceedings in any court.

5.   That affiant has been retained by Defendants, WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., in the above-entitled cause of action to act as co-counsel with current counsel of record, attorney BRIAN R. SHANK, licensed to practice in the State of Missouri, under Missouri Bar No 59955, and a member of good standing with the Missouri Bar Association, and a member of the law firm of EVANS & DIXON, with a business address of Metropolitan Square, 211 North Broadway, Ste. 2500, St. Louis, MO 63102.

6.   That affiant has filed her entry of Appearance in the above-entitled cause of action simultaneously herewith, and agrees to comply with the Rules of Professional Conduct

2

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

as set forth in Rule 4 of the Missouri Supreme Court Rules, and become subject to discipline by the courts of this state.

Further affiant sayeth not.

STEPHANIE M. ANDERSON

**AFFIANT**

In witness whereof, I have hereunto subscribed my name and affixed my official seal this 9th day of July, 2020.

JENNIFER R. HOWARD
Notary Public
State of Michigan, County of Lapeer
Acting in County of Oakland
My Commission Expires:  8-3-26

JENNIFER R. HOWARD
NOTARY PUBLIC, STATE OF MI
COUNTY OF LAPEER
MY COMMISSION EXPIRES Aug 3, 2026
ACTING IN COUNTY OF Oakland

3

Exhibit A

This is an official document issued by the State Bar of Michigan and will be valid for 45 days from the date on this certificate. While the State Bar of Michigan operates under the advisement of government officials during the COVID-19 pandemic, Certificates of Good Standing will only be issued in this manner and sent by email. No paper copies will be issued or mailed until further notice.

# State Bar of Michigan

## Certificate of Good Standing

This certifies that Stephanie I. Marino Anderson, P67493 of Birmingham, Michigan is an active member of the State Bar of Michigan in good standing.

He/She was admitted to practice in Michigan on November 9, 2004 in Macomb County and became a member of the State Bar of Michigan on November 15, 2004.

Janet K. Welch, Executive Director
June 29, 2020

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM



**CLERK OF THE SUPREME COURT**
**STATE OF MISSOURI**
**POST OFFICE BOX 150**
**JEFFERSON CITY, MISSOURI**
65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

June 23, 2020

*This will hereby acknowledge receipt of $820 as required by*
*Rule 6.01(m) for Milton S. Karfis and Stephanie M. Anderson,*
*appearing in Scofield v. WSTR Holdings, Inc. d/b/a Big Dog*
*Treestands, Inc. and Buchheit of Herculaneum, Inc., Case No.*
*20JE-CC00277, before the Circuit Court of Jefferson County,*
*State of Missouri.*

Betsy AuBuchon, Clerk

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION TO ADMIT ATTORNEY MILTON S. KARFIS PRO HAC VICE**

COME NOW the undersigned, counsel for Defendants WSTR HOLDINGS, INC. D/B/A

BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., hereby moves

the Court for admission of attorney Milton S. Karfis, as visiting attorney appearing on behalf of

defendants pursuant to Rule 9.03.  In support of said Motion, the undersigned hereby states as

follows:

1.  Milton S. Karfis, is a member in good standing of the Michigan Bar Association and is

    also admitted to practice before the United States District Court for the Eastern District

    of Michigan.  Mr. Karfis, nor members of his firm, are under suspension or disbarment

    by any Court.

2.  Mr. Karfis is not under disbarment by the highest Court of any state and is a member

    of  good  standing  of  the  Michigan  Bar  Association.   Mr.  Karfis  designates  the

    undersigned, Brian R. Shank, a member of the Missouri bar having an office in St.

    Louis, Missouri, as associate counsel.

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

3.  A receipt from the Clerk of the Supreme Court acknowledging receipt of $410.00 as required by Rule 6.01(m), Affidavit of Milton S. Karfis, and Certificate of Good Standing by Mr. Karfis are attached hereto as Exhibit A.

4.  Mr. Karfis agrees by his appearance to comply with the rules of professional conduct as set forth in Rule 4 and understand they are subject to discipline by the courts of this State regarding the above-referenced matter.

5.  A proposed order granting the instant motion is attached hereto as Exhibit B.

WHEREFORE, Defendants WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., pray for an Order (a) granting its motion for admission of Milton S. Karfis *pro hac vice*; (b) allowing Defendants to appear of record as co-counsel and participate *pro hac vice* before this Court, and (c) granting such other relief as the Court deems proper.

Respectfully submitted,

EVANS AND DIXON, L.L.C.

By: /s/ Brian R. Shank
    Brian R. Shank  (#59955)
    Metropolitan Square
    211 North Broadway, Ste. 2500
    St. Louis, MO 63102
    Phone: (314) 621-7755
    Fax:    (314) 621-3136
    bshank@evans-dixon.com

ClarkHill\36755\314761\260046115.v1-6/28/20

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

and

CLARK HILL PLC

MILTON S. KARFIS
Michigan Bar No.  P55673
STEPHANIE I. ANDERSON
Michigan Bar No. P67493
151 South Old Woodward, Ste. 200
Birmingham, MI  48009
Phone:  (313) 965-8802
Fax:  (313) 309-6922
mkarfis@clarkhill.com
sanderson@clarkhill.com

*ATTORNEYS FOR DEFENDANTS
BIG DOG TREESTANDS, INC. AND BUCHHEIT
OF HERCULANEUM, INC.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 30th day of July, 2020.

  /s/ Brian R. Shank

4532283

ClarkHill\36755\314761\260046115.v1-6/28/20

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF ATTORNEY MILTON S. KARFIS

STATE OF MICHIGAN    )
                     )ss.
COUNTY OF OAKLAND)

Before me, the undersigned authority, personally appeared attorney MILTON S. KARFIS, who, first duly sworn, upon his oath and as an officer of Michigan state and federal court, affirms and deposes as follows:

1. My name is MILTON S. KARFIS.  I am a practicing attorney in the State of Michigan, an officer of the Michigan state and certain Federal Courts, and fully competent to give this Affidavit.

2. That I am a resident of the State of Michigan, and a Member of the law firm of CLARK HILL, P.L.C., with a business address of 151 South Old Woodward Avenue, Ste. 200, Birmingham, Michigan 48009.

3. The undersigned is admitted to practice in the State of Michigan, admitted in 1996; the United States District Court for the Eastern District of Michigan, admitted in 1996;

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

U.S. Court of Appeals, Sixth Circuit, admitted in 1998; the United States District Court for the Western District of Michigan in 2006; the United States District Court for the Northern District of New York, admitted in 2010; the United States District Court for the Central District of Illinois, admitted in 2011; the United States District Court for the Western District of Tennessee, admitted in 2013; United States District Court for the Western District of New York, admitted in 2014; United States District Court for the Eastern District of Missouri, admitted in 2014; U.S. Court of Appeals, Tenth Circuit, admitted in 2015; U.S. Court of Appeals, Fifth Circuit, admitted in 2015; United States District Court Northern District of Alabama, admitted in 2015; United States District Court for the Western District of Oklahoma, admitted in 2016; United States District Court for the Eastern District of Oklahoma, admitted in 2016; U.S. Court of Appeals, Third Circuit, admitted in 2016; United States District Court for the Eastern District of Pennsylvania, admitted in 2017; and United States District Court for the Western District of Pennsylvania, admitted in 2017.

4. That affiant is not currently suspended, disbarred or subject to disciplinary proceedings in any court.

5. That affiant has been retained by Defendants, WSTR HOLDINGS, INC. D/B/A BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., in the above-entitled cause of action to act as co-counsel with current counsel of record, attorney BRIAN R. SHANK, licensed to practice in the State of Missouri, under Missouri Bar No 59955, and a member of good standing with the Missouri Bar Association, and a member of the law firm of EVANS & DIXON, with a business address of Metropolitan Square, 211 North Broadway, Ste. 2500, St. Louis, MO 63102.

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

address of Metropolitan Square, 211 North Broadway, Ste. 2500, St. Louis, MO 63102.

6. That affiant has filed his entry of Appearance in the above-entitled cause of action simultaneously herewith, and agrees to comply with the Rules of Professional Conduct as set forth in Rule 4 of the Missouri Supreme Court Rules, and become subject to discipline by the courts of this state.

Further affiant sayeth not.

MILTON S. KARFIS

**AFFIANT**

In witness whereof, I have hereunto subscribed my name and affixed my official seal this 28th day of July, 2020.

JENNIFER R. HOWARD
Notary Public
State of Michigan, County of Lapeer
Acting in County of Oakland
My Commission Expires: 8-3-26

ClarkHill\367593\14761\260046128.v1-7/6/20

Exhibit A

This is an official document issued by the State Bar of Michigan and will be valid for 45 days from the date on this certificate. While the State Bar of Michigan operates under the advisement of government officials during the COVID-19 pandemic, Certificates of Good Standing will only be issued in this manner and sent by email. No paper copies will be issued or mailed until further notice.

# State Bar of Michigan

## Certificate of Good Standing

This certifies that Milton S. Karfis, P55673 of Birmingham, Michigan is an active member of the State Bar of Michigan in good standing.

He/She was admitted to practice in Michigan on November 12, 1996 in Wayne County and became a member of the State Bar of Michigan on November 14, 1996.

Janet K. Welch, Executive Director
June 29, 2020

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM



## CLERK OF THE SUPREME COURT
### STATE OF MISSOURI
### POST OFFICE BOX 150
### JEFFERSON CITY, MISSOURI
65102

BETSY AUBUCHON
CLERK

TELEPHONE
(573) 751-4144

June 23, 2020

*This will hereby acknowledge receipt of $820 as required by Rule 6.01(m) for Milton S. Karfis and Stephanie M. Anderson, appearing in Scofield v. WSTR Holdings, Inc. d/b/a Big Dog Treestands, Inc. and Buchheit of Herculaneum, Inc., Case No. 20JE-CC00277, before the Circuit Court of Jefferson County, State of Missouri.*

Betsy AuBuchon, Clerk

Exhibit A

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

BEN SCOFIELD,                          )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )          Cause No: 20JE-CC00277
                                       )
WSTR HOLDINGS, INC. d/b/a BIG DOG      )
TREESTANDS, INC.                       )
                                       )
and                                    )
                                       )
BUCHHEIT OF HERCULANEUM, INC.          )
                                       )
        Defendants.                    )

**ORDER GRANTING DEFENDANTS' CONSENT MOTION
TO ADMIT ATTORNEY STEPHANIE M. ANDERSON *PRO HAC VICE***

By consent, and being fully advised in the premises, the motion of defendant seeking *pro hac* admission of attorney Stephanie M. Anderson on behalf of defendants WSTR HOLDINGS, INC. d/b/a BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., is hereby granted.

SO ORDERED:


Dated: _____        _____
                               Judge


ClarkHill\36755\314761\260046139.v1-6/28/20

Exhibit B

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' CONSENT MOTION
## TO ADMIT ATTORNEY MILTON S. KARFIS *PRO HAC VICE*

By consent, and being fully advised in the premises, the motion of defendant seeking *pro hac* admission of attorney Milton S. Karfis on behalf of defendants WSTR HOLDINGS, INC. d/b/a BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., is hereby granted.

SO ORDERED:

Dated: _____          _____
                                  Judge

4532289

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' CONSENT MOTION**
**TO ADMIT ATTORNEY STEPHANIE M. ANDERSON *PRO HAC VICE***

By consent, and being fully advised in the premises, the motion of defendant seeking *pro hac* admission of attorney Stephanie M. Anderson on behalf of defendants WSTR HOLDINGS, INC. d/b/a BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., is hereby granted.

SO ORDERED:

Dated: _____          _____   **J5**

*Jul 31, 2020, 11:58 am*

Judge

Exhibit B

Electronically Filed - Jefferson - July 30, 2020 - 09:13 AM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

BEN SCOFIELD,                          )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )        Cause No: 20JE-CC00277
                                       )
WSTR HOLDINGS, INC. d/b/a BIG DOG      )
TREESTANDS, INC.                       )
                                       )
and                                    )
                                       )
BUCHHEIT OF HERCULANEUM, INC.          )
                                       )
        Defendants.                    )

## ORDER GRANTING DEFENDANTS' CONSENT MOTION
## TO ADMIT ATTORNEY MILTON S. KARFIS *PRO HAC VICE*

By consent, and being fully advised in the premises, the motion of defendant seeking *pro hac* admission of attorney Milton S. Karfis on behalf of defendants WSTR HOLDINGS, INC. d/b/a BIG DOG TREESTANDS, INC. and BUCHHEIT OF HERCULANEUM, INC., is hereby granted.

                        SO ORDERED:

                        _____ **J5**
                        Jul 31, 2020, 11:58 am

Dated: _____
                        _____
                        Judge

4532289

Exhibit B

Electronically Filed - Jefferson - September 17, 2020 - 01:25 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

## **SCHEDULING ORDER**

COME NOW the Parties, by consent, and submit the following deadlines as requested by the Court.

1. This matter is set for a jury trial on **October 4, 2021**. Trial is expected to last one week. This trial date may only be amended by leave of Court for good cause shown.

2. Discovery cutoff on or before **May 14, 2021**.

3. Plaintiff shall disclose all retained and non-retained experts on or before **March 26, 2021**.

4. Plaintiff shall produce all retained and non-retained experts for deposition on or before **April 23, 2021**.

5. Defendants shall disclose all retained and non-retained experts on or before **May 21, 2021**.

6. Defendants shall produce all retained and non-retained experts for deposition on or before **June 18, 2021**.

7. All dispositive motions shall be filed on or before **July 16, 2021**.

8. The parties shall participate in mediation on or before **August 20, 2021**.

Exhibit A

Electronically Filed - Jefferson - September 17, 2020 - 01:25 PM

9.   The Parties agree to work with each other and the Court to set pre-trial deadlines related to exhibit lists, witness lists, written discovery designations, deposition designations, motions in limine, and jury instructions.

10. The Parties agree the dates set forth in this Second Amended Scheduling Order by Consent, except for trial date, may be amended by agreement of the Parties, or may be amended by leave of Court for good cause shown.

**IT IS SO ORDERED.**


_____                    _____
Date                                   Judge Victor Melenbrink, Circuit Court Judge


                                       Respectfully submitted,

                                       EVANS AND DIXON, L.L.C.

                                   By: /s/ Brian R. Shank
                                       Brian R. Shank  (#59955)
                                       Metropolitan Square
                                       211 North Broadway, Ste. 2500
                                       St. Louis, MO 63102
                                       Phone: (314) 621-7755
                                       Fax:    (314) 621-3136
                                       bshank@evans-dixon.com

                                       and

                                       CLARK HILL PLC

                                       MILTON S. KARFIS
                                       Michigan Bar No.  P55673
                                       STEPHANIE I. ANDERSON
                                       Michigan Bar No. P67493
                                       151 South Old Woodward, Ste. 200
                                       Birmingham, MI  48009
                                       Phone:  (313) 965-8802
                                       Fax:  (313) 309-6922

Exhibit A

Electronically Filed - Jefferson - September 17, 2020 - 01:25 PM

mkarfis@clarkhill.com
sanderson@clarkhill.com

*ATTORNEYS FOR DEFENDANTS*
*BIG DOG TREESTANDS, INC. AND BUCHHEIT*
*OF HERCULANEUM, INC.*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 17th day of September, 2020.

/s/Brian R. Shank_____

4592652

Exhibit A

Electronically Filed - Jefferson - September 17, 2020 - 01:25 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## **PROPOSED ORDER**

Defendant Buchheit of Herculaneum, Inc.'s motion to dismiss is called, heard, and granted for the reasons stated on the record.

It is hereby ORDERED that Defendant Buchheit of Herculaneum, Inc. is dismissed pursuant to the Innocent Seller Statute Sec. 537.762 from the pending action.

IT IS SO ORDERED.

_____          _____
Date                                                              Victor Joseph Melenbrink, Circuit Court Judge

Exhibit A

Electronically Filed - Jefferson - September 17, 2020 - 01:25 PM

Respectfully submitted,

EVANS AND DIXON, L.L.C.

By:  /s/ Brian R. Shank
     Brian R. Shank  (#59955)
     Metropolitan Square
     211 North Broadway, Ste. 2500
     St. Louis, MO 63102
     Phone: (314) 621-7755
     Fax:    (314) 621-3136
     bshank@evans-dixon.com

     and

     CLARK HILL PLC

     MILTON S. KARFIS
     Michigan Bar No.  P55673
     STEPHANIE I. ANDERSON
     Michigan Bar No. P67493
     151 South Old Woodward, Ste. 200
     Birmingham, MI  48009
     Phone:  (313) 965-8802
     Fax:  (313) 309-6922
     mkarfis@clarkhill.com
     sanderson@clarkhill.com

     *ATTORNEYS FOR DEFENDANTS*
     *BIG DOG TREESTANDS, INC. AND BUCHHEIT*
     *OF HERCULANEUM, INC.*

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 17th day of September, 2020.

     /s/Brian R. Shank

4592639

Exhibit A

Electronically Filed - Jefferson - September 17, 2020 - 01:25 PM

IN THE CIRCUIT COURT FOR THE 23RD JUDICIAL CIRCUIT
JEFFERSON COUNTY, MISSOURI

| | | |
|---|---|---|
| BEN SCOFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No: 20JE-CC00277 |
| | ) | |
| WSTR HOLDINGS, INC. d/b/a BIG DOG | ) | |
| TREESTANDS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUCHHEIT OF HERCULANEUM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## **PROPOSED ORDER**

Defendant Buchheit of Herculaneum, Inc.'s motion to dismiss is called, heard, and granted for the reasons stated on the record.

It is hereby ORDERED that Defendant Buchheit of Herculaneum, Inc. is dismissed pursuant to the Innocent Seller Statute Sec. 537.762 from the pending action.

IT IS SO ORDERED.

_____
Date

*Oct 30, 2020, 8:45 am* **J5**
_____
Victor Joseph Melenbrink, Circuit Court Judge

Clerk note: Claims are still pending against other
defendants.

Exhibit A

Electronically Filed - Jefferson - September 17, 2020 - 01:25 PM

Respectfully submitted,

EVANS AND DIXON, L.L.C.

By:  /s/ Brian R. Shank
     Brian R. Shank  (#59955)
     Metropolitan Square
     211 North Broadway, Ste. 2500
     St. Louis, MO 63102
     Phone: (314) 621-7755
     Fax:    (314) 621-3136
     bshank@evans-dixon.com

     and

     CLARK HILL PLC

     MILTON S. KARFIS
     Michigan Bar No.  P55673
     STEPHANIE I. ANDERSON
     Michigan Bar No. P67493
     151 South Old Woodward, Ste. 200
     Birmingham, MI  48009
     Phone:  (313) 965-8802
     Fax:  (313) 309-6922
     mkarfis@clarkhill.com
     sanderson@clarkhill.com

     *ATTORNEYS FOR DEFENDANTS*
     *BIG DOG TREESTANDS, INC. AND BUCHHEIT*
     *OF HERCULANEUM, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was filed electronically with the Clerk of the Court to be served on all parties of record by operation of the Court's electronic filing system on this 17th day of September, 2020.

     /s/Brian R. Shank

4592639

Exhibit A